**BATHAEE DUNNE LLP**
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (CA 345965)
awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel.: (213) 462-2772

*Attorneys for Plaintiffs and the
Proposed Classes*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| JONATHAN DAY and MICHELLE DOBEK, individually and on behalf of all others similarly situated, | Case No. 3:22-cv-04305-VC |
| Plaintiffs, | **THIRD AMENDED CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| ADVANCED MICRO DEVICES, INC., a Delaware corporation, | |
| Defendant. | |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

PARTIES ........................................................................................................................... 8

I.  PLAINTIFFS ............................................................................................................. 8

II.  DEFENDANT ......................................................................................................... 12

JURISDICTION AND VENUE ..................................................................................... 15

DIVISIONAL ASSIGNMENT ....................................................................................... 15

FACTS .............................................................................................................................. 16

I.  THE TRUSTED PLATFORM MODULE (TPM) .................................................. 16

    A.  The Advent of TPM ..................................................................................... 16

    B.  The TPM as an External System .................................................................. 18

II.  MICROSOFT FORCES TPM ADOPTION AS PART OF WINDOWS 11 .......... 21

    A.  The Growing Risk of Firmware Attacks and the Need for Hardware Security Solutions ................................................................................................... 21

    B.  The Onslaught of Firmware Attacks ........................................................... 23

    C.  Microsoft Requires a TPM to Run Windows 11 ......................................... 27

III.  AMD IMPLEMENTS A DEFEAT DEVICE—A FIRMWARE TPM BUILT ON A PLATFORM WITH DIRECT ACCESS TO PRIVILEGED SYSTEM RESOURCES ............ 30

    A.  The AMD Platform Security Processor ....................................................... 30

    B.  AMD Shoehorns a Software-Based TPM into the PSP as Firmware ........... 33

IV.  AMD'S FLAWED DESIGN RESULTS IN PLAYBACK AND GAMING STUTTERING .... 35

    A.  AMD-Based System Users Flood the Internet with Complaints of Stuttering When Watching Video, Listening to Music, Playing Video Games, and Even Videoconferencing ................................................................................................ 35

    B.  AMD's Forums Receive Repeated Complaints of Stuttering ......................... 49

    C.  AMD Acknowledges the Stuttering Problem and Recommends Its Users Purchase Hardware TPMs as a "Workaround" ................................................................ 50

    D.  The Stuttering Was Caused by a Serious Design Flaw that Cannot Be Fixed through a Firmware Update ................................................................................................. 52

V.  AMD'S STATEMENTS ABOUT ITS CPUS ........................................................ 53

    A.  Gaming, Video, and Audio Playback .......................................................... 54

    B.  Videoconferencing ...................................................................................... 56

    C.  Security and Windows 11 Compatibility ..................................................... 58

D. AMD Markets Its Defective CPUs As Specially Adapted for Gaming and Media on Third-Party Websites, Including Amazon.com ................................................ 61

E. AMD Made False Statements About "Multi-tasking" Performance .............................. 64

VI. AMD'S DESIGN DEFECT INJURED PLAINTIFFS' AND CLASS MEMBERS' PROPERTY—THEIR PCS ............................................................................. 65

VII. AMD KNEW THAT ITS CPUS WERE DEFECTIVE WHEN IT SOLD THEM TO PLAINTIFFS AND CLASS MEMBERS ................................................................. 69

A. AMD Gleaned Knowledge of the Defect from Testing, including in Collaboration with Microsoft ............................................................................................ 69

B. AMD Knew about the Design Defect as a Result of User Complaints ........................ 71

C. AMD Knew Its Defective Design of the fTPM as Part of the PSP Made Its CPUs Vulnerable to Firmware Attacks ............................................................... 76

CLASS ACTION ALLEGATIONS ................................................................... 77

CHOICE OF LAW ............................................................................... 84

CLAIMS FOR RELIEF ........................................................................... 84

A. Nationwide Claims (based on California Law) ............................................ 84

B. Claims Brought in the Alternative on Behalf of the Illinois Subclass .......................... 104

C. Claims Brought in the Alternative on Behalf of the West Virginia Class .................... 108

LACK OF ADEQUATE REMEDIES AT LAW ......................................................... 113

PRAYER FOR RELIEF .......................................................................... 115

JURY DEMAND ................................................................................ 116

**INTRODUCTION**

1.     Watching videos, listening to music or other audio, videoconferencing, and playing games are key—indeed, indispensable—activities on modern personal computers (PCs). It is no stretch to say that in 2022,[1] a desktop or laptop PC that can't play video or audio, or run videoconferencing software, or render a computer game, without experiencing intrusive stuttering, is unworthy of sale.

2.     So, too, is a baseline level of hardware security—one recognized by Microsoft as necessary to mitigate the risk and effect of devastating firmware attacks—a central part of the baseline bargain expected by modern PC users. In a world in which virtually every aspect of an American's life is performed at least in part through their computer, a desktop or laptop that is uniquely vulnerable to known, crippling attack vectors is not a computer that consumers seek to buy—or build.

3.     Yet Defendant Advanced Micro Devices, Inc. ("AMD") makes, markets, and sells defective CPUs that, when placed in an otherwise healthy PC build, create exactly these types of serious flaws—flaws that run contrary to the basic, expected bargain made by a CPU purchaser. Numerous AMD CPUs—specifically, AMD Ryzen and Athlon CPUs that have so-called "firmware TPM" ("fTPM") modules embedded within them—include a design defect that causes invasive stuttering in audio and video playback, during videoconferencing, and while playing games. At the same time, this design defect renders consumers' computers that incorporate these CPUs uniquely vulnerable to catastrophic firmware attacks—despite the fact that a TPM is, by its very nature, supposed to *defend* against such attacks.

4.     AMD, however, does not acknowledge any of this. Instead, on its website and elsewhere AMD specifically markets its Ryzen and Athlon CPUs as especially suited for watching video, for videoconferencing, and for gaming. AMD also touts these processors' "multi-layered," "built from the ground up" security.

5.     The Plaintiffs in this case each purchased AMD processors that include AMD's defective fTPM design, then incorporated them into PCs. As a result of the defective AMD processors—and contrary to the basic bargain proposed to them by AMD, including through its marketing—Plaintiffs have

---

[1] This statement was true in 2022, when this case was originally filed, and remains true today.

all experienced severe stuttering in media playback; in videoconferencing; and/or in gameplay. Their computers are, because of the presence of a defective AMD CPU purchased by the Plaintiffs, also uniquely vulnerable to firmware attacks that could compromise not just Plaintiffs' computers, but potentially their home or business networks. The AMD fTPM design defect and its manifestations have significantly—perhaps totally—impaired the value of Plaintiffs' PCs, as they are unfit for their intended use, and their resale value is crippled. Despite this—and despite growing complaints about the performance of AMD-based computers in AMD forums and across the Internet—AMD has not fixed or replaced its defective CPUs.

6.      Plaintiffs and those similarly situated—*i.e.*, other persons who have purchased defective AMD CPUs, which have harmed Plaintiffs' PCs by their presence—bring this lawsuit against AMD in order to be made whole.

* * *

7.      AMD designs, manufactures, and sells CPUs—branded as AMD Ryzen and AMD Athlon—for desktop and laptop personal computers. On its website (amd.com) and elsewhere, including the so-called "AMD Store" on Amazon.com, AMD touts its CPUs, including specifically its Ryzen processors, as providing smooth playback of audio and video, videoconferencing, and gameplay.



8.      AMD states that its Ryzen CPUs are "[f]or gamers and content creators alike," and markets its processors with statements like "EXTREME GAMING . . . OPTIMIZED FOR AMD."





9.      AMD also advertises and markets the security features of its Ryzen and Athlon CPUs, including their compliance with the security requirements of the leading PC operating system, Microsoft Windows 11. AMD Ryzen and Athlon CPUs are specifically designed to be incorporated into x86-type computers running Windows, and advertised and sold for use in that context and purpose.

10.      In June 2021, in response to a striking increase in so-called "firmware attacks"—devastating cyberattacks that allow an attacker to compromise low-level CPU, memory, and hardware resources of computer before an operating system even loads—the leading operating system maker, Microsoft, resolved to act. Specifically, Microsoft decided to require, as a precondition for running its

upcoming operating system Windows 11, a specific piece of hardware designed to separate sensitive cryptographic and other security-related resources from the main CPU and system memory—a Trusted Platform Module ("TPM").

11.     Because a TPM was a separate hardware device from the system's CPU, it could protect important computer security resources—such as the system's random number generator and private keys used for encryption—from being compromised. That is, even if the system's CPU, memory, and operating system had been attacked, the secrets stored in the TPM would remain safe. For Microsoft, requiring a TPM meant implementing a broad-based minimum level of security that was uniform and consistent with a detailed specification, called the TPM 2.0 standard.

12.     This TPM requirement was not entirely out of left field. Microsoft had been discussing such a requirement to run Windows as far back as the run-up to Windows 10, when Microsoft pushed Original Equipment Manufacturers (OEMs) preinstalling Windows 10 to ship TPMs with their computers, but had stopped short of requiring a TPM to run Windows. However, as Windows 11 was being developed, it became clear that Microsoft would actually require a TPM for its next operating system—a necessity after a series of devastating firmware attacks had rocked the Windows-compatible PC ecosystem in the years since Windows 10's introduction in 2015.

13.     AMD, whose Ryzen and Athlon processors are specifically designed for and principally used in PCs running Windows (which among other things runs the games, media, and videoconferencing programs and platforms desired to be used by AMD CPU purchasers), accordingly faced a new and significant design requirement for its CPUs.

14.     Faced with a potentially burdensome redesign, AMD implemented what was essentially a defeat device for Microsoft's new TPM requirement: a "firmware TPM," or simply "fTPM." Not an actual TPM—*i.e.*, a discrete piece of hardware to protect and segregate security-sensitive information and operations from the main system processor and memory—in any historical or computer security sense, AMD's fTPM was simply a piece of code that announced itself to the system (and critically, to Windows 11) as a "TPM." AMD implemented this firmware "TPM" as part of its Platform Security Processor (PSP)—an ARM-based embedded processor within the overall AMD CPU package. The PSP

had direct access to sensitive and privileged CPU and memory resources, and as such, so did the fTPM module AMD had incorporated within it.

15.     Implementing fTPM as part of the AMD PSP subsystem meant that the co-processor that ran that subsystem would be further taxed, sharing resources and memory with the fTPM. A micro-operating system called a Trusted Execution Environment ("TEE") sliced the PSP subsystem's scarce resources between the fTPM and numerous other firmware-based systems that ran as part of the PSP, including, for example, DRM software that enables the decryption of streaming video and/or audio.

16.     Not only did AMD's fTPM design ironically implement a security module designed to prevent firmware attacks *in the firmware itself*, it did so in a way that exposed sensitive system resources to the fTPM—by placing it as a firmware module within the PSP. At the same time, given Windows 11's new TPM requirement, AMD could simply ensure that fTPM—a piece of code that tells the operating system it's a TPM—was enabled on its CPUs, and this would satisfy Windows 11's security checks.

17.     Of course, the fTPM merely checked a box for Windows 11—it was not an *actual* Trusted Platform Module because it was a firmware TPM implemented as part of the PSP. Indeed, AMD's fTPM not only failed to accomplish the very reason for being of a TPM—hardware segregation of cryptographic keys and other security-sensitive information from system resources, the CPU, and system memory, which reduces the risk and effect of firmware attacks—it made the problem of firmware attacks *worse*.

18.     Compromising AMD's PSP subsystem, which hackers had repeatedly done since at least the end of 2018, now meant potentially compromising all the security-sensitive resources of an entire computer system—all conveniently grouped in one software-based module for the attacker. Incorporating Ryzen or Athlon CPUs with AMD's fTPM into a Windows 11 PC left (and leaves) users *more* vulnerable to firmware attacks, under the guise of bolstering system security and ensuring compliance with Windows 11's system security requirements.

19.     The flawed CPU design had at least two resultant effects on people that bought AMD Ryzen or Athlon CPUs and integrated them into PCs.

20.     *First*, because the fTPM was implemented as part of the PSP, which could directly access system memory and CPU resources, particularly when users' PCs must decrypt audio and video content

(*e.g.*, when streaming video from Netflix), interactions with fTPM meant potentially delaying the function of other systems implemented in the PSP that were required for smooth playback or time-sensitive memory or CPU interactions.

21.     The result was the catastrophic stuttering of playback on Windows-compatible PCs that incorporate AMD Ryzen and Athlon processors. Reports flooded online forums and YouTube channels describing AMD-based PCs stuttering when playing back video, when playing audio, or both. The stuttering also affected videoconferencing—a staple in the post-pandemic work-from-home environment.

22.     And, with respect to gamers, whom AMD directly targets for CPU sales, the defective AMD CPUs would cause a PC to stutter when playing video games. In YouTube video after YouTube video, users showed the stuttering effect in various popular computer games being run (or attempting to run) on AMD-based computers. Despite AMD's promises that its Ryzen and Athlon processors were suitable for ordinary PC uses, such as watching video, listening to music, videoconferencing, and playing games, its AMD CPUs caused the Plaintiffs'—and other similarly situated AMD CPU buyers'—PCs to stutter during these baseline applications.

23.     **Second**, the flawed fTPM design left—and leaves—PCs that built around AMD CPUs uniquely vulnerable to cyberattacks that exploit a PC's firmware. This sort of attack was (and is) especially pernicious, as it allows a hacker to access a computer system's most sensitive resources (*e.g.*, its Basic Input Output System ("BIOS")) before the operating system even comes online. Even though AMD purported to make computer systems built around its CPUs—particularly those running Windows 11—more secure from such attacks, the design of AMD's fTPM in Ryzen and Athlon CPUs did the opposite.

24.     Despite the swelling of complaints over several years that PCs built around AMD's Ryzen and Athlon CPUs had significant stuttering problems, AMD did not order a recall of its Ryzen and Athlon CPUs to replace them with processors without the fTPM design defect, or otherwise provide purchasers with replacement CPUs that did not have the design defect. Indeed, for years AMD refused to even acknowledge any problem. Nonetheless, AMD kept selling defective Ryzen and Athlon CPUs, and

indeed kept making false and misleading statements and omissions about the PCs' functionality and security.

25. On March 8, 2022, the dam broke. AMD finally recognized that there was a problem. AMD explained that systems built around Ryzen or Athlon CPUs running Windows 10 and 11 that enabled its fTPM subsystem would experience "intermittent system sutter[ing]." The release by AMD tersely blamed the stuttering on its CPUs "intermittently perform[ing] extended fTPM-related memory transactions in SPI flash memory ('SPIROM') located on the motherboard," which AMD explained led to "temporary pauses in system interactivity or responsiveness until the transaction is concluded."

26. The problem arose, however, from the flaw in the fTPM's design: it shared resources with the PSP subsystem, including flash memory (such as SPIROM), which in turn had access to the PC's CPU and memory resources. When the fTPM consumed too much of the PSP's scarce processing power and its TEE micro-operating system failed to prioritize time-sensitive needs of the overall PC, this caused the entire system to stutter. This happened in predictable—but critical—circumstances, such as media playback, videoconferencing, or gameplay.

27. The stuttering had (and has) revealed a deep flaw in the AMD Ryzen and Athlon CPUs that AMD sells for incorporation into PCs, specifically for use—per AMD's continuing, express representations—in media playback, videoconferencing, and gameplay.

28. AMD has provided no meaningful fix for the problem, recommending that owners of AMD-based systems buy external hardware TPMs, potentially at significant additional cost. Although AMD previously signaled that firmware updates may be available through individual PC and hardware manufacturers—an issue not helpful for CPU purchasers like Plaintiffs and the proposed Class Members in this action—there appears to be no true fix promised, or (absent recall and replacement) even possible. Indeed, when AMD eventually announced firmware updates through individual motherboard manufacturers, these were rolled out to only a subset of motherboards, were complicated and dangerous to install, and were by their own terms not an assured or complete "fix" to the AMD fTPM's design flaws.

29. The flawed AMD fTPM design, which implemented what should have been—by definition—a segregated hardware module in the CPU's firmware, remained and remains fatally

defective. No fix, absent replacement with non-defective hardware, could cure the security problem that resulted, nor could there be a (non-replacement) fix for the fundamental problem that had caused the stuttering: AMD's fTPM is implemented as part of a PSP subsystem that can and frequently does access a PC's sensitive CPU and memory resources, including for DRM tasks. Moreover, a motherboard-based firmware update for a CPU, even if helpful, is a complicated, sensitive procedure that should be installed and tested by a professional to ensure its safety and effectiveness—the entire point of a recall (which Plaintiffs seek, and AMD has never implemented, for the company's flawed CPUs).

30.     The design flaw in AMD's CPUs leads to two substantial Effects in PCs built around these processors: (1) intrusive stuttering during media playback, videoconferencing, and gameplay; and (2) elevated vulnerability to firmware attacks. Each of these Effects had—and has—a direct and quantifiable demand and price effect on defective AMD CPUs, and on PCs built around these defective CPUs. Based on a pre-complaint statistical conjoint study (described in Section VI of this Complaint), (i) the defective AMD CPUs were worth less at purchase than the price Plaintiffs and Class Members paid for them, resulting in an out-of-pocket loss at purchase; (ii) each Effect caused a diminution in value of PCs built around AMD CPUs owned by Plaintiffs and Class Members; and (iii) these AMD CPUs will remain defective—and the PCs built around them worth less—until AMD recalls and replaces the faulty AMD CPUs in Plaintiffs' and Class Members' PCs.

31.     This lawsuit seeks to recover the out-of-pocket loss for Plaintiffs' and Class Members' AMD CPUs; the diminution in value to Plaintiffs' and Class Members' PCs based on their incorporation of faulty AMD CPUs; and an injunction requiring AMD to recall and replace the defective AMD CPUs that Plaintiffs and Class Members purchased and incorporated into their PCs.

## PARTIES

### I.     PLAINTIFFS

32.     Jonathan Day is a domiciled resident of West Virginia, residing in Huntington. In November 2020, Mr. Day purchased three AMD Ryzen CPUs from Amazon.com.

33.     On or around November 5, 2020, Mr. Day purchased an AMD Ryzen 9 5900X CPU.



34.   On or around November 9, 2020, Mr. Day purchased an AMD Ryzen 5 5600X CPU.



35.   On or around November 17, 2020, Mr. Day purchased an AMD Ryzen 7 5800X CPU.



36.   Mr. Day reviewed and relied on online discussions, reviews, and marketing materials—including on Amazon.com—before deciding on a CPU for his PC. He chose an AMD Ryzen CPU based on materials he read before purchase. These materials stated that the AMD Ryzen CPU had more cores and was specially adapted for multitasking and background processing. Based on Mr. Day's research, the AMD Ryzen 7 processor appeared to be the best choice for his intended PC use of video rendering, photo editing, and moving large files.

37.   Since purchasing his AMD Ryzen CPU and incorporating it into a PC, Mr. Day has frequently experienced stuttering issues and other performance instability, including when playing media and during gameplay.

38.   The stuttering and playback problems are most severe when playing games heavily reliant on the CPU. The stuttering is so severe that it impairs Mr. Day's ability to play even a very old video

game, such as EverQuest, which is a massively multiplayer roleplaying game ("MMORPG") released in March 1999 that relies heavily on the CPU for graphics processing.

39.     The stuttering when playing even this decades-old game is severe enough that it causes Mr. Day to "die" during gameplay because Mr. Day is unable to react to gameplay during a stuttering event. Indeed, for PC users like Mr. Day that play real-time games, particularly massively multiplayer games that cannot be paused, the stuttering endemic to AMD's flawed CPUs render PCs that have incorporated them unusable for gaming. Character "deaths" in these real-time, massively multiplayer games may result in the loss of game items and in-game currency. This is more than a mere inconvenience, but goes to the heart of the intended use of an AMD Ryzen or Athlon CPU for gameplay.

40.     Mr. Day also experiences stuttering while using photo editing software.

41.     None of the representations received and reviewed by Mr. Day contained any disclosure relating to the defectively designed AMD fTPM in the CPU he purchased. None of the representations received and reviewed by Mr. Day disclosed that his AMD CPU would, when integrated into a PC, make that system uniquely vulnerable to firmware attacks, nor that such a system would experience stuttering because of the defectively designed AMD CPU.

42.     Mr. Day would not have purchased his AMD CPU at the price he paid had he known about the AMD fTPM defect described in this Complaint. AMD has not fixed the problems with Mr. Day's CPU attributable to the AMD fTPM defect, including its stuttering during gaming and media playback, and its unique vulnerability to firmware attacks. Mr. Day also experiences the Windows "Blue Screen of Death"—an irrecoverable crash of the Windows operating system—on his computer built around an AMD Ryzen CPU.

43.     Mr. Day's AMD Ryzen CPU is incorporated into an ASUS X570 TUF GAMING X570-PLUS (WI-FI) 4403 motherboard within his PC. On August 7, 2022, Mr. Day updated the BIOS microcode in his motherboard through ASUS, his motherboard supplier. Mr. Day's PC continues to experience the above-described stuttering problems, and remains especially vulnerable to firmware attacks.

44.     Michelle Dobek is a domiciled resident of Illinois, residing in New Lenox. On August 19, 2021, Ms. Dobek purchased an AMD Ryzen 9 processor from Micro Center, an online retailer. Below is a screenshot of the confirmation of Ms. Dobek's purchase from the Micro Center website:

**Order Placed:** Thursday, August 19 2021
**Order Number:** 025-PO-5503616
**Order Total:** $999.73

Items Ordered

| Item Price | Qty | Item Total |
|---|---|---|

- AMD Ryzen 9 5900X Vermeer 3.7GHz 12-Core AM4 Boxed Processor - Heatsink Not Included
- SKU: 195099
- Condition: New
- Transaction #: 25-PO-5503616

45.     Ms. Dobek reviewed and relied upon marketing materials and online reviews concerning the AMD Ryzen CPU prior to purchasing it. She also spoke to sales associates. None of the representations received and reviewed by Ms. Dobek contained any disclosure relating to the defective AMD CPU and onboard fTPM module in her AMD Ryzen processor.

46.     Ms. Dobek purchased her AMD Ryzen 9 CPU for the specific purpose of building a computer capable of high-performance gaming, conducting audio and video calls, streaming audio and video, and running multiple applications at the same time.

47.     Since purchasing her AMD CPU and incorporating it into a PC, Ms. Dobek has experienced stuttering during gaming, video calls, and audio calls nearly every time she uses her computer for these tasks. Ms. Dobek experiences stuttering almost every day that she uses the PC she built around an AMD Ryzen CPU, specifically when using Zoom, when 3D printing, when using AutoCAD, and generally during high-intensity computing tasks involving audiovisual playback and rendering. Ms. Dobek experiences stuttering on an hourly basis when running applications that are CPU-intensive on her AMD Ryzen-based PC.

48.     The stuttering is so invasive that Ms. Dobek purchased an additional Intel-based PC to perform necessary tasks that Ms. Dobek's significantly more expensive AMD-based system (Ms. Dobek

1    paid nearly $1000 for her AMD Ryzen 9 CPU, as shown above) cannot perform without intrusive

2    stuttering.

3        49.    None of the representations received and reviewed by Ms. Dobek disclosed that her AMD

4    CPU would, when integrated into a PC, make that system uniquely vulnerable to firmware attacks, nor

5    that such a system would experience stuttering because of the defectively designed AMD CPU.

6        50.    Ms. Dobek would not have purchased her AMD CPU at the price she paid had she known

7    about the AMD fTPM defect described in this Complaint. AMD has not fixed the problems with Ms.

8    Dobek's CPU attributable to the AMD fTPM defect, including its stuttering during gaming and media

9    playback and its unique vulnerability to firmware attacks.

10       51.    Neither Plaintiff Day nor Plaintiff Dobek knew when they purchased their AMD CPUs

11   that their CPUs were defective and would malfunction (including by intrusively stuttering), that AMD

12   had defectively designed its fTPM as part of the PSP, or that the AMD CPUs the purchased were

13   especially prone to firmware attacks.

14   **II.    DEFENDANT**

15       52.    Defendant Advanced Micro Devices, Inc. ("AMD") is a Santa Clara, California-based

16   corporation incorporated under the laws of Delaware. AMD's headquarters are located at 2485 Augustine

17   Drive, Santa Clara, CA 95054.

18       53.    In a 2016 statement announcing the impending move of its headquarters from nearby

19   Sunnyvale, California, to Santa Clara, AMD noted that "the new headquarters will keep AMD close to

20   key customers, partners, and public transportation options." (*See* https://www.amd.com/en/press-

21   releases/amd-announces-new-2016aug19.)

22       54.    AMD directs its operations from California and maintains other offices within the state,

23   including in San Diego.

24       55.    AMD (defectively) designed the AMD Ryzen and Athlon CPUs at issue in California.

25       56.    AMD made false and/or misleading statements and/or omissions (as set forth in this

26   Complaint) emanating from California about its Ryzen and Athlon CPUs.

27       57.    AMD directs distribution operations from its headquarters in California.

28

58.     AMD designs and manufactures, among other things, microprocessors used in computing systems, including desktops and laptops, as well as for commercial applications. As AMD explains in its 2021 10-K filed with the SEC, it produces the following:

> Desktop Microprocessors. Our microprocessors for desktop platforms currently include the AMD Ryzen series processors and AMD Athlon processors. AMD Ryzen 5000 Series desktop processor family powered by our "Zen 3" core architecture has up to 16 cores and delivers across the board leadership performances for gamers and content creators.
>
> Notebook Microprocessors. Our mobile APUs, including AMD Ryzen and AMD Athlon mobile processors for the consumer and commercial markets, combine both high levels of performance and efficiency for notebook PC platforms. In January 2021, we launched our AMD Ryzen 5000 Series Mobile Processors, which are powered with our "Zen 3" core architecture and are designed for gamers, creators and professional.
>
> Commercial Microprocessors. We offer enterprise-class desktops and notebook PC solutions sold as AMD PRO Mobile and AMD PRO desktop processors with Radeon graphics for the commercial market. AMD Ryzen PRO, AMD Threadripper PRO and AMD Athlon PRO series solutions are designed to provide enterprise customers with the performance, security capabilities and business features such as enhanced security and manageability, platform longevity and extended image stability. We launched the AMD Ryzen PRO 5000 Series Mobile Processors powered with our "Zen 3" core architecture for business laptops in March 2021.

59.     AMD's processors include its Ryzen and Athlon series processors. Both processors are Intel-compatible processors, forward- and backwards-compatible with Intel instruction sets, namely the Intel x86 instruction set. AMD's processors are seen as an alternative to Intel's microprocessors, particularly for Windows-based PCs and laptops, as well as for computer gaming.

60.     AMD primarily sells to original equipment manufacturers ("OEMs"), which in turn package its processors into computer products. These OEMs include HP, Lenovo, Microsoft, MSI, Dell, and other computer manufacturers. AMD also sells directly to resellers, which in turn sell to end users, particularly those that build custom computing systems.

61.     AMD's chief competitor, Intel, has been the dominant maker of CPUs for PCs and notebooks for decades. As AMD explains in its 2021 10-K:

Intel Corporation (Intel) has been the market share leader for microprocessors for many years. Intel's market share, margins and significant financial resources enable it to market its products aggressively, to target our customers and our channel partners with special incentives and to include customers who do business with us. These aggressive activities have in the past resulted in lower unit sales and a lower average selling price for many of our products and adversely affected our margins and profitability.

As long as Intel remains in this dominant position, we may be materially adversely affected by Intel's business practices, including rebating and allocating strategies and pricing actions, designed to limit our market share and margins; product mix and introduction schedules; product bundling, marketing and merchandising strategies; exclusivity payments to its current and potential customers, retailers and channel partners; de facto control over industry standards, and heavy influence on PC manufacturers and other PC industry participants, including motherboard, memory, chipset and basic input/output system (BIOS) suppliers and software companies as well as the graphics interface for Intel platforms; and marketing and advertising expenditures in support of positioning the Intel brand over the brand of its original equipment manufacturer (OEM) customers and retailers.

62.    To viably compete with Intel, including for market share of computers that run x86-based operating systems (specifically, Microsoft Windows), AMD must maintain lockstep in feature improvements with Intel. Failure to provide the same core functionality as Intel's processors could create a compatibility wedge, damaging AMD's marketability and market share. AMD is particularly reliant on operating system giant Microsoft's design requirements for its market-leading Windows operating system. As AMD explains:

Our ability to innovate beyond the x86 instruction set controlled by Intel depends partially on Microsoft designing and developing its operating systems to run on or support our x86-based microprocessor products.

63.    AMD is also heavily reliant on computer manufacturers to sell its products to end users. AMD's business depends on maintaining relationships with computer manufacturers and convincing them to package computers with AMD's processors, and additionally, to market AMD CPUs alongside AMD itself.

64.    AMD's net revenue has nearly tripled since 2020. The company's year-end net revenue for 2022 was $23.6 billion, an increase of 44% over 2021 year-end net revenue of $16.4 billion. That

2021 figure, meanwhile, represented a 68% year-over-year increase against AMD's 2020 year-end net revenue of $9.8 billion. AMD's net revenue from its Client, Gaming, and Embedded lines of business was approximately $17.6 billion in 2022, $12.7 billion in 2021, and $8.1 billion in 2020.

65.    AMD employs approximately 15,500 employees in its global workforce.

## JURISDICTION AND VENUE

66.    This Court has personal and subject matter jurisdiction over all causes of action asserted in this Complaint.

67.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because at least one member of the proposed Classes is of diverse citizenship from Defendant AMD, the proposed Classes consist of 100 or more members, and the aggregate claims of the members of the proposed Classes exceed $5 million, exclusive of interest and costs.

68.    This Court has personal jurisdiction over AMD because AMD's principal place of business is in the State of California, and AMD is therefore subject to general jurisdiction in this State. Additionally, the conduct alleged in this Complaint occurred in and/or emanated from the State of California.

69.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(1) and (2) because AMD resides in this judicial district and a substantial part of the events and/or omissions that give rise to Plaintiffs' claims occurred in this judicial district.

## DIVISIONAL ASSIGNMENT

70.    This action was initially assigned to the San Jose Division of this District pursuant to the Court's Assignment Plan (General Order No. 44). Pursuant to the Court's Related Case Order of December 5, 2022, this action was reassigned to a United States District Judge in the San Francisco Division.

**FACTS**

**I.    THE TRUSTED PLATFORM MODULE (TPM)**

**A.    The Advent of TPM**

71.    As Internet access and use proliferated in the late 1990s, computers increasingly required cryptographic operations in everyday use—including to interact with websites; to store and retrieve sensitive information; and to verify information about computer configurations, software, and content.

72.    For example, secure http protocols central to e-commerce websites and online authentication; hard-drive and tape backup encryption relied upon by Enterprise IT; and digital rights management systems like iTunes and Windows Media Player, all relied upon encryption not just for added security, but for their very use. As a result, with the dawn of the 21st century came an increasing need in personal computers—both at work and at home—for a permanent (and secure) place to store encryption keys and assist the main hardware of a computer with cryptographic and other security-related operations.

73.    In addition, with cryptography underpinning an ever-growing swath of everyday operations in Internet-connected personal computers, these systems increasingly relied on the soundness and integrity of random number generation to function securely. The cryptosystems used in standard Internet and other network protocols around the world rely for their security on the unpredictability (*i.e.*, randomness) of certain values; as a result, a weak or insecure random number generation can compromise the security of an entire, otherwise secure, computer system.

74.    Early means of providing needed security functionality—secure key storage, secure random number generation, and often secure computation of certain commonly-used cryptographic algorithms—relied on so-called "smart cards" or "smart chips." These devices, effectively small integrated circuits embedded in physical cards or wafers, were designed to securely store relevant cryptographic keys and identifiers associated with a particular user; the user would insert a given smart card or smart chip into a computer to facilitate secure cryptographic operations.

75.    Smart cards or smart chips interacted with independently-implemented subsystems in a given computer that ensured (or more accurately, were meant to ensure) that cryptography was performed

securely—*i.e.*, that cryptographic keys were securely segregated from the rest of a computer system; that a random number generator produced truly pseudo-random numbers with a particular statistical distribution[2]; and other cryptographic security requirements were met.

76.     A major drawback was that respective computer manufacturers each implemented these subsystems differently, creating widespread compatibility and consistency issues for cryptographic and other security-sensitive processing operations, particularly in large companies that deployed thousands of computers across their workforce.

77.     The logical solution was to create a standardized, modular hardware subsystem that facilitated secure performance of increasingly essential cryptographic and security-related computing functions—a hardware subsystem that was purpose-built for storing cryptographic secrets, for securely generating random numbers, and for securely validating other components of a computing system prior to allowing it access to security-sensitive operations and information. By necessity, this standardized hardware subsystem would need to be narrow in scope and strictly segregated from the rest of the system, so that it could serve as a root of trust for a decidedly insecure Internet-connected personal computer.

78.     In 2003—following an abortive attempt from 1999-2001—a group of microprocessor and computer manufacturers including Intel, AMD, IBM, Microsoft, and Cisco formed an entity called the Trusted Computing Group to define a standard for trusted computer hardware in computers and mobile devices. The result of this effort was the Trusted Platform Module ("TPM"), a standardized hardware subsystem meant to enable trusted computing features in computers and mobile devices.

79.     The first versions of TPM specified a hardware subsystem—in practice, a discrete hardware chip—that provided a common set of cryptographic- and trust-related functions that would increase the security of frequent, security-sensitive operations in modern personal computers, particularly those connected to the Internet.

80.     Among the goals of the TPM standard was the ability to identify devices with a unique identifying number, key, or letter-number sequence; the ability to generate new cryptographic keys that

---

[2] Computers cannot generate truly random numbers, but algorithms can be designed to generate pseudo-random numbers, which are for most applications sufficiently random.

were secure; the ability to store cryptographic keys to be used in applications, including hard drive encryption; a separate memory system, NVRAM, which allowed persistent information to be stored when storage on the computer was wiped or lost; and a system to attest to device health—that is, whether a system was running genuine, secure, and up-to-date security-sensitive software (*e.g.,* operating system software and/or organization-mandated software).

81.    Early versions of TPM hardware—deployed in laptops, desktop computers, and even some mobile devices in the mid-to-late 2000s—achieved many of these goals, but were inflexible. Changes and/or vulnerabilities in hard-wired encryption algorithms left large numbers of TPM-equipped systems suddenly vulnerable, without the ability to adopt new technology to be used in the TPM.

82.    With that said, over a billion computers were using some form of TPM by 2005, such that any changes to the TPM standard would have to maintain existing TPM goals and features, even while adding new ones. As the first decade of the new millennium came to a close, the Trusted Computing Group set out to define a major revision to the original TPM standard—what would become TPM 2.0.

83.    Initially chaired by Intel's David Grawrock, the Trusted Computing Group ultimately included HP's David Wooten and AMD's Julian Hammersly.

84.    TPM 2.0 was meant to add significant additional functionality to the original TPM standard. Chief among the new additions for TPM 2.0 was algorithm agility—the ability to accommodate new or revised encryption technologies and algorithms. TPM 2.0 also ensured better resource identification systems, and faster key loading.

85.    The TPM 2.0 standard solved many of the problems of the first standard, but left the implementation of particular TPM subsystems to computer and microprocessor manufacturers.

**B.    The TPM as an External System**

86.    One of the principal security features of the TPM standard was that it was generally implemented as part of a separate hardware system on a computer's motherboard. This ensured that a TPM did not commingle system memory and could not easily be tampered with through the system itself.

87.    A discrete hardware TPM meant that cryptographic keys used by a system were stored in a physically separate subsystem—away from the system's main processor and memory systems. The

TPM would serve as a neutral oracle, providing keys, random numbers, and device identification on demand.

88.     The TPM also allowed for external control over a system's resources—a method of maintaining a trusted over-system to facilitate, for example, "trusted" booting, memory access, and/or disk drive access on an otherwise untrustworthy system. That is, a TPM would stand as a trusted oracle to evaluate whether the *rest* of the system was as the TPM expected it to be, at boot or in other security-sensitive contexts: the TPM could store trusted authentication and/or measurement values for other aspects of a computer system, and disable boot, memory access, or disk drive access if the general system was not as the TPM expected it to be. The fact that these "trusted" values were stored in a physically discrete, segregated hardware subsystem was, in essence, the entire reason they could be trusted.

89.      The most secure implementation of TPM was the "discrete TPM," a distinct hardware module physically separate from the CPU and thus less immune to attack. As the Trusted Computing Group explained:

> Discrete TPM provides the highest level of security, as might be needed for a TPM used to secure the brake controller in a car. The intent of this level is to ensure that the device it's protecting does not get hacked via even sophisticated methods. To accomplish this, a discrete chip is designed, built and evaluated for the highest level of security that can resist tampering with the chip, including probing it and freezing it with all sorts of sophisticated attacks.

90.     A separate, hardware TPM module provided the highest fidelity to the TPM standard, as well as its very premise. Moreover, separate hardware that was independent of the CPU, the operating system, and system memory meant that no matter the sophistication of an attack, the odds of reaching the TPM's guarded secrets were far lower.

91.     Indeed, many attacks and security vulnerabilities rely on tricking the operating system into allowing access to trusted parts of a computer's memory and then running arbitrary code. Often, a hacker will focus on inserting a payload into memory—called "shell code"—then tricking the operating system into jumping to a memory location where the payload is stored to run the code. That code will then, in

many cases, provide an attacker privileged access to the computer system—*e.g.*, allowing an attacker to interact with the operating system through a shell as a super user or in trusted memory space.

92.     Shell code, like the code below, can be disassembled into lower-level code, called assembly code, then the "op codes," or instructional code can be encoded into a string of text.



93.     The code above would therefore become a string of hexadecimal numbers, such as "x55x48x89xe5x48x83xecx30x31xc0x89xc2x48x8dx75xe0x48x8bx3bx0dxe9x . . . ." Once this string is stored in memory, the operating system will run the code if it is tricked to jump to the part of memory where the code is stored.

94.     The degrees of freedom for attacks on personal computers are extremely high—nearly infinite, given the complexity and breadth of modern systems and the ways in which they are used. The example above is just one of many potential "attack vectors" for a modern computer.

95.     The above example is, however, illustrative of a fundamental (and serious) security problem in modern computers that hardware-based TPM specifically addresses. A hardware TPM is not part of the CPU of a computer, and is not simply mapped to the computer's general memory address space. Thus, an attack on the operating system that provides privileged access to the CPU—and such attacks are not merely widespread, but indeed pervasive—would not, in many cases, mean that a hardware TPM would also be compromised.

96.     This is in part because the hardware TPM does not share memory with the CPU, and therefore it does not share memory with the computer's operating system. Its secrets are simply out of reach, even if the operating system is tricked into jumping to particular memory locations or running arbitrary instructions as in the example above.

97.     Separate physical memory space in a hardware TPM also means that a malfunction in the operation of the CPU or the operating system will not generally compromise a hardware TPM. And, *vice versa*, memory access by the hardware TPM is not accomplished through the same data pipelines used by the CPU to communicate with system memory.

98.     The strict, physical separations between the trusted locations and functions in a hardware-based TPM and the untrusted rest of a modern computer system are in many ways the raison d'être of the TPM standard.

99.     Additionally, a hardware TPM can be designed to disable itself, erase itself, or even self-destruct, without damaging the CPU or other expensive hardware—yet still disable access to security-sensitive operations across the computing system by doing so. For example, repeated attempts to access the TPM's data or to tamper with the TPM, if the module is implemented in separate hardware, can result in a shutoff of TPM functions, securing the computer from further attack until a trusted administrator of the system regains control.

## II.     MICROSOFT FORCES TPM ADOPTION AS PART OF WINDOWS 11

### A.     The Growing Risk of Firmware Attacks and the Need for Hardware Security Solutions

100.    In March 2021, Microsoft concluded its "security signals" study, which targeted cybersecurity attacks on the Windows operating system as well as enterprise cybersecurity practices. As Microsoft explained, the goal of the study was to "provide up-to-date research on the state of security, across countries and industries in order to better serve our customers and partners, and enable security decision makers to further their development of security strategies within their organizations."

101.    One of the primary conclusions reached by Microsoft was that "security frameworks" were an important means by which security could be achieved at an enterprise level and across contexts in which the Windows operating system was used.

102.    A broader security "framework" was necessary, Microsoft determined, because most enterprise administrators were bogged down with individual security problems, which they addressed *ad hoc* and separately. As Microsoft's report explained:

> While companies' security strategies are clearly important to their business, more than half the decision makers we surveyed said their staff is currently too busy to spend enough time on strategic work. Instead, they are focusing on "table stakes" security issues such as software and firmware patches, hardware upgrades, and internal and external security vulnerabilities.

103.    The study further showed that "firmware attacks" were a significant problem across enterprises. Firmware refers to software that is seldom modified and that is used by low-level computer hardware. The firmware is often foundational code run by the computer, including at bootup time. Obtaining control over BIOS firmware, for example, can mean controlling the system's hardware before the operating system or even the CPU comes fully online.

104.    Microsoft's study found that more than 80% of enterprises had experienced at least one firmware attack in the past two years, but only 29% of security budgets were allocated to protect firmware.

105.    In other words, firmware was a massive and under-protected vulnerability for most systems, particularly laptops and PCs provided to employees—even more so after the onset of the global COVID-19 pandemic, as employees in even the most sensitive industries were forced to work from home. Moreover, Microsoft found, enterprises were increasingly allowing employees to purchase or use their own computer hardware, creating further security complexity.

106.    For computers without hardware-based protection, firmware was a centralized point of vulnerability. If hacked, many of a computer's most sensitive secrets would be revealed to the hacker. As Microsoft explained in a March 30, 2021 post on its website:

> Firmware, which lives below the operating system, is emerging as a primary target because it is where sensitive information like credentials and encryption keys are stored in memory. Many devices in the market today don't offer visibility into that layer to ensure that attackers haven't compromised a device prior to the boot process or at runtime below the kernel. And attackers have noticed.

107.     The National Institute of Standards and Technology (NIST), which maintains a National Vulnerability Database (NVD), reported that there had been a five-fold increase in attacks against firmware in the four years prior to 2021, and attackers "have used this time to further refine their techniques ahead of software-only protections."

108.     Microsoft concluded that it would need to adopt a broader security framework that it could enforce across many Windows devices at once. Its solution was to require specialized hardware to run its operating system, hardware immune from a firmware attack: a TPM.

**B.     The Onslaught of Firmware Attacks**

109.     Years prior to Microsoft's March 2021 report, a new and extremely dangerous form of cyberattack was taking hold: the "firmware" attack. These cyberattacks focus not on the programs running on the computer or on its operating system, but instead target the hardcoded software stored in flash memory or read-only memory within a computer's hardware.

110.     While historically, most firmware was stored in a read-only memory that could not be modified once the data was "burned" into a memory chip, the lack of flexibility became problematic. Important firmware needed to be modified from time to time, including to address security threats unforeseen at the time a computer system or hardware peripheral was released.

111.     The solution was to use non-volatile flash memory—a semi-permanent, but not immutable, memory that can store foundational instructions or data for hardware. Flash memory could be "flashed" with data, then later updated with a "re-flashing." The memory would not be accessed randomly, such as with local memory on computer systems (*i.e.*, random access memory ("RAM")); flashed memory would remain largely static, updated only for important reasons.

112.     Nonetheless, such flash memory *could* be updated, and that meant hardware-level instructions and data could be tampered with. This created a new threat vector to computer systems.

113.    The most important information stored in non-volatile flash memory pertains to the computer's Basic Input/Output System ("BIOS"). Hardcoded instructions in a computer's BIOS—usually stored on a computer's motherboard—handle the computer's bootup process, including bringing the microprocessor's full functionality online and setting up input-output systems to communicate with hardware peripherals.

114.    In the late 1990s and early 2000s, the legacy BIOS used on most Intel-based PCs began to be replaced in new computers by an extensible interface that handled the same bootup functions—an extensible interface that could be modified after the initial manufacturing of the computer.

115.    Originally developed by Intel and eventually migrated to an industry consortium comprised of twelve "promoter" companies including AMD, HP, Intel, Dell, Lenovo, and Microsoft, this standardized, extensible system was called the Unified Extensible Firmware Interface (UEFI), which was released as a version 2.0 specification in 2006. Other computing systems had recently moved in a similar direction, with Apple's PowerPC systems using the OpenFirmware system. There was an unmistakable trend: hardcoded instructions for bootup and hardware-OS communication were giving way to updatable instructions stored in on-board flash memory.

116.    The flexibility of firmware, including UEFI firmware, came at a cost. A hardcoded BIOS stored in read-only memory (ROM) could only be modified with physical access to a computer. Flashed firmware, however, could be altered through software, and in later devices, remotely over a network and/or Internet connection.

117.    It was not long before hackers discovered ways to compromise computer systems by tampering with foundational firmware, including the UEFI firmware that had become standard across PCs around the world.

118.    For example, in 2018, it was publicly revealed that the state-sponsored hacking group Fancy Bear had developed an exploit to UEFI firmware that gave an attacker privileged access to most modern PCs. The malicious code worked by rewriting the firmware stored in a computer's SPI flash memory. As ZDNet reported on September 27, 2018:

> Researchers have uncovered what appears to be the first case of a UEFI rootkit in the wild, changing the concept of active UEFI exploit from a conference topic to reality.
>
> The UEFI rootkit was found bundled together with a toolset able to patch a victim's system firmware in order to install malware at this deep level, ESET researchers said on Thursday.
>
> In at least one recorded case, the threat actors behind the malware were able to write a malicious UEFI module into a system's SPI flash memory— leading to the drop and execution of malicious code on disk during the boot process.

119.   The danger of such an exploit was that it obtained access to a computer system at the lowest of levels—code directly instructing and interacting with critical system hardware, even before an operating system comes online. As ZDNet explained:

> Not only do such methods circumvent operating system reinstall, but also hard disk replacement. The only way to remove such malware—assuming victims know they have been compromised in the first place—is to flash the firmware, a process not often conducted by typical users.

120.   The exploit was almost impossible for an unsophisticated user to detect. It could not be removed by erasing or even changing out the computer's hard disk. It was in the most persistent storage possible—the memory ancillary to the foundational hardware systems of the computer, its firmware.

121.   In May 2020, another massive firmware attack vector emerged. With this attack, the firmware governing Thunderbolt ports shipped on computers since 2011 could be maliciously modified. ZDNet reported on this threat vector on May 11, 2020:

> A Dutch researcher has detailed nine attack scenarios that work against all computers with Thunderbolt shipped since 2011 and which allow an attacker with physical access to quickly steal data from encrypted drives and memory.
>
> Researcher Bjorn Ruytenberg detailed the so-called Thunderspy attacks in a report published Sunday, warning that the attacks work even when users follow security best practice, such as locking an unattended computer, setting up Secure Boot, using strong BIOS and operating system account passwords, and enabling full disk encryption.

122.    This newly-revealed firmware attack was extremely pernicious. It was an attack upon the underlying communication channels between a computer's hardware peripherals and its operating system.

123.    Most operating systems map hardware memory onto system memory, allowing interaction with the hardware through direct memory read and write instructions. Because these memory read and writes are time-sensitive, an operating system often allows certain hardware Direct Memory Access ("DMA") to facilitate peripheral communication. Firmware attacks, such as Thunderspy, targeted this mechanism:

> Ruytenberg notes that Thunderspy differs to [Thunderclap, a 2019-disclosed Thunderbolt attack vector], which relied on tricking users into accepting a malicious device as a trusted one. Thunderspy on the other hand breaks Thunderbolt hardware and protocol security.

> While all Thunderbolt-equipped computers are vulnerable to Thunderspy, Intel, which develops Thunderbolt technology, says the attacks were mitigated at the operating system level with Kernel Direct Memory Access (DMA) protection, but this technology is limited to computers sold since 2019.

124.    The Thunderspy attack vector illustrated a significant vulnerability common to firmware attacks: the exploit facilitated access to what is typically a read-only part of the operating system's memory. Modern operating systems had implemented DMA protections, but this circumvented most of those protections entirely.

125.    In October 2020, the U.S. Department of Transportation sounded an alarm regarding firmware exploits of transportation systems, such as cars. So-called Over-the-Air systems, which allow manufacturers to, for example, update automobile software remotely, created a massive threat vector:

> The importance of software in computer system architecture makes it an attractive target for attackers. Software modification attacks on various embedded systems have been demonstrated repeatedly at hacking conferences and in academic publications. The capability of OTA updates for vehicle software only widens the attack vector, making it possible for hackers to distribute malware to millions of vehicles simultaneously.

126.    The same problem was manifesting across industries, applications, and enterprises: firmware attacks could hijack the remote update systems built into most computers to replace foundational code, capturing the system before operating system protections even came online.

127.    A discrete TPM—a distinct piece of hardware physically separate from the computer system's firmware or operating system—appeared to be a viable antidote to firmware attacks designed to reach cryptographically sensitive systems of a computer.

128.    A hardware TPM insulated the computer system from, for example, having its random number generator tampered with (which would be disastrous for the safety of encryption systems), having cryptographic keys stolen or replaced, or having a system's authentication mechanisms hijacked.

129.    To Microsoft—maker of the dominant operating system for personal computers, and whose Windows OS was the target of many firmware attacks—it was the next logical step to require systems running Windows to include a TPM. Absent some sort of hardware requirement, there was simply not much Microsoft's operating system could itself do to prevent or control firmware attacks, which by design capture a computer system before the operating system even comes online.

C.      **Microsoft Requires a TPM to Run Windows 11**

130.    In 2015, Microsoft released Windows 10 as the then-latest version of its dominant operating system. Microsoft pushed OEMs pre-installing Windows 10 to ship TPMs with their computers, but stopped short of requiring a TPM to run Windows 10.

131.    That changed with the operating's next major release. In June 2021, Microsoft published minimum system requirements for its forthcoming Windows 11 operating system. The system requirements stated for the first time that TPM 2.0 hardware was required to run Windows.



132.    The newly published Windows 11 system requirements led to an immediate run on hardware TPMs. Reports were widespread of TPM modules being "scalped" at inflated prices.



133.    Microsoft also had recently released software that would check whether a particular computer was eligible to upgrade to Windows 11, called the Windows Health Check app. For the first time, that utility was flagging computers without TPMs, or without enabled TPMs, as incompatible with the next version of Windows.

134.    In September 2021, after a long summer of confusion and price-gouging, Microsoft expressly confirmed that it was requiring TPM 2.0 compliance going forward: a computer was required to have a TPM in order to run Windows 11.

135.    On September 8, 2021, Microsoft tweeted the following from its verified Microsoft Support account:



136.    On its website and elsewhere, Microsoft provided instructions as to how users could check their computers for TPMs and how to enable the TPMs on their systems.

137.    In October 2021, just ahead of Windows 11's public launch, David Weston, Microsoft's Director of OS and Enterprise Security, explained why Microsoft had transitioned from optional TPMs in Windows 10 to mandatory TPMs in Windows 11:

> What we learned from 10 is, if you make things optional, people don't turn them on . . . . They assume that if it was necessary, it would be on. And so I think that's a big learning. What we put into 11 is [that] we are going to secure you by default. . . .

> Ultimately, we could have chosen many lines. But we used data analysis around reliability, performance, and security to get there, and that is how we landed on that particular bar.

138. Microsoft had, in a sweeping move, implemented the new security framework it had envisioned in its mid-2021 study. With Windows 11, it had decided to enforce a minimum level of hardware security by default to protect its operating system's users from firmware attacks.

139. Microsoft's move, at least at first glance, meant that most modern computers would have segregated hardware that ensured a computer's security, including with respect to the integrity of the computer's firmware.

## III. AMD IMPLEMENTS A DEFEAT DEVICE—A FIRMWARE TPM BUILT ON A PLATFORM WITH DIRECT ACCESS TO PRIVILEGED SYSTEM RESOURCES

### A. The AMD Platform Security Processor

140. In 2013, AMD introduced a separate co-processor and system that functioned alongside its CPUs. This new system was called the AMD Platform Security Processor ("PSP").

141. The goal of the PSP is to perform security functions before the CPU comes online and while the CPU functions. As AMD explains in its Developer Guide:

> The PSP is a standalone complex within AMD Family 16h Models 30h-3Fh processors that is responsible for creating, monitoring and maintaining the security environment. Its functions include managing the boot process, initializing various security related mechanisms, and monitoring the system for any suspicious activity or events and implementing an appropriate response.

142. The PSP uses a separate CPU of its own, with an architecture designed not by AMD, but by ARM—a British semiconductor design company. The PSP also contains a cryptographic coprocessor (CCP); local memory registers; and dedicated interfaces to interact with the system memory, input/output devices, and configuration registers.

143. The PSP's ARM CPU and supporting subsystem have direct access to an AMD-based computer system's most privileged and sensitive resources. The PSP can directly read and write to the AMD-based computer system's memory, and it can directly interact with the AMD-based computer system's hardware.

144.    Notably, the PSP can generate what are called "interrupts" to the AMD CPU. An interrupt is the ability to send a priority message to the CPU to handle a particular task that requires attention. Interrupts are typically used to convey high-priority or time-sensitive events related to hardware. This means that the PSP has a privileged and direct line of communication to the AMD CPU.

145.    The PSP has its own local memory, and some resources are stored on flash memory or read-only memory connected through a Serial Peripheral Interface ("SPI").

146.    The ARM CPU in the PSP is controlled by its own separate micro-operating system, called a Trusted Execution Environment ("TEE"). Various functions related to security run on the co-processor's TEE, sharing the PSP's local memory and flash memory.

147.    The ARM processor in the PSP can generally execute instructions one at a time. To allow it to run multiple programs at once, the TEE uses a program called a "scheduler," which allows the ARM CPU to time-slice its work. By rapidly switching between programs, called a context switch, the ARM processor looks like it is executing multiple tasks at once.

148.    The TEE running the PSP's ARM processor, supporting hardware, and memory, is called Kinibi, which is made by a largely obscure company called Trustonic, which guards most workings of its micro-operating system from public access.

149.    Many TEEs use a scheduling algorithm called "round robin." Under a round robin scheduling system, or a system like it, the CPU allocates equal time slices to various tasks without priority, which is also known as cyclic execution.

150.    A benefit of round robin scheduling is that it is simple to implement. And for simple tasks sharing a single CPU, the algorithm is usually more than sufficient to prevent individual resources from being starved for processor time while other programs operate.

151.    However, the Kinibi operating system modifies this scheduling method by assigning programs priority values and executing them accordingly. This is called preemptive scheduling. The scheduling system in Kinibi is also designed to *stop execution* of a task for a lower priority program when it determines a time-sensitive task (and/or a task for a higher-priority program) must be completed.

152.     One reason for the special scheduling algorithm in the ARM processor running in the AMD PSP is because that ARM processor is designed to concurrently run processes in two different security modes—"secure mode" and "non-secure mode"—each with its own set of registers and memory maps. Using an ARM security framework called "TrustZone," the ARM processor in the AMD PSP effectively runs two sets of processing "worlds" at once, and repeatedly switches back and forth between them using a special processing bit and special "secure interrupts." Because of the TrustZone functionality, every security-related context switch in the ARM processor in the AMD PSP requires zeroing out a program's memory state prior to transitioning to another program, among other significant processor transitions. Otherwise, data lingering in memory could be compromised by other processes.

153.     The AMD PSP is essentially a separate computer system that sits on top of an AMD-based system. It boots up first; it controls the booting of the AMD CPU; and it routinely interacts with the system's AMD CPU, system memory, and hardware to (supposedly) ensure that only trusted programs have access to privileged resources.

154.     This creates a significant problem. If the PSP is compromised by an attacker, the entire AMD-based system can be trivially compromised as well—including direct access to system memory and hardware. As explained earlier in this Complaint, such a compromise could mean tricking the AMD CPU to run arbitrary code that provides privileged access to the system.

155.     The PSP has been the source of many vulnerabilities in AMD computer systems, particularly in computers running AMD Ryzen CPUs.

156.     For example, in late 2017, a Google security researcher discovered a stack overflow vulnerability in the PSP—specifically, within its firmware TPM implementation—that would allow an attacker to take full control of the PSP (which would then, by the PSP's design, allow escalation to compromise of the AMD CPU and system itself). Google's security researcher noted: "As far as we know, general exploit mitigation technologies (stack cookies, NX stack, ASLR) are not implemented in the PSP environment."

157.     As another example, in June 2019, security researchers discovered another flaw in the AMD PSP that allowed hackers to capture an AMD CPU and system's protected memory and resources.

158.     Then in December 2021, another exploit was publicly revealed in which the AMD PSP could be compromised such that an attacker would have access to uninitialized memory on the system, again leaving data and privileged memory in the system open to being compromised. Since its inception, AMD's PSP has been attacked and compromised repeatedly.

159.     One use for the PSP is Digital Rights Management ("DRM"), which is implemented through software systems designed to authenticate, decrypt, and monitor protected media content, such as movies, music, and video games. To facilitate DRM, the PSP uses its privileged access to the AMD CPU and to the system's hardware to ensure that only those with rights to watch a movie, play a game, or listen to a song can play the media on their computers. If the DRM blocks access, the PSP is able to block access to the media at the hardware level, with even more powerful/broad system-level access than the operating system running the AMD processor.

160.     The PSP runs many programs in addition to those implementing various standardized DRM systems. The ARM processor used as part of the PSP is shared among these programs. When a program reads or writes to memory or to slower hardware, it may delay or stall a change in context to another program, delaying execution of other programs on the ARM processor until the slow memory or hardware read or write is complete. Many of the programs running on the PSP share the same bank of SPIROM or other forms of "flash memory," which is generally far slower than other memory used by CPUs. When the ARM processor reads from the SPIROM, for example, it may stall out other programs running on the ARM processor from executing.

**B.     AMD Shoehorns a Software-Based TPM into the PSP as Firmware**

161.     As TPMs initially became ubiquitous, hardware TPMs were the primary implementations of the TPM 2.0 standard. Separate hardware TPMs, however, were costly, ranging between $20 to $150 dollars depending on functionality and speed.

162.     Microsoft, for its part, was pressuring Original Equipment Manufacturers ("OEMs"), such as HP and Dell, to add TPMs to their systems. By 2015, as the release of Windows 10 was imminent, OEMs were pre-installing the new Windows OS—which encouraged, but did not yet require, TPM 2.0

compliance—to their computers. However, Microsoft (and industry observers) signaled that TPM compliance could become a requirement in the near future.

163.     Faced with an added and potentially significant cost to their systems, OEMs that used AMD Athlon or Ryzen processors sought a solution from AMD. AMD's response was an addition to the PSP: a so-called "firmware TPM," referred to by AMD as fTPM.

164.     AMD implemented the fTPM as part of its PSP—as another program that ran on its ARM co-processor and Kinibi operating system. AMD's fTPM shared resources with other programs running on the PSP, including those responsible for DRM tasks relating to media, including video, music, and video games.

165.     The AMD fTPM read its instructions from read-only memory ("ROM") connected to the PSP's SPI—so-called SPIROM. Reading from the SPIROM, which was shared among programs running on the PSP, was costly in time. It took orders of magnitude longer to read from the SPIROM than from local memory.

166.     TPMs were designed to stand apart from the CPU, memory, and hardware of a computer system in order to provide trusted security-sensitive subsystems and services, including cryptography. The TPM's separation from the rest of the computer system was central to its trustworthiness, and its ability to serve as a hardware "root of trust" for an otherwise untrustworthy computer system. AMD, however, implemented the fTPM as part of its PSP subsystem, which had virtually ***unfettered*** access and connections to precisely the resources a TPM was meant to stand apart from.

167.     AMD's fTPM was plainly not about providing actual hardware-based security according to the TPM standard. This fTPM was shoehorned into the existing PSP system, which was designed to directly access hardware resources, including as part of execution of DRM processes protecting media.

168.     In other words, AMD's implementation of fTPM shared resources and SPIROM access with other privileged programs, proving the mere illusion of hardware-based security.

169.     When Windows 11 ended up requiring a TPM, AMD-based systems could simply enable the fTPM subsystem. No separate hardware was required—or provided. The problem, unfortunately, was that the AMD fTPM, which provided none of the protections a hardware TPM was designed to provide,

merely satisfied the letter of the Windows 11 requirement without providing any substantive, structural (and much-needed) hardware protections to the subject computer system.

170.    fTPM was a Potemkin TPM, designed the check a box—and more to the point, satisfy a Windows compliance check—for Windows 11's security framework requirements without actually providing the hardware-based security and trust that Microsoft had determined was necessary in the face of spiraling low-level security vulnerabilities, including firmware attacks.

171.    In short, when Windows 11 looked for a TPM to evaluate compliance with Microsoft's security framework, it found AMD's "defeat device." AMD's onboard fTPM was merely a piece of software designed to look and act like a hardware TPM. Its firmware was stored among other data in shared flash memory; it ran on top of an operating system that time-sliced a single ARM co-processor; and it was part of a subsystem that had privileged and high-priority access to AMD CPU-based systems, hardware, and memory.

172.    As explained below, implementing the fTPM in software and as a program running on AMD's PSP proved to be problematic. AMD had cut corners, and the OEMs let it do so. It was, however, obvious to both AMD and OEMs that a software-based TPM that ran as part of a subsystem with privileged access to the overall CPU and hardware was not a TPM at all.

## IV.    AMD'S FLAWED DESIGN RESULTS IN PLAYBACK AND GAMING STUTTERING

### A.    AMD-Based System Users Flood the Internet with Complaints of Stuttering When Watching Video, Listening to Music, Playing Video Games, and Even Videoconferencing

173.    AMD's implementation of fTPM as part of the PSP had serious implications for the performance of AMD-based systems, particularly systems based on AMD Ryzen processors touted by OEMs for their speed and security.

174.    The AMD fTPM shared resources with PSP programs that controlled video, audio, and other hardware, including the CPU itself. When PSP programs sent interrupts to the ARM processor, the processor had to turn its attention to whatever task was being signaled—and PSP programs often had a priority lane, particularly those controlling DRM and other media-based functionality.

175. This meant that if the fTPM software was accessed, it would have to complete its work rapidly, such that it would not stall out other PSP programs running at the same time via the Kinibi TEE's time slicing. And, to the extent an operation required repeated fTPM access, that access could potentially stall out the entire PSP's array of running programs, some of which were responsible for the function of the computer's CPU and hardware peripherals.

176. This flaw became apparent as early as March 2021, when AMD's forums began to be filled with reports that AMD Ryzen systems were stuttering when playing streaming video or during gameplay.

 SweetPhilosophy  Adept I

03-10-2021 01:02 PM

## 5800x brand new build stutters  ✔ Jump to solution

Hello,

I experience random stutters. That's basically it. Most of the time I observe them during gaming session because the fps counter also drops for a fraction of a second. There are other instances where I experience them, mostly when I open a program or a game, just after I double click it the stutter will occur (I randomly move my mouse waiting and that's how I noticed). Games where I mostly observe these stutters are League of Legends (which should run flawlessly on such a build), Apex Legends, Warzone/ColdWar, probably because being competitive and being fully focused I immediately spot them.

Also tried with different refresh rates, from 60 to 165hz and it still occurs, granted - it's less noticeable on lower refresh rates.

 Shadowy89  Adept I

03-12-2021 11:20 AM

I have also noticed mirco stutters in GTA Online with same processor but with Asus x570 Strix E. Steam fps counter show few drops in frames. I have locked game to 100FPS and it drops to 90-98 fps area but in truth 1% lows goes way lower. You shouldnt see that mirco stutter with 144hz panel if it was only few frames what steam fps counter shows.

Also running Nvidia 2080 super, so no hic-ups in there. Also playing with graphical settings didn't do anything.

 rglenpayne  Journeyman III

03-15-2021 11:06 AM

I have this issue as well, screen will occasionally "smear" for me as if we hit a hitch in the action or as if time stopped just for a brief moment. 5800X on an X570 Unify with an EVGA RTX 3070 XC3 Ultra Gaming.

177.    Then in mid-2021, when Microsoft announced TPM would be a requirement for its upcoming Windows 11 release, the complaints exploded—across the Internet, at such volume and of such types that AMD unquestionably noticed.

178.    Thus, for example, on July 6, 2021, a Linus Tech Tips message board user with an AMD Ryzen 9 3900XT desktop processor—a high-end AMD Ryzen CPU touted on its website as "[e]xtreme processing for gamers, streamers and creators" with "[n]o-compromise performance for gamers and creators who deserve to have it all"—complained that "[r]ecently I turned on the fTPM on my asus B550 wifi motherboard because of the new Windows 11 TPM 2.0 requirements, after I did that I started getting random stuttering on everything, heavy cpu or gpu load don't seem to trigger it . . . its *[sic]* just random and everything stutters, discord calls, games YouTube, it happens randomly at least 3 times a day. I turned off fTPM and the stuttering went away, anyone have a clue what could be happening?"





179.    The above complaint—posted to the forums of Linus Tech Tips, one of the Internet's most popular hardware message boards, tied to a YouTube channel with 15.4 million users and 6.88 billion

1   views—spawned a 28-page, 688-post thread titled "AMD fTPM causing random stuttering" in which

2   more than a dozen different users with AMD Ryzen or Athlon-based computers identified fTPM-linked

3   stuttering in mid-2021, several prior to August 19, 2021 (when Plaintiff Dobek purchased her Ryzen

4   CPU).









180.    Multiple users experiencing this fTPM-linked stuttering contacted their motherboard providers (*e.g.*, ASUS and ASROCK), including in July 2021.

181.    Another heavily-trafficked hardware message board, Tom's Hardware Forums, included complaints about Ryzen fTPM-based stuttering in June 2021:



182.    AMD's own message boards contained complaints about fTPM-based stuttering no later than August 9, 2021, before Plaintiff Dobek purchased her defective Ryzen CPU on August 19, 2021.

183.    The above-quoted "FTPM Stuttering" thread on AMD's "community.amd.com" hardware forums runs 95 pages (in printable pdf form) and contains more than a hundred posts ranging in date from August 9, 2021, to February 13, 2023, nearly all (including the 2023 posts) complaining about persistent, fTPM-linked stuttering on computers with AMD Ryzen or Athlon CPUs.

184.    The problem was not fixed, and AMD continued selling its defective Ryzen and Athlon CPUs thereafter, including to Plaintiff Dobek on August 19, 2021.

185.    Users on Linus Tech Tips, on popular hardware message board Overclock.net, and on Reddit all complained of intrusive stuttering on their AMD Ryzen or Athlon-based computers in July, August, and September of 2021. The stuttering was clearly and unambiguously linked to AMD's fTPM, and was not fixed by BIOS updates or by an AMD security update for the PSP.







1

2

3

4

5

6

7

8



9   186.   The official AMD sub-reddit was flooded with complaints about fTPM-related stuttering

10  beginning on August 28, 2021—with reports of unexplained stuttering in AMD Ryzen processors in June

11  and July of 2021.

12

13

14

15

16

17

18



*Aug. 30, 2021 Reddit Post within www.reddit.com/r/Amd*

19

20

21

22

23



*Aug. 28, 2021 Reddit Post within www.reddit.com/r/Amd*

24

25

26

27

28




*Jun. 21, 2021, and Jun. 26, 2021 Reddit Posts within www.reddit.com/r/Amd*

187.    On January 29, 2022, a YouTube post from the user "José Ribeiro" demonstrated the stuttering by showing the playback of streaming video on his AMD system with fTPM.



188.    Notably, as pictured above in the graph in the top left corner, the stuttering triggered a significant power consumption spike signified by a red region in the graph—an almost wall-like increase in power usage by the AMD processor. This occurred at the same time as the fTPM stutter.

43

189.    As "José Ribeiro" explained:

The issue happens on 0:11. You can definitely see a lot of values jumping for a second and Power Reporting Deviation having a new minimum. Also, it sounds way worse on my headphones than the OBS recording. The sound freezes for a second like Windows is about to BSOD.

I've been having this stuttering issue since July last year, when I enabled fTPM for the first time. It happens while listening to music, watching videos, editing videos and during gaming also. It happens for about 3 or 4 times a day and doesn't seem to be affecting performance or anything else. One thing I noticed though… [*sic*] While the stutter is happening, the Power Reporting Deviation on HWiNFO reports a low percentage and switches to red for the duration of the stutter.

190.    User comments on YouTube confirmed the same behavior—user after user. As one user recounted:

Thank you for the example, this confirms that my system is suffering from the same problem. I've been wondering what this annoying issue was and today I read about it. Didn't think I was affected, cause I'm still on Windows 10, but I guess this was never related to 11 specifically.

191.    Another YouTube comment confirmed that video games, video, and even videoconferencing on an AMD system resulted in stuttering:

Same here! If you're either watching a video, playing a game, or video conferencing, stuttering will occur on AMD cpu or apu regardless of generation of cpu & apu you have! On dual core cpu or apu, I'll notice a stutter every now and then which is annoying when doing normal tasks!

44

192.   Another YouTube video, this one posted January 8, 2022 by user "Harrison S," demonstrated the stuttering in a video game.



193.   The post's description explained:

> Enabling the 'firmware TPM' causes system wide stuttering on a growing number of AMD based PC's, as seen in this video. Personally, I have now had 4 consecutive PC's with AMD CPU's that have this problem. Both on Windows 10 and Windows 11. . . .
>
> In my case, I had this type of stutter 3-4 times a day. Regardless of what programs I was running. Having a TPM is a requirement for Windows 11, and apparently without it your system has a chance of not installing Windows Updates properly. However, sometimes the fTPM can also be automatically enabled on Windows 10 through updates.

194.   Reddit posts echoed the same problem, with some users purchasing separate TPMs to stop the stuttering. Again and again, users of AMD-based systems reported stuttering when they watched video, listened to music, played video games, or even videoconferenced.

195.   Month after month went by, with AMD still selling defective Ryzen and Athlon processors with an fTPM defect that manifested through intrusive stuttering. For example, a May 2022 post on Overclock.net (one of many similar complaints from this time period on that heavily-trafficked hardware message board) explained:



196.   An entire thread on AMD's official "Drivers & Software" message board, titled "AMD fTPM Causes Random Stuttering Issue" described how pernicious and intrusive the fTPM-based stuttering was for an AMD Ryzen processor as of February 2022:

Francobér   Adept II

02-01-2022 12:41 PM

**AMD fTPM Causes Random Stuttering Issue**

Good evening together
I wanted to ask if anyone here knows anything about the still existing fTPM Bug in Windows 11 or in Windows 10 as I have heard in the meantime.
I am affected by the bug myself and it really gets on my nerves to have to go into the bios every time I update to activate fTPM and then immediately deactivate it again so that I don't get jerks and sound problems. I have a x570 Steel Legend board with the latest bios and 32 GB Ram Trident z Royale Gold. It would be really time that one of AMD times to this but very widespread problem.
If there are errors in the text I apologize for it because I come from Germany and English is not my greatest strength.

AMD Ryzen 5600X, Asrock X570 Steel Legend, 32GB G Skill Trident Z Royal Gold, AMD Rx 7900XTX, Gygabyte G34WQC

197.   The thread didn't stop there, though. As of January and February of *2023*, the AMD message board thread continued, with multiple AMD Ryzen CPU users posting that they had suffered "fTPM" "crash[es]" and "freezes" in *2023*.

1
2
3
4
5
6
7
8
9
10



*Recent Posts on AMD Message Board Thread for "AMD fTPM Causes Random Stuttering Issue"*

198.   And AMD's official r/AMD subreddit continued to be flooded with stuttering complaints into late 2022, well after AMD's purported firmware "fix" to the stuttering manifestation of the fTPM defect. Thus, for example, a lengthy thread from September 2022 titled "Does AMD's latest BIOS fix the Windows 11 fTPM stuttering and lag issue for you?" provided a rather emphatic answer: No.



*September 12, 2022 Reddit Post on r/Amd*

199.    As one Redditor explained on September 12, 2022, well after AMD released an alleged BIOS fix and that Redditor installed it, "i still have the stutter. AMD Claims... but nah." The Redditor further observed of the fTPM stuttering, post-"fix": "It's pretty extreme."

200.    Reddit users—like users on Overclock.net, on Linus Tech Tips, and on AMD.com itself—continued to suffer stuttering *into 2023*.



*February 8, 2023 Reddit Post from r/Amd*

201.    The epic, multiyear, 688-post Linus Tech Tips thread ran well past the alleged "fix" from AMD, and makes clear that the stuttering manifestation of the AMD fTPM defect continued to plague AMD Ryzen and Athlon users well into late 2022 (and indeed into 2023):



202.     Since at least March 2021, people using AMD Ryzen and Athlon CPUs have complained across several of the largest dedicated forums on the Internet—including AMD's own message boards—of intrusive stuttering during media (video and/or audio) playback, during gameplay, and during videoconferencing due to AMD's defectively designed fTPM. They have explained that they contacted their motherboard manufacturer, and even AMD directly. And they have stated that they tried to install AMD's alleged "fix," and continued to suffer.

**B.     AMD's Forums Receive Repeated Complaints of Stuttering**

203.     As noted above, AMD's customer forums include requests for help regarding stuttering in Ryzen CPUs since at least March of 2021, and a deluge of posts on fTPM-linked stuttering beginning in June 2021. These requests continued for months and years, leading into 2023. For example, as one AMD Ryzen 5600X self-builder explained in February 2022:

> I wanted to ask if anyone here knows anything about the still existing fTPM Bug in Windows 11 or in Windows 10 as I have heard in the meantime. I am affected by the bug myself and it really gets on my nerves to have to go into the bios every time I update to activate fTPM and then immediately deactivate it again so that I don't get jerks and sound problems. I have a [Asrock] x570 Steel Legend board with the latest bios and 32 GB Ram Trident z Royale Gold. It would be really time that one of AMD times to this but very widespread problem. . . .
>
> I have to deactivate [the fTPM] to eliminate the problems. This is only quite cumbersome because I have to re-enable this function with each Windows 11 update to get the updates. …
>
> I'm trying everything so that finally this **bleep**ing problem can be fixed. I find it really sad that no one from amd comments on the problem.

204.     Another self-builder with a Ryzen 5600X CPU explained, in August 2021:

> I have a problem with the FTPM feature that after activating it I have random STUTTERING while using it on the PC and disabling the problem no longer occurs.

205.     The only response to the above post was from another user, in December 2021:

> This is affecting countless people and seems 99% is solved by disabling AMD TPM in the BIOS – however this is needed for windows 11.

206.    As noted in the previous subsection, an August 9, 2021, complaint thread about "FTPM Stuttering" contains nearly a hundred pages worth (in printable form) of complaints about intrusive, fTPM-linked stuttering in computers with AMD Ryzen or Athlon CPUs ranging from August 9, 2021, to February 13, 2023.

### C.    AMD Acknowledges the Stuttering Problem and Recommends Its Users Purchase Hardware TPMs as a "Workaround"

207.    On March 8, 2022, AMD finally acknowledged that there was a problem. In a post on its website called, "Intermittent System Stutter Experience with fTPM Enabled on Windows 10 and 11," AMD explained:

> AMD has determined that select AMD Ryzen system configurations may intermittently perform extended fTPM-related memory transactions in SPI flash memory ("SPIROM") located on the motherboard, which can lead to temporary pauses in system interactivity or responsiveness until the transaction is concluded.

208.    AMD never mentioned the obvious pattern—that the stuttering came during media playback and gaming. Additionally, AMD never explained why the fTPM's access of the SPIROM resulted in "transactions" that caused stuttering.

209.    AMD also provided no meaningful workaround. AMD's solution was to buy an external TPM hardware module:

> Workaround: As an immediate solution, affected customers dependent on fTPM functionality for Trusted Platform Module support may instead use a hardware TPM ("dTPM") device for trusted computing. Platform dTPM modules utilize onboard non-volatile memory (NVRAM) that supersedes the TPM/SPIROM interaction described in this article.

210.    Purchasing a TPM module, however, is costly. Modules can range in price from $20 to $150 depending on functionality and speed.

211.    As for a more permanent fix, AMD promised a firmware update in early May 2022, which AMD never posted on its page. Notably, AMD also explained that any update for OEM computers would have to be performed through the manufacturer. That process, AMD explained, "depends on the testing

and integration schedule of your manufacturer. Flashable updates for motherboards will be based on AMD AGESA 1207 (or newer)."

212.   Despite attempts to roll out firmware updates to motherboard manufacturers in mid-2022, stuttering persisted, including among those who attempted to install AMD's alleged "fix" (which was, in itself, no small task to perform, as a motherboard BIOS update is a complicated and dangerous procedure that can "brick" a computer if flawed or imperfectly performed).







213.    AMD has never ordered a recall of its CPUs to fix the problem.

**D.    The Stuttering Was Caused by a Serious Design Flaw that Cannot Be Fixed through a Firmware Update**

214.    The stuttering left an important clue as to the problem. It happened when AMD-based system owners watched video, listened to music, played video games, or communicated on video chats. This was not a coincidence.

215.    As explained above, AMD's fTPM was implemented as a program running as part of the PSP subsystem developed by AMD to sit in a privileged position above the most critical system resources, including the AMD CPUs themselves.

216.    Some of the programs running on the PSP relate to DRM, which provides for the decryption of multimedia content and the authentication and monitoring of the person accessing the content.

217.    Because the PSP's TEE operating system divides time among the programs running on its ARM processor, it forces the fTPM to share resources with programs that relate to multi-media access, including at the hardware level.

218.     Moreover, the PSP has direct access to the system's hardware, to the AMD CPU, and even to protected system memory.

219.     When the AMD fTPM read from slow SPIROM, it likely forced all other programs to wait until its read was completed, causing multimedia or gaming playback to "stutter."

220.     Thus, AMD was in some ways correct: the stuttering was caused by "fTPM-related memory transactions in SPI flash memory," but that was the narrowest possible explanation for the problem. It was a mere symptom of a broader design blunder—the implementation of a firmware TPM as part of the privileged PSP system, where resources would be shared by the fTPM and other programs addressed to time-sensitive tasks.

221.     This flawed design had caused (and continues to cause) damage to the computer systems that used AMD's processors. The stuttering was a symptom of a design that was never an earnest way to secure Windows-compatible computers from firmware attacks (and other serious, low level threats that would be addressed by a real, hardware TPM). Ironically, AMD implemented the TPM—a system designed to thwart firmware attacks—***in firmware***. Worse yet, it implemented this fTPM as part of an already-cluttered system with direct access to system resources.

222.     AMD's fTPM was not (and is not) a TPM. It was designed as a defeat device to placate the Windows operating system, which requires that a TPM be present and enabled. And AMD's defeat device not only woefully fails to provide the security provided by the TPM 2.0 standard, it causes the system itself to malfunction during ordinary—and in fact, intended—operation.

## V.     AMD'S STATEMENTS ABOUT ITS CPUS

223.     AMD's Ryzen brand CPUs are the company's high-end CPUs. Based on AMD's "Zen" architecture, AMD makes Ryzen CPUs for desktop, mobile, and workstation PCs. AMD Ryzen CPUs are sold to consumers as stand-alone CPUs, and these CPUs are only compatible with certain motherboards, including those made by ASRock, Asus, Biostar, Gigabyte, and MSI.

224.     AMD's Athlon processors are designed and marketed for their entertainment functionality and performance. AMD's Athlon processors are less powerful, but in many cases, tuned for lower power

consumption while performing video streaming and mid-range gaming functions. Like its Ryzen CPUs, AMD also sells Athlon chips to consumers.

225.    As explained below, AMD makes representations about its CPUs' suitability for gaming, audio and video playback, videoconferencing, and security—the very attributes impaired by AMD's defectively designed CPUs with onboard fTPMs.

## A.    Gaming, Video, and Audio Playback

226.    AMD represents that its Ryzen processors are designed to play the latest PC games. For example, AMD states on its website that its Ryzen 7 CPU is "[t]he World's Fastest PC Gaming Processor." AMD states that its Zen 3 architecture-based Ryzen processors provide "performance that immersive gaming demands." AMD, in particular, states that certain technology in its Ryzen CPUs result in higher "frame rates" while gaming—the rate at which the PC smoothly renders a game's individual frames.

227.    AMD targets gamers who build their own PCs. Indeed, AMD's website invites gamers to build PCs with AMD's Ryzen processors alongside its separately sold graphics cards:

> More AMD Performance. Built to Game.
>
> Combine an AMD Ryzen 5000 series processor or a select AMD Ryzen 3000 Series processor with an AMD Radeon RX 6000 Series graphics card to help boost your system's performance, thanks to AMD Smart Access Memory technology. Combined with AMD Fidelity FX Super Resolution or Radeon Super Resolution, enjoy the increased performance with all AMD in your system for the ultimate gaming advantage.

228.    AMD provides performance data for its processors by providing information about frame rates in particular games:



229.    A significant (indeed, critical) aspect of immersive gaming is uninterrupted, smooth frame rate during gameplay. AMD's benchmarks target precisely that expectation from gaming PCs.

230.    AMD also states that its CPUs are well-suited for high-quality audio and video playback. With respect to its Athlon processors, AMD touts entertainment functionality with "amazing responsiveness":

**Gorgeous Entertainment**

With AMD Radeon Graphics built right in, you'll enjoy every pixel as you edit family photos, stream your favorite shows in up to 4K HDR, and play the most popular esports games in high-definition 720p. . . .

231.    Likewise, AMD states that its Ryzen CPUs provide "seamless streaming" and 4K playback of video, as well as AI-based audio playback, including for noise cancellation.

232.   Video playback is such a foundational use for AMD-based PCs that AMD advertises its battery-life maximizing technology in terms of video streaming hours.



## B.   Videoconferencing

233.   AMD also markets its CPUs as suitable for office productivity, particularly for "work-from-home" use cases in which employees access work-related resources from home and other locations other than the office.

234. Indeed, AMD expressly states on its website that its processors are suitable for "videoconferencing":

235. As AMD's website further explains, videoconferencing is the "norm" in modern PC usage and "table stakes" for software that runs on PCs:

> Video conference meetings throughout the day are now the norm and laptop performance that more than meets the challenges of using remote collaboration tools and productivity apps simultaneously has become table stakes. Based on the world's first 6nm process technology for business notebook, AMD Ryzen PRO 6000 Series processors deliver the leadership performance and uncompromising battery life needed to meet the demand of remote collaboration and productivity.



236. AMD targets its processors to users with substantial hybrid office applications, particularly those who rely heavily on videoconferencing for daily work. As AMD states on its website, its CPUs provide important productivity features—chief among them, integrated voice and video chat:

> Productivity Features
>
> Take your collaboration to the next level with integrated voice + video chat with Microsoft Teams, voice typing and incredible battery life. Don't lose a moment with instant wake and biometric security for fast bootup.

237.   As AMD explains, its CPUs are designed to "Bring [the user's] World Closer."



238.   AMD plainly recognizes that the ordinary and expected use of a computer built with one of its CPUs includes—and indeed, likely centers upon—high-quality audio- and videoconferencing and collaboration.

**C.      Security and Windows 11 Compatibility**

239.   AMD touts security functionality throughout its website, including the ***isolation*** of its PSP and fTPM subsystems from CPU and memory resources. AMD also represents that it works closely with OEMs and operating system developers (including Microsoft) to ensure its CPUs' security from attack, and indeed represents that it designs its CPUs from the ground up to ensure security.

240.   AMD represents compatibility with Microsoft Windows 11 security requirements:

241.   With respect to its Ryzen 6000 series CPUs, AMD represents that its CPUs are "born ready for Windows 11"; contain integrated processor features that include "security features"; and were "designed to help defend against new, sophisticated attacks, and to help keep your data safe."



242.     With respect to its Ryzen PRO CPUs, AMD represents that it has implemented a "multi-layered approach" to security, including designing its "processor architecture from the ground up with security features as a priority."

243.     Importantly, AMD expressly touts its "Secure Processor" technology—technology that includes the same PSP subsystem in which the defective fTPM module is implemented in defective Ryzen and Athlon CPUs.



244.     In 2021, AMD released and posted to its website a security whitepaper titled, "AMD Ryzen Pro 5000 Series Mobile Processors Making Defense Count: Designing for Substantial Depth," written by Akash Malhotra of AMD's Product Security and Strategy Group.

245.     The whitepaper explains that AMD works closely with operating system developers and OEMs to design security features:

> AMD works closely with operating system (OS) and original equipment manufacturers (OEMs) to provide hardware security features that complement and strengthen their own security design.

246.     Moreover, AMD in its whitepaper states that it designs its CPUs with security as a central priority:

**EVERYTHING BUILT WITH SECURITY IN MIND**

AMD "Zen"-based core architectures provide a strong security foundation. AMD's security architecture helps to reduce exposure of attacks, can reduce downtime, may require fewer patches and can help improve the total cost of ownership.

247.    With respect to its Secure Processor technology, AMD expressly touts its integration of "dedicated hardware" available in a system-on-a-chip (SoC), but also the TEE micro-operating system, that runs its PSP and fTPM firmware. AMD repeatedly represents that these systems are "***isolated***" from the CPU's main systems:

> The AMD Secure Processor is dedicated hardware available in each system-on-a-chip (SoC), designed to anchor a hardware root of trust. It will also help boot and initialize the SoC through a secure boot flow and establish ***an isolated*** Trusted Execution Environment. Even though it is part of the silicon, it is ***considered isolated***, as the host SoC cannot access its memory. The ASP is foundational to platform security, with the following components . . . .

248.    AMD describes its secure boot process with particularity, identifying the TPM module as part of the secure boot system:



249.    As AMD's diagram represents, the TPM is part of the AMD CPU's "[t]rusted environment" and is initialized as part of its Secure Loader, before the operating system itself is loaded. AMD never discloses the TPM's interactions with privileged CPU and memory resources, nor that it is implemented as part of the PSP subsystem. Put simply, AMD repeatedly represents ***isolation*** of its fTPM and PSP subsystems.

250.     Despite speaking directly on the subject of hardware security in its CPUs—and indeed, speaking on the subject of TPM security in its CPUs—AMD does not disclose the defective design of its fTPM subsystem, nor does it disclose the fTPM subsystem's potential to interfere with the functionality and operation of a PC using an AMD CPU during ordinary PC activities, such as playing audio and video, playing games, and videoconferencing.

### D.     AMD Markets Its Defective CPUs As Specially Adapted for Gaming and Media on Third-Party Websites, Including Amazon.com

251.     AMD aggressively markets its CPUs' allegedly superior performance in media playback and gameplay on third-party websites that sell its defective Ryzen and Athlon CPUs. For example, Amazon.com, which sells defective AMD CPUs, has a so-called "AMD Store" that touts, in its header, "Play it all with AMD Ryzen and Radeon," and advertises "Powerhouse Performance" in gaming, including "fluid gaming," as "AMD Ryzen processors . . . *enhance the gaming experience*."



252. The front page of Amazon's "AMD Store" includes giant, banner-like statements by AMD that "AMD Ryzen" is "[f]or gamers and content creators alike," that AMD CPUs create "[t]he ultimate gaming platform for any game," and that AMD CPUs offer "[r]eliable high performance computing for competition" in E-Sports.







253.    In truth, "reliable," "fluid" gaming and "content creation" specifically require—indeed, center upon—smooth, stutter free audio and video playback and gameplay.

254.    On its website, AMD touts its Ryzen 9 Desktop CPUs as "Extreme processing for gamers streamers and creators." It promises "No-compromise performance for gamers and creators who deserve to have it all." This statement has been on AMD's website since at least August 17, 2020.



255.    What is more, AMD expressly promises that its CPUs perform streaming tasks, including for "gaming experiences," without stuttering. To wit, AMD currently states on its website—on a page

that has been live since no later than February 25, 2022—that AMD Ryzen processors allow users to "stream with less stutter":



256.   AMD's express representation about "stuttering," which remains on its website to this day, makes no mention of the debilitating stuttering plaguing its Ryzen CPUs.

**E.   AMD Made False Statements About "Multi-tasking" Performance**

257.   AMD also made statements at least as early as November 5, 2020, expressly promising that multi-tasking on AMD processors would be "lag free."

> # Do More at Once
>
> Enjoy the perks of seamless multi-tasking, like streaming your favorite shows, opening new browser tabs, and chatting at the same time, completely lag-free.

258.   The statement was made conspicuously on AMD's consumer website until approximately August 28, 2021, when AMD made new representations about multi-tasking:



259.    This statement was also false and misleading. While AMD was telling customers that its CPUs were suited for "do[ing] it all at once"—namely, multimedia experiences and gaming—its CPUs were malfunctioning in everyday (non-)performance of precisely those tasks. Indeed, as alleged below, when AMD made these statements, AMD was aware of a deluge of complaints about stuttering while multi-tasking, including on its own official support forum.

## VI.   AMD'S DESIGN DEFECT INJURED PLAINTIFFS' AND CLASS MEMBERS' PROPERTY—THEIR PCS

260.    Because the AMD fTPM module is integrated into AMD Ryzen and Athlon CPUs as firmware running within AMD's PSP subsystem, it shares memory and resources with the main CPU, including privileged and sensitive CPU functions and system memory. That same integration requires the PSP to share its co-processor and memory resources with other PSP functions, *e.g.*, DRM-related processing. There are at least two substantial, consumer-facing effects of AMD's flawed design.

261.    First, because AMD's fTPM is a firmware solution that is implemented as part of the PSP, it leaves the main CPU itself vulnerable to firmware attacks. These are attacks on foundational system software that run even before the operating system comes online, and such attacks are particularly pernicious because they can provide the attacker with broad, low-level access to a computer's hardware, software, and peripheral systems. Moreover, these attacks are difficult to protect against at the operating system level, and as a result they are usually mitigated by hardware-based security—principally, TPMs implemented as discrete hardware modules or subsystems on a computer. AMD's implementation, however, does not provide such hardware-based separation or security, and leaves PCs vulnerable to firmware attacks because of the flawed AMD fTPM and PSP design. The net effect is that PCs with affected Ryzen and Athlon CPUs are more vulnerable to firmware attacks than PCs with other comparable CPUs, including those provided by AMD's chief competitor, Intel.

262.    Second, because the AMD fTPM shares resources with the main CPU and the PSP ARM co-processor (and its TEE operating system), a system's interactions with the fTPM can stall out or occupy important system resources, including the resources of the PSP ARM co-processor (and TEE operating system) that houses the fTPM firmware. The result of this AMD design choice is that users

running Ryzen and Athlon CPUs may experience intrusive stuttering during the playback of audio and video, during videoconferencing, and while playing games.

263.    Both effects (collectively referred to as the "Effects") result in direct harm to Plaintiffs and the Classes by injuring their property—their PCs. Because of these Effects, the economic value of Plaintiff and Class Members' PCs is lower than the aggregate price Plaintiffs and Class Members paid for their PCs' components, resulting in an out-of-pocket loss. Moreover, because of the Effects, the value of Plaintiffs and Class Members' PCs Plaintiffs and Class Members remains lower than it otherwise would have been, including upon resale, resulting in additional injury because of the diminution of value of Plaintiffs' and Class Members' PCs.

264.    Plaintiffs and Class Members were able to identify and quantify these injuries to their PCs because of the AMD defect with a pre-complaint survey-based statistical analysis, called a conjoint analysis. This analysis allows Plaintiffs and Class Members to pinpoint relative values of the Effects as well as price and brand features of PCs. The results of this pre-complaint analysis, which was based on a survey sample size of 150 U.S. respondents, clearly show that Plaintiffs and Class Members have suffered injury through an overcharge and/or the diminution of value of their PCs.

265.    To begin with, the conjoint analysis identified a negative price effect for PCs with AMD CPUs given each of the Effects. As described below, each of the Effects results in a significant negative value under the marginal willingness-to-pay metric ("MWTP"), which measures the amount of money purchasers are willing to pay for each feature tested. The calculated MWTP for each Effect is set forth below compared to the baseline of PCs without any of the Effects. The MWTP measured for PCs with a given CPU brand is also set forth below and is based on the baseline of a PC with an AMD-branded CPU.

| Product Attribute / Effect | Marginal Willingness to Pay (MWTP) | 90% Confidence Interval MWTP |
|---|---|---|
| Stuttering audio/video playback, videoconferencing, or gameplay | -$915.66 | -$716.32 to -$1085.64 |
| Increased vulnerability to firmware attacks | -$1088.49 | -$807.42 to -$1398.76 |
| Intel Brand (vs. AMD baseline) | $104.40 | $53.30 to $146.06 |

266.     The conjoint results, summarized above, indicate that purchasers are willing to purchase PCs at a discount of $915.66 and $1088.49 for stuttering and increased vulnerability to firmware attacks, respectively. In other words, the Effects have a quantifiable negative value on the AMD-based PCs owned by Plaintiffs and Class Members. Indeed, the negatively valued 90% confidence intervals set forth above confirm that almost all, if not all, of the Plaintiffs or Class Members actually experienced injury to the value as to their PCs.

267.     The conjoint study also identified each of the measured Effects as highly material to purchasers. A breakdown of consumer preferences as to security, playback, and brand features tested above is shown below:



268.     The study identified an increased vulnerability to firmware attacks, described as the "Security" feature in the above graphic, as nearly as important as a PC's price, with 32.1% of survey respondents valuing that attribute as the most important feature. As to stuttering in playback of audio and video, videoconferencing, and gameplay, which is identified as the "Playback / Gameplay" feature in the above graphic, 25.11% of users identified that Effect as the most important feature. In contrast, the CPU brand, identified above as the "CPU" feature, was the least important to survey respondents, with only 8.8% valuing that feature as most important.

269.     The relative importance of features described above indicates that increase vulnerability to a firmware-based attack on a PC is highly material to users and that this Effect, when present, impairs, and deprives the owner of, a PC's ordinary use—*i.e.*, functionality without disproportionate vulnerability

to firmware attacks. Indeed, purchasers identified this Effect as nearly as important as one of the central features of a PC product—its price.

270.    Likewise, the study's relative importance metric also indicates that stuttering in audio and video playback, videoconferencing playback, and/or gameplay are also highly material to purchasers, and that when the Effect related to this feature is present, it significantly impairs, and deprives the owner of, the PC's ordinary use—*i.e.*, the smooth playback of audio and video, videoconferencing, and gameplay.

271.    Moreover, the negatively valued MWTP figures revealed in the study—summarized above—indicate that a significant amount of the value of a PC is lost given each of the Effects. For example, as to the median price for a PC measured by the conjoint analysis and survey, $1750, the playback Effect results in an approximately 52% loss of value, and as to the firmware vulnerability Effect, 62% of the PC's value is lost.

272.    Finally, the conjoint analysis shows that AMD received significant benefit from selling its defective CPUs. Indeed, based on simulations run given the results of the conjoint analysis, each Effect would have significant effects on AMD's revenue shares with respect to its main competitor for x86 microprocessors, Intel. AMD could not have sold nearly as many computers with its CPUs if AMD's revenue shares accurately reflected its true standing in the market given the defective CPUs it sold, including because demand for AMD-based computers would have been far less.

273.    Simulations run based on the results of the conjoint analysis show that for a market in which purchasers knew *ex ante* that AMD-based PCs had the playback/gameplay Effect, PC revenue shares for AMD-based PCs compared to Intel-based PCs would have dropped from 45.5% to 17.3%.

274.    Simulations run based on the results of the conjoint analysis show that for a market in which purchasers knew *ex ante* that AMD-based PCs had the increased firmware vulnerability Effect, AMD's revenue share would have dropped from 45.5% to 15.3%.

275.    AMD received the benefit of selling more CPUs, at a higher price, than it would have if the AMD design Effects were known by would-be PC purchasers at the time of their purchase. Plaintiffs and the Class Members conferred that benefit on AMD by paying an inflated price for AMD Ryzen- and Athlon-based CPUs at purchase.

1

**VII.    AMD KNEW THAT ITS CPUS WERE DEFECTIVE WHEN IT SOLD THEM TO PLAINTIFFS AND CLASS MEMBERS**

2        276.    AMD knows that its fTPM design is defective—and it has known this for several years.

3   AMD has known about the stuttering effect of its flawed fTPM design since at least March 2021, and it

4   has known of the security vulnerabilities stemming from that flawed design since at least September

5   2018. Both of these effects put AMD on notice that there was a design defect in the fTPM module that

6   AMD integrated into its Ryzen and Athlon CPUs.

7        277.    Plaintiff Day purchased AMD Ryzen CPUs in November 2020. By then, AMD knew that

8   its fTPM design (incorporating the fTPM as part of the PSP) was flawed and made computers built around

9   Affected CPUs uniquely vulnerable to firmware attacks.

10        278.    Plaintiff Dobek, who experiences debilitating stuttering as a result of AMD's flawed

11   design, purchased her AMD Ryzen CPU on August 19, 2021. By then, AMD knew—through various

12   independent sources—not only of the security vulnerability of its fTPM design, but that this design

13   (incorporating the fTPM as part of the PSP) was causing intrusive stuttering during streaming, gameplay,

14   and videoconferencing in computers built around Affected CPUs.

15        **A.    AMD Gleaned Knowledge of the Defect from Testing, including in Collaboration with Microsoft**

16

17        279.    AMD performs pre-silicon testing of its CPUs to ensure that there are no defects or

18   performance issues. This means that AMD performed extensive testing prior to selling Plaintiff Dobek

19   and other class members their CPUs—testing that would have revealed the effects of AMD's defective

20   design. As AMD explains on its website:

21            AMD conducts verification testing pre-silicon and validation testing post-
             silicon. Pre-silicon activities include verifying the functionality of the chip
22            and conducting various advanced chip level modeling and simulations.
             Post-silicon validation involves testing for speed, functionality and
23            reliability on packaged silicon. These comprehensive tests must meet
             stringent requirements prior to production. Software validation is
24            performed in parallel with hardware validation to help deliver hardware
             and software components that operate in harmony.
25

26        280.    AMD also performs extensive testing of its CPUs in collaboration with Microsoft to

27   ensure compatibility with the Microsoft Windows operating system. Windows 11 was no exception.

28

281.    Prior to the release of Windows 11, Microsoft made available the Windows Hardware Lab Kit and the Windows Assessment Toolkit to AMD. AMD tested its CPUs with pre-release versions of Windows 11 to ensure compatibility. Indeed, Windows widely released its first Beta of Windows 11 beginning on July 8, 2021, and a more widely distributed Beta on July 29, 2021. Both of these Windows 11 Betas were provided to AMD for testing prior to Plaintiff Dobek's purchase of a defective AMD Ryzen CPU on August 19, 2021.

282.    AMD also collaborated with Microsoft to provide a microcode update that addressed the Spectre and Meltdown flaws in x86-based microprocessors. Microsoft announced its collaboration with AMD on the microcode update on November 11, 2019. AMD itself had previously released Microcode updates for Windows 10 in April 2018. Put simply, AMD has a long history of working closely with Microsoft to update the microcode embedded in its CPUs.

283.    On October 5, 2021, AMD issued a press release touting its "long history of collaboration" with Microsoft and announced that AMD had worked closely with Microsoft ahead of the release of Windows 11:

> "We are thrilled to continue our close relationship with Microsoft as they introduce Windows 11, with all its features and benefits, which together bring a refined and streamlined experience to AMD-powered PCs," said Saeid Moshkelani, Senior Vice President and General Manager, Client Business Unit, AMD. "Consumers who already have AMD-powered products can experience the innovations of Windows 11 along with the trusted features and capabilities that they're used to from AMD."

284.    AMD markets its close collaboration with Microsoft on its website. For example, on a page titled "Windows 11 and AMD," AMD states that it worked with Microsoft to ensure its processors' compatibility with Windows 11:



285.    AMD continually monitors the performance of its CPUs while running the Windows operating system. Indeed, upon the release of Windows 11, AMD made a statement that the performance of its CPUs had dropped approximately 15% on Windows 11. As an October 8, 2021 post on AMD's website explained: "AMD and Microsoft have determined that compatible AMD processors may exhibit reduced performance in certain applications when running Windows 11 build 22000.194."

286.    As reported by ZDNet on October 7, 2021, AMD and Microsoft diagnosed the problem after a year of testing by "Windows Insiders," such as AMD:

> Despite a ***year of testing*** with Windows Insiders, AMD and Microsoft have now disclosed that there may be as much as a 15% hit on performance after installing Windows 11 on AMD processors, such as its EPYC and Ryzen line. The size of the impact depends on what applications are running, and it affects games more severely.

(emphasis added).

287.    In other words, AMD's testing of its CPUs with Microsoft Windows 11 began as early as October 2020, and continued even after the release of the operating system. Microsoft and AMD collaborated on compatibility, performance, and even firmware (*i.e.*, AMD CPU microcode).

## B.    AMD Knew about the Design Defect as a Result of User Complaints

288.    As explained at length in subsection IV.A of this complaint, AMD received reports of "stuttering" in computers that incorporated its CPUs beginning in at least March of 2021 (and possibly years earlier)—well before Plaintiff Dobek purchased her CPU.



SweetPhilosophy   Adept I                                          ⋮

03-10-2021 01:02 PM

### 5800x brand new build stutters   ✔ Jump to solution

Hello,

I experience random stutters. That's basically it. Most of the time I observe them during gaming session because the fps counter also drops for a fraction of a second. There are other instances where I experience them, mostly when I open a program or a game, just after I double click it the stutter will occur (I randomly move my mouse waiting and that's how I noticed). Games where I mostly observe these stutters are League of Legends (which should run flawlessly on such a build), Apex Legends, Warzone/ColdWar, probably because being competitive and being fully focused I immediately spot them.

Also tried with different refresh rates, from 60 to 165hz and it still occurs, granted - it's less noticeable on lower refresh rates.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Shadowy89  Adept I                                                    ⋮

03-12-2021 11:20 AM

I have also noticed mirco stutters in GTA Online with same processor but with Asus x570 Strix E. Steam fps counter
show few drops in frames. I have locked game to 100FPS and it drops to 90-98 fps area but in truth 1% lows goes way
lower. You shouldnt see that mirco stutter with 144hz panel if it was only few frames what steam fps counter shows.

Also running Nvidia 2080 super, so no hic-ups in there. Also playing with graphical settings didn't do anything.



rglenpayne  Journeyman III                                            ⋮

03-15-2021 11:06 AM

I have this issue as well, screen will occasionally "smear" for me as if we hit a hitch in the action or as if time stopped
just for a brief moment. 5800X on an X570 Unify with an EVGA RTX 3070 XC3 Ultra Gaming.

289.     These reports, which included numerous posts on AMD's official support forum, exploded

in quantity beginning in June 2021, when Microsoft announced it would be requiring TPM enablement

on its forthcoming Windows 11 operating system.



Rafaelhaf  Journeyman III                                             ⋮

08-09-2021 02:47 PM

## FTPM Stuttering

Hey

I have a problem with the FTPM feature that after activating it I have random STUTTERING while
using it on the PC and disabling the problem no longer occurs.


Anyone else with this problem?

My Setup:


CPU - Ryzen 5600X
MB - Asrock B550 Steel Legends - Bios 2.00 AGESA ComboAM4v2 1.2.0.2
Ram - G.skill 16 GB 3600

*August 9, 2021 Post from AMD.com Support Forum*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28





*July-August 2021 Posts from Linus Tech Tips Hardware Support Forum*

290.    The user reports on AMD.com and on Internet-leading hardware support forums and message boards like Linus Tech Tips were detailed, voluminous, and very assertive—and further explained that users were contacting motherboard manufacturers and even AMD about the fTPM-linked stuttering they were experiencing.



291.    Another heavily-trafficked hardware message board, Tom's Hardware Forums, included complaints about Ryzen fTPM-based stuttering in June 2021:



292.    Reddit, too (the official AMD subreddit, /r/Amd), contained reports of stuttering during gameplay on computers built around AMD Ryzen CPUs in June 2021:




*Jun. 21, 2021, and Jun. 26, 2021 Reddit Posts within www.reddit.com/r/Amd*

293.    As noted above, AMD's own message boards contained complaints about fTPM-based stuttering no later than August 9, 2021, before Plaintiff Dobek purchased her defective Ryzen CPU on August 19, 2021.

294.    AMD received complaint after complaint on its official support forum and elsewhere on heavily-monitored hardware forums like Linus Tech Tips, Overclock.net, Tom's Hardware, and the AMD subreddit, but said nothing about the fTPM flaw in its advertising, merchandising, or on its website. Rather, AMD sold the defective CPUs without any disclosures, including to Plaintiff Dobek and members of the Nationwide Fraud Class.

295.    As explained in subsection IV.A, the complaints to AMD—including on its official forum—continued at high volume, in extreme detail, throughout 2021 and into 2022 before AMD finally even disclosed that there was a problem with its processors in March 2022. And after AMD released an alleged "fix" in mid-2022, complaints, including on AMD's website, continued to roll in at high volume about the incomplete rollout of the alleged BIOS fix, the difficulty and danger of personally installing a

motherboard-based BIOS update, and the overall ineffectiveness of the alleged "fix" in actually stopping stuttering on users' AMD Ryzen and Athlon CPUs impacted by the fTPM defect. *See* §§ IV.A-C, *supra*.

### C.   AMD Knew Its Defective Design of the fTPM as Part of the PSP Made Its CPUs Vulnerable to Firmware Attacks

296.   AMD has long known that its implementation of the fTPM as part of the PSP created a serious security vulnerability—namely, to firmware attacks.

297.   For example, in September 2018, Cfir Cohen, a security researcher with the Google Cloud Security Team, discovered a security vulnerability in AMD's fTPM built into the PSP. Cohen reported the vulnerability, which he described as "trivial" to exploit, directly to AMD that same month, and AMD responded to Cohen's vulnerability report in December 2018. As Bleeping Computer reported on January 6, 2018:

> **Vulnerability reported to AMD**
>
> The Google researcher reported the flaw to AMD in September, and AMD told the researcher in December that they've developed a patch and were preparing to roll it out.

298.   Numerous firmware attacks, including against the PSP and fTPM, have been publicly disclosed since then. Some of these attack vectors are described in Section II.B, *supra*.

299.   Attacks on AMD's PSP and fTPM include a vulnerability addressed by AMD in August 2021 (AMD ID CVE-2021-26333), which according to AMD, meant "[l]ow privileged malicious users may be able to access and leak data through the AMD Chipset Driver."

300.   Security researchers continue to find vulnerabilities to firmware attacks in AMD's fTPM and PSP to this day. Indeed, in April 2023, an academic paper titled, "faulTPM: Exposing AMD fTPM's Deepest Secrets," authored by security researchers at Technische Universität Berlin, surveyed the numerous attack vectors that exist for AMD's fTPM and PSP, then described yet another attack vector.

301.   AMD responded to the paper by stating that it had known about related attack vectors since the ACM CCS 2021 Academic conference, which occurred from November 15-19, 2021. As an AMD spokesman told Tom's Hardware: "AMD is aware of the research report attacking our firmware

trusted platform module which appears to leverage related vulnerabilities previously discussed at ACM CCS 2021." The "Call for Papers" for the ACM CCS 2021 Conference was on December 7, 2020.

302.    In sum, AMD had knowledge of the security risks posed by its flawed design before Plaintiffs purchased—certainly before Plaintiff Dobek purchased her CPU in August of 2021. AMD continues to sell its CPUs with fTPMs built into the PSP without disclosing the defective design and the security risks stemming from it.

## CLASS ACTION ALLEGATIONS

303.    Plaintiffs bring this action and seek to certify and maintain it as a class action under Rules 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure, on behalf of themselves and on behalf of the proposed classes of persons (collectively, the "Classes") defined below.

304.    Each class's claims derive directly from a course of conduct by AMD.

305.    AMD has engaged in uniform and standardized conduct toward each class. AMD did not materially differentiate in its actions or inactions toward members of the respective Classes. For each class, the objective facts on these subjects are the same for all class members.

306.    Within each Claim for Relief asserted by each class, the same legal standards govern. Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed classes pursuant to Fed. R. Civ. P. 23.

307.    Additionally, many states, and for some claims all states, share the same legal standards and elements of proof, allowing for a multistate or nationwide class or classes for some or all claims.

308.    This action may be brought and properly maintained as a class action because the questions it presents are of a common or general interest, and of many persons, and also because the parties are numerous, and it is impracticable to bring them all before the court. Plaintiffs may sue for the benefit of all as representative parties pursuant to Federal Rule of Civil Procedure 23.

### The Nationwide Class

309.    Plaintiffs Day and Dobek bring this action and seek to certify and maintain it as a class action on behalf of themselves and a Nationwide Class. The Nationwide Class comprises:

> All persons, business associations, entities, or corporations that purchased
> AMD Ryzen or AMD Athlon processors with fTPM modules for their PCs
> from January 1, 2019, to the present, inclusive (the "Class Period").

310.    Plaintiffs and members of the class assert nationwide claims based on the uniform application of California law against AMD.

311.    Excluded from the Nationwide Class are AMD, its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates; and the judicial officers and their immediate family members and associated court staff assigned to this case.

### The Nationwide Fraud Class

312.    Plaintiff Dobek brings this action and seeks to certify and maintain it as a class action on behalf of herself and a Nationwide Fraud Class. The Nationwide Fraud Class comprises:

> All persons, business associations, entities, or corporations that purchased
> AMD Ryzen or AMD Athlon processors with fTPM modules for their PCs
> from March 10, 2021, to the present, inclusive (the "Class Period").

313.    Plaintiff Dobek and members of the class assert nationwide claims based on the uniform application of California law against AMD.

314.    Excluded from the Nationwide Fraud Class are AMD, its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates; and the judicial officers and their immediate family members and associated court staff assigned to this case.

### The Illinois Class

315.    If Plaintiffs are unable to assert claims as part of a nationwide class, Plaintiff Dobek, in the alternative, brings this action and seeks to certify and maintain it as a class action on behalf of herself and an Illinois Class. The Illinois Class comprises:

> All Illinois persons who purchased Ryzen or AMD Athlon processors with
> fTPM modules for their PCs from January 1, 2019, to the present, inclusive
> (the "Class Period").

316.    Excluded from the Illinois Class are AMD, its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates; and the judicial officers and their immediate family members and associated court staff assigned to this case.

**The Illinois Fraud Class**

317.    If Plaintiffs are unable to assert claims as part of a nationwide class, Plaintiff Dobek, in the alternative, brings this action and seeks to certify and maintain it as a class action on behalf of herself and an Illinois Fraud Class. The Illinois Fraud Class comprises:

> All Illinois persons who purchased Ryzen or AMD Athlon processors with fTPM modules for their PCs from March 10, 2021, to the present, inclusive (the "Class Period").

318.    Excluded from the Illinois Fraud Class are AMD, its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates; and the judicial officers and their immediate family members and associated court staff assigned to this case.

**The West Virginia Class**

319.    If Plaintiffs are unable to assert claims as part of a nationwide class, Plaintiff Day, in the alternative, brings this action and seeks to certify and maintain it as a class action on behalf of himself and a West Virginia Class. The West Virginia Class comprises:

> All West Virginia persons who purchased Ryzen or AMD Athlon processors with fTPM modules for their PCs from January 1, 2019, to the present, inclusive (the "Class Period").

320.    Excluded from the West Virginia Class are AMD, its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates; and the judicial officers and their immediate family members and associated court staff assigned to this case.

**Numerosity**

321.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).

322.    The members of the Classes are so numerous that a joinder of all members would be impracticable. AMD has sold millions of defective CPUs, which have been incorporated into PCs during the Class Period.

**Ascertainability**

323.    The Classes are ascertainable.

324.     The defined Classes consist of individuals who purchased AMD CPUs for use in their computers. This identity of these individuals can be determined through records maintained by AMD, re-sellers, and purchasers.

325.     This information can be used to provide members of each class with direct notice pursuant to the requirements of Rule 23 and the Due Process Clause of the United States Constitution.

**Typicality**

326.     Plaintiffs' claims are typical of the members of the Classes.

327.     Plaintiffs' claims are the same as those asserted by members of the Classes. Each Plaintiff, like the members of the Classes, has purchased a defective AMD Ryzen or Athlon processor, and has been harmed by injury to their PCs as a result of the defective AMD CPUs.

328.     Each Plaintiff alleges injury that is not unique to them, but is typical of members of each of the Classes, including measures of damages, such as damages resulting from the diminution of value of their PCs proximately caused by AMD's defective CPUs.

329.     Each Plaintiff alleges that their injury flows from the common course of conduct alleged as to AMD.

330.     Each Plaintiff is similarly positioned as to each member of the Classes. As such, their injury can be redressed in the same manner as any redress provided to the members of the Classes (and *vice versa*).

**Adequate Representation**

331.     Plaintiffs will fairly and adequately protect the interests of the class members.

332.     Plaintiffs are committed to putting the interest of the Classes ahead of their own and to act in the best interest of members of the Classes.

333.     Plaintiffs understand their obligations to the Classes and are committed to monitoring/supervising developments in the case and class counsel.

334.     Plaintiffs have retained competent counsel experienced in computer science, computer architecture, cryptography, and computer security, as well as in consumer class actions.

335.    Plaintiffs have retained counsel with the resources and capital to litigate the case on behalf of the Classes.

336.    Plaintiffs and their counsel intend to prosecute this action vigorously and to obtain relief, including both injunctive and monetary relief, that will remedy the design flaw and its manifestations (*e.g.*, stuttering in audiovisual playback and gameplay).

**Superiority**

337.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because AMD has acted and/or refused to act on grounds generally applicable to the Classes, thereby making final injunctive and/or corresponding declaratory relief appropriate with respect to each class as a whole.

338.    The class device is superior to all other available methods of adjudication, as it would make little sense for each of the millions of class members to separately prove the common conduct in which AMD has engaged.

339.    Moreover, damages suffered by each individual member of the Classes may be small, meaning that the expense or burden of individual litigation would make it very difficult or impossible for individual class members to redress their injury individually.

340.    Because damages may be small, individual members of the Classes may not have a rational economic interest in individually controlling the prosecution of a single action, and the burden imposed on the judicial system from having to individually adjudicate such claims will be significant in comparison to the value of individual claims.

341.    Class litigation is thus superior to individual litigation and is the best procedural device to vindicate the rights of the members of the Classes.

342.    In addition, class litigation will streamline the management of the litigation, such that the expense, burdens, inconsistencies, economic infeasibility, and other negative effects of individual mitigation will be lessened if not eliminated.

343.    In sum, class litigation is superior because it mitigates significant inefficiencies and barriers that would result from individual litigation. In fact, absent invocation of the class device, the

Classes' claims would likely not be vindicated individually, and AMD's sale of defective CPUs, and the resulting injury to PCs, will go unaddressed.

**Commonality and Predominance**

344.    This action and the claims asserted by the classes satisfy the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because there are many questions of law and fact that are common as to all of the members of the Classes.

345.    These questions of fact and law concern AMD's conduct, which is common as to the members of the Classes, and answers to those questions would provide answers to issues posed by claims asserted by all members of the Classes.

346.    These common issues will predominate at trial, and any individual issues that may arise would not outweigh the predominance of common issues.

347.    Common issues that will predominate at trial include, without limitation, the following:

   a.   Whether AMD's defective design of its affected Ryzen and Athlon processors is reckless, negligent, and/or unlawful;

   b.   Whether AMD's design of its affected Ryzen and Athlon processors amounts to unfair competition;

   c.   Whether AMD's design of its affected Ryzen and Athlon processors should be permanently enjoined;

   d.   Whether AMD's design of its affected Ryzen and Athlon processors resulted or is resulting in an injury to PCs that incorporate those CPUs;

   e.   Whether the members of the Classes experienced or are experiencing out of pocket losses caused by AMD's alleged conduct;

   f.   Whether AMD was unjustly enriched by its conduct;

   g.   Whether AMD employed unlawful, unfair, deceptive, and/or fraudulent practices that harmed Plaintiffs and members of the Classes;

   h.   Whether AMD engaged in false advertising in contravention of California law;

i.    Whether AMD violated the consumer protection laws and statutes of California, including its Unfair Competition Law and the California Consumer Legal Remedies Act;

j.    Whether members of the Classes are entitled to equitable relief including, but not limited to, a preliminary and/or permanent injunction or declaratory relief;

k.    Whether aggregate amounts of statutory penalties are enough to punish and deter AMD and to vindicate statutory and public policy;

l.    How such penalties should most equitably be distributed among class members;

m.    Whether AMD violated the consumer protection statutes of each State, including Illinois and West Virginia;

n.    Whether AMD knew or should have known about the faulty design of its CPUs when it sold them;

o.    Whether purchasers of defective AMD processors are entitled to restitution for money paid for AMD's products and services due to the allegedly unlawful and/or unfair conduct by the company.

**Grounds Generally Applicable to the Classes**

348.    Plaintiffs intend to seek injunctive relief ending AMD's sale of defective processors.

349.    Plaintiffs are properly situated to seek such an injunction because AMD has acted and/or refused to act on grounds generally applicable to Plaintiffs and the members of the Classes.

350.    This means that final injunctive relief or declaratory relief will redress Plaintiffs' harm as well as the harm to members of the Classes.

351.    An injunction preventing AMD from continuing to sell defective CPUs will stop AMD's unlawful conduct from occurring in the future. In the alternative, an injunction requiring AMD to recall the affected CPUs (the "Affected CPUs") will stop AMD's unlawful conduct from continuing to injure the Classes.

**CHOICE OF LAW**

352.    Plaintiffs aver that California law applies to their claims, and Plaintiffs accordingly assert their claims on behalf of a Nationwide Class and Nationwide Fraud Class.

353.    There are no conflicts between California law and those of the several States as to the nationwide claims asserted in this Complaint on behalf of the Nationwide Class and Nationwide Fraud Class.

**CLAIMS FOR RELIEF**

**REALLEGATION AND INCORPORATION BY REFERENCE**

354.    Plaintiffs reallege and incorporate by reference all the preceding paragraphs and allegations of this Complaint, as though fully set forth in each of the following Claims for Relief asserted on behalf of the Classes.

A.    **Nationwide Claims (based on California Law)**

**COUNT ONE**
**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On behalf of the Nationwide Class)**

355.    Plaintiffs incorporate by reference all preceding and succeeding allegations as though fully set forth in this Count.

356.    Plaintiffs Day and Dobek bring the unlawful and unfair prongs of this Count on behalf of themselves and the Nationwide Class.

357.    The fraudulent prong of this Count is brought by Plaintiffs Day and Dobek on behalf of themselves and the Nationwide Class. In the alternative, the fraudulent prong of this Count is brought by Plaintiff Dobek on behalf of herself and the Nationwide Fraud Class.

358.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." AMD has engaged in unfair or deceptive acts or practices that violated the UCL, as described above and below, by, among other things, representing that the Affected CPUs have characteristics, uses, benefits, and qualities which they do not

have; representing that the Affected CPUs are of a particular standard, quality and grade when they are not; advertising that the Affected CPUs are of a particular standard, quality, and grade when they are not; advertising the Affected CPUs with the intent not to sell them as advertised; and representing that the Affected CPUs had been supplied in accordance with their representations, when they had not. AMD has violated the unlawful, unfair, and fraudulent prongs of the UCL, as set forth in this Complaint and below.

359.    AMD's actions constitute **"unlawful" trade practices** within the meaning of the UCL. In the course of AMD's business, it willfully failed to disclose and actively concealed that the Affected CPUs were defective, such that normal use of AMD's Affected CPUs would not provide (a) smooth playback of audio and video; (b) smooth gameplay; and/or (c) a secure TPM module that maintained a separation from privileged system memory, general system memory, and CPU resources, reducing the risk and effect of a firmware attack. Particularly in light of AMD's advertising campaign, a reasonable American consumer would expect the Affected CPUs to provide (a) smooth playback of audio and video; (b) smooth gameplay; and/or (c) a secure TPM module that maintained a separation from privileged system memory, general system memory, and CPU resources, reducing the risk and effect of a firmware attack. Accordingly, AMD engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of material facts with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Affected CPUs. AMD's actions violated other statutes and common law prohibitions, including those recited in the other Counts of this complaint.

360.    AMD's actions also constitute **"fraudulent" trade practices** within the meaning of the UCL. In purchasing the Affected CPUs, Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members, were deceived by AMD's failure to disclose that normal use of the Affected CPUs would not provide (a) smooth playback of audio and video, (b) smooth gameplay, and/or (c) a secure TPM module that maintained a separation from privileged system memory, general system memory, and CPU resources, reducing the risk of a firmware attack.

361.    Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members, reasonably relied upon AMD's false misrepresentations. They had no way of knowing that AMD's representations were false and misleading. As alleged here, AMD engaged in sophisticated methods of deception, including about highly technical matters for which there was and is an inherent asymmetry of information. Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members, did not, and could not, find out about AMD's deception on their own, as Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members, were not aware of the defective nature of AMD's CPUs.

362.    AMD actions as set forth above occurred in the conduct of trade or commerce.

363.    AMD's deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely to and did in fact deceive reasonable consumers.

364.    AMD intentionally and knowingly misrepresented material facts regarding the Affected CPUs it manufactured and sold with intent to mislead Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members.

365.    AMD knew or should have known that its conduct violated California law regarding unfair or deceptive acts in trade or commerce.

366.    AMD owed Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members, a duty to disclose the truth about the Affected CPUs because AMD:

    i.    Possessed exclusive knowledge of the defective design of the Affected CPUs;

    ii.    Intentionally concealed the above from Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members; and/or

    iii.    Made incomplete representations regarding the quality of the Affected CPUs, while purposefully withholding material facts from Plaintiffs Day and Dobek and the

Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members, that contradicted these representations.

367.    Due to the specific and superior knowledge that AMD possessed, its false representations regarding the quality of the Affected CPUs, and Plaintiffs Day and Dobek and the Nationwide Class Members' or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members', reliance on these material representations, AMD had a duty to disclose to Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members, that the Affected CPUs were defective, *i.e.*, that AMD's Affected CPUs do not provide (a) smooth playback of audio and video; (b) smooth gameplay; and/or (c) a secure TPM module that maintains a separation from privileged system memory, general system memory, and CPU resources, reducing the risk and effect of a firmware attack. Having volunteered to provide information to Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members, AMD had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Affected CPUs that were purchased by Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members. Smooth audio/video playback, smooth gameplay, and a secure TPM module that reduces the risk and effect of a firmware attack are material concerns to CPU consumers like (and including) Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members. AMD represented to Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members, that they were purchasing CPUs that were free from defect, when in fact they were defective.

368.    AMD's conduct proximately caused injuries to Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members.

369.    Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members, were injured and suffered ascertainable loss,

injury-in-fact, and/or actual damage as a proximate result of AMD's conduct: Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members, overpaid for Affected CPUs, and the Affected CPUs suffered a diminution in value. These injuries are the direct and natural consequence of AMD's misrepresentations and omissions.

370.    AMD's actions constitute **"unfair" trade practices** within the meaning of the UCL. AMD's unlawful acts and practices complained of in this Complaint affect the public interest, as its actions offend public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

371.    Under a balancing test, AMD's actions, including designing and deploying a "defeat device"—fTPM—to meet Windows security requirements without any actual increased security, and doing so in a defective manner that caused the stuttering and security vulnerability Effects in Plaintiffs' and the Nationwide Class Members built around defective AMD CPUs, constitute unfair trade practices within the meaning of California's UCL.

372.    As a direct and proximate result of AMD's violations of the UCL, Plaintiffs Day and Dobek and the Nationwide Class Members have suffered injury-in-fact and/or actual damage.

373.    Plaintiffs Day and Dobek would like to purchase Affected CPUs or AMD CPUs of similar design in the future but are unable to rely on AMD's representations regarding its CPUs' performance, as they have no way of determining whether those representations are in fact true.

374.    Defendant has been unjustly enriched and should be required to make restitution to Plaintiffs Day and Dobek and the Nationwide Class Members under §§ 17203 and 17204 of the California Business & Professions Code. Plaintiffs Day and Dobek and the Nationwide Class Members also seek injunctive relief as deemed appropriate by the Court, including but not limited to a prohibition on falsely advertising the Affected CPUs or AMD CPUs of similar design until the design defect is corrected.

**COUNT TWO**
**Violation of the California Consumer Legal Remedies Act**
**Cal. Civ. Code § 1750, *et seq.***
**(On behalf of the Nationwide Class)**

375.    Plaintiffs incorporate by reference all preceding and succeeding allegations as though fully set forth in this Count.

376.    Plaintiffs Day and Dobek bring this Count on their own behalf and on behalf of the Nationwide Class based on California law.

377.    Plaintiffs Day and Dobek and the Nationwide Class are "consumers" as defined in Cal. Civ. Code § 1761(d), and Plaintiffs Day and Dobek, the Nationwide Class, and AMD are "persons" as defined in Cal. Civ. Code § 1761(c).

378.    The CPUs made by AMD are "goods" as defined in Cal. Civ. Code § 1761(a).

379.    California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

380.    AMD's conduct as described in this Complaint was and is in violation of the CLRA. Defendant's conduct violates at least the following enumerated CLRA provisions:

i.    Cal. Civ. Code § 1770(a)(5): Representing that the Affected CPUs have sponsorship, approval, characteristics, uses, benefits, or quantities that they do not have.

ii.    Cal. Civ. Code § 1770(a)(7): Representing that the Affected CPUs are of a particular standard, quality, or grade although they are of another.

iii.    Cal. Civ. Code § 1770(a)(9): Advertising the Affected CPUs with the intent not to sell them as advertised.

iv.    Cal. Civ. Code § 1770(a)(16): Representing that the subject of a transaction involving the Affected CPUs has been supplied in accordance with a previous representation when it has not.

381.     In the course of AMD's business, it willfully failed to disclose and actively concealed that the Affected CPUs were defective, such that normal use of the Affected CPUs would not provide (a) smooth playback of audio and video; (b) smooth gameplay; and/or (c) a secure TPM module that maintains a separation from privileged system memory, general system memory, and CPU resources, thereby reducing the risk and effect of firmware attacks. Particularly in light of AMD's advertising campaign, a reasonable California consumer would expect the Affected CPUs to provide (a) smooth playback of audio and video; (b) smooth gameplay; and/or (c) a secure TPM module that maintains a separation from privileged system memory, general system memory, and CPU resources, reducing the risk and effect of a firmware attack. Accordingly, AMD engaged in unlawful trade practices by employing deception, deceptive acts or practices; fraud; misrepresentation; or concealment, suppression, or omission of material facts with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Affected CPUs.

382.     In purchasing the Affected CPUs, Plaintiffs Day and Dobek and the Nationwide Class Members were deceived by AMD's failure to disclose that normal use of the Affected CPUs would not provide (a) smooth playback of audio and video; (b) smooth gameplay; and/or (c) a secure TPM module that maintains a separation from privileged system memory, general system memory, and CPU resources, thereby reducing the risk and effect of a firmware attack.

383.     Plaintiffs Day and Dobek and the Nationwide Class Members reasonably relied upon AMD's false misrepresentations. They had no way of knowing that AMD's representations were false and misleading. As alleged in this Complaint, AMD engaged in sophisticated methods of deception, including about highly technical matters for which there was (and is) an inherent asymmetry of information. Plaintiffs Day and Dobek and the Nationwide Class Members did not, and could not, discover AMD's deception on their own, as Plaintiffs Day and Dobek and the Nationwide Class Members were not aware of the defective nature of the Affected CPUs prior to purchase.

384.     AMD's actions as set forth above occurred in the conduct of trade or commerce.

385.     AMD's deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely to, and did in fact, deceive reasonable consumers.

386.    AMD intentionally and knowingly misrepresented material facts regarding the Affected CPUs with intent to mislead Plaintiffs Day and Dobek and the Nationwide Class Members.

387.    AMD owed Plaintiffs Day and Dobek and the Nationwide Class Members a duty to disclose the truth about the Affected CPUs because AMD:

    i.    Possessed exclusive knowledge of the design of its CPUs, including the defective nature of the processors and onboard fTPM modules;

    ii.    Intentionally concealed the above from Plaintiffs Day and Dobek and the Nationwide Class Members; and/or

    iii.    Made incomplete representations regarding the performance of the Affected CPUs, while purposefully withholding material facts from Plaintiffs Day and Dobek and the Nationwide Class Members that contradicted these representations.

388.    Due to its specific and superior knowledge that the Affected CPUs did not provide (a) smooth playback of audio and video; (b) smooth gameplay; and/or (c) a secure TPM module that maintained a separation from privileged system memory, general system memory, and CPU resources (reducing the risk and effect of a firmware attack), AMD had a duty to disclose to Plaintiffs Day and Dobek and the Nationwide Class Members that the Affected CPUs were defective. Moreover, AMD had a duty to disclose that its processors did not provide (a) smooth playback of audio and video, (b) smooth gameplay, and/or (c) a secure TPM module that maintained a separation from privileged system memory, general system memory, and CPU resources that would reduce the risk and effect of firmware attacks. Having volunteered to provide information to Plaintiffs Day and Dobek and the Nationwide Class Members, AMD had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impacted, and impact, the value of the Affected CPUs purchased by Plaintiffs Day and Dobek and the Nationwide Class Members.

389.    The following features are material to Plaintiffs Day and Dobek and the Nationwide Class Members: (a) smooth playback of audio and video, (b) smooth gameplay, and/or (c) a secure TPM module that maintains a separation from privileged system memory, general system memory, and CPU resources, reducing the risk and effect of firmware attacks.

390.    AMD represented to Plaintiffs Day and Dobek and the Nationwide Class Members that they were purchasing CPUs that were free from defect, when in fact the CPUs were defective.

391.    AMD's conduct proximately caused injuries to Plaintiffs Day and Dobek and the Nationwide Class Members.

392.    Plaintiffs Day and Dobek and the Nationwide Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of AMD's conduct. Plaintiffs Day and Dobek and the Nationwide Class Members overpaid for the Affected CPUs, and the Affected CPUs have suffered a diminution in value. These injuries are the direct and natural consequence of AMD's misrepresentations and omissions.

393.    AMD's unlawful acts and practices complained of in this Complaint affect the public interest, as these actions offend public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumer.

394.    As a direct and proximate result of AMD's violations of the CLRA, Plaintiffs Day and Dobek and the Nationwide Class Members have suffered injury-in-fact and/or actual damage.

395.    Plaintiffs Day and Dobek would like to purchase Affected CPUs or AMD CPUs of similar design in the future but are unable to rely on AMD's representations regarding its CPUs' performance, as they have no way of determining whether those representations are in fact true.

396.    As a result of AMD's violations of the CLRA, Plaintiffs Day and Dobek, on behalf of themselves, the Nationwide Class Members, and the general public of the State of California, seek injunctive relief prohibiting AMD from continuing the unlawful practices described in this Count and in this Complaint, including but not limited to a prohibition on falsely advertising the Affected CPUs or AMD CPUs of similar design until the design defect is corrected, pursuant to Cal. Civ. Code § 1782(a)(2); equitable relief, including restitution; and a declaration that AMD's conduct violated the CLRA.

397.    Pursuant to Cal. Civ. Code § 1782, on March 22, 2023, Plaintiffs Day and Dobek, on behalf of themselves, the Nationwide Class Members, and the general public of the State of California, mailed AMD notice in writing, via certified U.S. mail, of AMD's particular violations of the CLRA and demanded that AMD rectify the actions described above by providing complete monetary relief, agreeing

to be bound by AMD's legal obligations, and giving notice to all affected customers of AMD's intent to do so.

398.     AMD failed to respond to the letter within 30 days or take the actions demanded to rectify its violations of the CLRA. Accordingly, Plaintiffs Day and Dobek seek damages and attorneys' fees as allowed by the CLRA, including actual and punitive damages under the CLRA pursuant to Civil Code § 1780(a), and an additional award of up to $5,000 to each Plaintiff and Nationwide Class Member who is a "senior citizen," as well as any other remedies the Court may deem appropriate under the CLRA.

**COUNT THREE**
**Violation of the California False Advertising Law**
**Cal. Bus. & Prof. Code § 17500, *et seq.***
**(On behalf of the Nationwide Class)**

399.     Plaintiffs incorporate by reference all preceding and succeeding allegations as though fully set forth in this Count.

400.     Plaintiffs Day and Dobek bring this Count on their own behalf and on behalf of the Nationwide Class under California law.

401.     AMD has benefitted from intentionally selling defective CPUs at artificially inflated prices due to fraudulent statements about the CPUs and their defective design. AMD has received unjust profits from this conduct, and Plaintiffs Day and Dobek and the Nationwide Class Members overpaid for Affected CPUs made by AMD as a result of this conduct.

402.     AMD publicly disseminated advertising and promotional material that was designed and intended to convey to the public that the Affected CPUs were capable of providing (a) smooth playback of audio and video; (b) smooth gameplay; and/or (c) the security features, including features which reduce the risk and effect of a firmware attack.

403.     AMD was aware of the defective design of its Affected CPUs and fTPM modules at the time Plaintiffs Day and Dobek and the Nationwide Class Members purchased the Affected CPUs. AMD intentionally designed its Affected CPUs to defraud consumers about whether these CPUs provided (a) smooth playback of audio and video; (b) smooth gameplay; and/or (c) a secure TPM module that

maintained a separation from privileged system memory, general system memory, and CPU resources, reducing the risk and effect of a firmware attack.

404.    However, AMD intentionally made representations in advertisements about the superior performance (including for video and audio playback and gameplay) and security features of its Affected CPUs yet—due to defects AMD was aware of—did not sell Affected CPUs that conformed to the representations and promises in AMD's publicly disseminated advertisements.

405.    AMD unjustly received and retained benefits from Plaintiffs Day and Dobek and the Nationwide Class Members.

406.    It is inequitable and unconscionable for AMD to retain these benefits.

407.    Because AMD wrongfully concealed its misconduct, Plaintiffs Day and Dobek and the Nationwide Class were not aware of the facts concerning the Affected CPUs and did not benefit from AMD's misconduct.

408.    AMD knowingly accepted the unjust benefits of its wrongful conduct.

409.    AMD had notice of its misconduct as alleged in this Complaint.

410.    Plaintiffs Day and Dobek would like to purchase Affected CPUs or AMD CPUs of similar design in the future but are unable to rely on AMD's representations regarding its CPUs' performance, as they have no way of determining whether those representations are in fact true.

411.    As a result of AMD's misconduct, Plaintiffs Day and Dobek and the Nationwide Class suffered an injury-in-fact and lost money and/or property in an amount to be proven at trial. Plaintiffs Day and Dobek and the Nationwide Class Members also seek injunctive relief as deemed appropriate by the Court, including but not limited to a prohibition on falsely advertising the Affected CPUs or AMD CPUs of similar design until the design defect is corrected.

**COUNT FOUR**
**Fraud under California Law**
**(On behalf of the Nationwide Class, Or In the Alternative, the Nationwide Fraud Class)**

412.    Plaintiffs incorporate by reference all preceding and succeeding allegations as though fully set forth in this Count.

413.     Plaintiffs Day and Dobek bring this cause of action on their own behalf and on behalf of the Nationwide Class against AMD based on the common law of fraud under California law.

414.     In the alternative, Plaintiff Dobek brings this cause of action on her own behalf and on behalf of the Nationwide Fraud Class against AMD based on the common law of fraud under California law.

415.     AMD fraudulently concealed and suppressed material facts regarding the Affected CPUs. AMD knew when it marketed and sold its CPUs that they were defective as to functionality central to the product's function—security, video and audio streaming, and gaming. AMD failed to disclose these facts to consumers at the time it marketed and sold the Affected CPUs. AMD knowingly and intentionally engaged in this concealment in order to boost sales and revenues, maintain its competitive edge in the industry, and obtain windfall profits.

416.     Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members, had no reasonable means of knowing that AMD's misrepresentations were false and misleading, or that AMD had omitted to disclose material details relating to the Affected CPUs. Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members, did not and could not reasonably discover AMD's concealment on their own.

417.      AMD had a duty to disclose, rather than conceal and suppress, the full scope and extent of the Affected CPUs' defects:

  i. AMD had exclusive or far superior knowledge of the design of its CPUs, including as to their onboard fTPM module and its defective implementation as part of the PSP;

  ii. The details regarding these CPUs' defective design and defective products were known and/or accessible only to AMD;

  iii. AMD knew Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members, did not know about AMD's defective CPUs; and

iv.   AMD made representations and assurances about the qualities of the Affected CPUs, including statements about their performance, security, and quality that were misleading, deceptive, and incomplete without the disclosure of the fact that these processors were defectively designed.

418.   These omitted and concealed facts were material because a reasonable consumer would rely on them in deciding to purchase the Affected CPUs, and because they substantially reduced the value of the Affected CPUs that Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members, purchased. Whether the Affected CPUs were defective would have been an important factor in Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members.

419.   Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members, trusted AMD not to sell them products that were defective.

420.   AMD intentionally and actively concealed and suppressed these material facts to falsely assure consumers that the Affected CPUs were of superior quality, performance, and security, as represented by AMD and as reasonably expected by consumers.

421.   Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members, are accordingly unable to rely on any representations by AMD given the fraudulent omission.

422.   Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members, were unaware of these omitted material facts and would have paid less for the Affected CPUs, or would not have purchased them at all, if they had known of the concealed and suppressed facts.

423.   Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members, relied to their detriment upon AMD's

reputation, fraudulent misrepresentations, and material omissions in deciding to purchase the Affected CPUs.

424.    As a direct and proximate result of AMD's deceit and fraudulent concealment, including its intentional suppression of the true facts, Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members, suffered injury. They purchased CPUs of inferior quality, performance, and security, which had a diminished value by reason of AMD's concealment of, and failure to disclose, the defects.

425.    Plaintiffs Day and Dobek and the Nationwide Class Members or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members, sustained damages as a direct and proximate result of AMD's deceit and fraudulent concealment in an amount to be proven at trial.

426.    AMD's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard for Plaintiffs Day and Dobek and the Nationwide Class Members' or, in the alternative, Plaintiff Dobek and the Nationwide Fraud Class Members', rights, with the aim of enriching AMD, justifying an award of punitive damages in an amount sufficient to deter such wrongful conduct in the future.

<u>**COUNT FIVE**</u>
**Breach of Implied Warranty under California Law**
**Cal. Comm. Code § 2314**
**(On behalf of the Nationwide Class)**

427.    Plaintiffs incorporate by reference all preceding and succeeding allegations as though fully set forth in this Count.

428.    Plaintiffs Day and Dobek bring this cause of action on their own behalf and on behalf of the Nationwide Class under the law of warranties, which is materially uniform in all states. In the alternative, Plaintiffs bring implied warranty claims on behalf of the Illinois and West Virginia Classes, as set forth later in this complaint.

429.    AMD is and was at all relevant times a merchant with respect to its PCs, including the Affected CPUs.

430.    A warranty that the Affected CPUs were in merchantable condition was implied by law for the subject transactions.

431.    AMD marketed the Affected CPUs as having high quality, speed, performance, and security, that would function, at least, as reasonably expected by consumers and in accordance with industry standards. AMD's representations formed the basis of the bargain in Plaintiffs' and the Nationwide Class Members' decisions to purchase the Affected CPUs.

432.    Plaintiffs and the other Nationwide Class Members purchased the Affected CPUs from AMD, or through retailers or resellers. At all relevant times, AMD was the manufacturer, distributor, warrantor, and/or seller of the Affected PCs.

433.    AMD knew or had reason to know of the specific use for which the Affected CPUs were purchased.

434.    Because of the defective AMD-based CPUs and integrated fTPM subsystems in the Affected CPUs, the Affected CPUs were not in merchantable condition when sold and are not fit for the ordinary purpose of such CPUs.

435.    AMD knew about the defect in the Affected CPUs, allowing AMD to cure its breach of warranty if it chose.

436.    In its capacity as warrantor, AMD had knowledge of the inherently defective nature of the defectively designed fTPM system. Any effort by AMD to limit the implied warranties in a manner that would exclude coverage of the Affected CPUs is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

437.    Any limitations AMD might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between AMD on the one hand and Plaintiffs and the Nationwide Class Members on the other as, at the time of purchase, Plaintiffs and the Nationwide Class Members had no other viable options for purchasing warranty coverage other than from AMD, nor were there alternative sources of comparable CPUs that Plaintiffs or the Nationwide Class Members could have purchased free of the unconscionable terms contained in AMD's warranties. In addition, the terms of any applicable AMD express warranties were not displayed or conspicuous to Mr. Day or Ms. Dobek

during the process of purchasing their AMD CPUs on the Amazon.com or Micro Center website, respectively, and they did not review those terms prior to purchase. The time limits contained in AMD's warranty periods were also unconscionable and inadequate to protect Plaintiffs and the Nationwide Class Members. Among other things, Plaintiffs and the Nationwide Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored AMD.

438.    Any limitations AMD might seek to impose on its warranties are also substantively unconscionable. AMD knew that the Affected CPUs would result in the Effects set forth above and that the fTPM module was defectively designed and faulty. Moreover, AMD knew that the Affected CPUs would result in the Effects after the warranty purportedly expired. AMD failed to disclose the fTPM defect, or the Effects stemming from it, to Plaintiffs and the Nationwide Class Members. Thus, AMD's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

439.    To the extent a Plaintiff or a Nationwide Class Member is not in privity with AMD, privity of contract is not required here because Plaintiffs and the Nationwide Class Members are intended third-party beneficiaries of contracts between AMD and retailers/resellers, including (1) the written distribution and supply agreements between AMD and its authorized resellers (*e.g.*, Amazon.com, Micro Center), and of the implied warranties that attach to those contracts; and (2) any express warranties provided by AMD. AMD's retailers and resellers have no rights under the warranty agreements provided with the Affected CPUs; the warranty agreements were designed for and intended to benefit consumers. Plaintiffs are also the intended beneficiaries of retailer and reseller warranties.

440.    Plaintiffs and the Nationwide Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of AMD's conduct described in this Complaint. Affording AMD a reasonable opportunity to cure the breach of written warranties would be unnecessary and futile.

441.    Accordingly, AMD is liable to Plaintiffs and the Nationwide Class Members for damages in an amount to be proven at trial.

**COUNT SIX**
**Breach of Implied Warranty under Song-Beverly Consumer Warranty Act**
**Cal. Civ. Code § 1790, *et seq.***
**(On behalf of the Nationwide Class)**

442.    Plaintiffs incorporate by reference all preceding and succeeding allegations as though fully set forth in this Count.

443.    Plaintiffs Day and Dobek bring this cause of action on their own behalf and on behalf of the Nationwide Class under the law of warranties, which is materially uniform in all states. In the alternative, Plaintiffs bring implied warranty claims on behalf of the Illinois and West Virginia Classes, as set forth later in this complaint.

444.    Plaintiffs are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

445.    AMD is a "manufacturer" within the meaning of Cal. Civ. Code § 1791(j).

446.    The Affected CPUs, including those purchased by Plaintiffs, are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

447.    Plaintiffs Day and Dobek purchased their Affected CPUs at retail in California within the meaning of Cal. Civ. Code § 1792. Mr. Day and Ms. Dobek purchased their Affected CPUs from AMD through the Amazon.com and Micro Center websites, respectively. AMD is headquartered in California and directs its United States sales and shipping operations from California, including with respect to the Affected CPUs purchased by Plaintiffs and the Nationwide Class Members.

448.    A warranty that the Affected CPUs were in merchantable condition was implied by law for the subject transactions.

449.    AMD marketed the Affected CPUs as having high quality, speed, performance, and security, that would function, at least, as reasonably expected by consumers and in accordance with industry standards. AMD's representations formed the basis of the bargain in Plaintiffs' and the Nationwide Class Members' decisions to purchase the Affected CPUs.

450.    Plaintiffs and the other Nationwide Class Members purchased the Affected CPUs from AMD, or through retailers or resellers. At all relevant times, AMD was the manufacturer, distributor, warrantor, and/or seller of the Affected PCs.

451.     AMD knew or had reason to know of the specific use for which the Affected CPUs were purchased.

452.     Because of the defective AMD-based CPUs and integrated fTPM subsystems in the Affected CPUs, the Affected CPUs were not in merchantable condition when sold and are not fit for the ordinary purpose of such CPUs.

453.     AMD knew about the defect in the Affected CPUs, allowing AMD to cure its breach of warranty if it chose.

454.     In its capacity as warrantor, AMD had knowledge of the inherently defective nature of the defectively designed fTPM system. Any effort by AMD to limit the implied warranties in a manner that would exclude coverage of the Affected CPUs is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

455.     Any limitations AMD might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between AMD on the one hand and Plaintiffs and the Nationwide Class Members on the other as, at the time of purchase, Plaintiffs and the Nationwide Class Members had no other viable options for purchasing warranty coverage other than from AMD, nor were there alternative sources of comparable CPUs that Plaintiffs or the Nationwide Class Members could have purchased free of the unconscionable terms contained in AMD's warranties. In addition, the terms of any applicable AMD express warranties were not displayed or conspicuous to Mr. Day or Ms. Dobek during the process of purchasing their AMD CPUs on the Amazon.com or Micro Center website, respectively, and they did not review those terms prior to purchase. The time limits contained in AMD's warranty periods were also unconscionable and inadequate to protect Plaintiffs and the Nationwide Class Members. Among other things, Plaintiffs and the Nationwide Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored AMD.

456.     Any limitations AMD might seek to impose on its warranties are also substantively unconscionable. AMD knew that the Affected CPUs would result in the Effects set forth above and that the fTPM module was defectively designed and faulty. Moreover, AMD knew that the Affected CPUs would result in the Effects after the warranty purportedly expired. AMD failed to disclose the fTPM

defect, or the Effects stemming from it, to Plaintiffs and the Nationwide Class Members. Thus, AMD's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

457.    A claim for breach of implied warranty under the Song-Berly Consumer Warranty Act does not require contractual privity between the plaintiff and the defendant. In the alternative, to the extent a Plaintiff or a Nationwide Class Member is not in privity with AMD, privity of contract is not required here because Plaintiffs and the Nationwide Class Members are intended third-party beneficiaries of contracts between AMD and retailers/resellers, including (1) the written distribution and supply agreements between AMD and its authorized resellers (*e.g.*, Amazon.com, Micro Center), and of the implied warranties that attach to those contracts; and (2) any express warranties provided by AMD. AMD's retailers and resellers have no rights under the warranty agreements provided with the Affected CPUs; the warranty agreements were designed for and intended to benefit consumers. Plaintiffs are also the intended beneficiaries of retailer and reseller warranties.

458.    Plaintiffs and the Nationwide Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of AMD's conduct described in this Complaint. Affording AMD a reasonable opportunity to cure the breach of written warranties would be unnecessary and futile.

459.    Accordingly, AMD is liable to Plaintiffs and the Nationwide Class Members for damages in an amount to be proven at trial.

**COUNT SEVEN**
**Quasi-Contract/Restitution under California Law**
**(On behalf of the Nationwide Class)**

460.    Plaintiffs incorporate by reference all preceding and succeeding allegations as though fully set forth in this Count.

461.    Plaintiffs Day and Dobek bring this cause of action on their own behalf and on behalf of the Nationwide Class Members against AMD, under California law, based on principles of quasi-contract and restitution.

462.    This cause of action is pleaded in the alternative to the legal claims asserted.

463.    Plaintiffs lack an adequate remedy at law for their claim, as specifically set forth later in this complaint.

464.    AMD's conduct is unjust and requires restitution. Specifically, AMD received hundreds of millions—if not billions—of dollars in revenue from the sale of the Affected CPUs.

465.    This revenue was a benefit conferred upon AMD by Plaintiffs and the Nationwide Class Members.

466.    AMD was unjustly enriched through financial benefits conferred upon it by Plaintiffs and the Nationwide Class Members, in the form of the amounts paid to AMD for the Affected CPUs.

467.    AMD knew and understood that it would and did receive a financial benefit, and voluntarily accepted the same, from Plaintiffs and the Nationwide Class Members when they elected to purchase the Affected CPUs.

468.    By selecting the Affected CPUs and purchasing them at a premium price, Plaintiffs and the Nationwide Class Members reasonably expected that the affected AMD CPUs would have the performance, security, and quality promoted by AMD, and be designed and manufactured with reasonable care. Instead, not only did the Affected CPUs fall short of such expectations and performance/security standards, they injured and damaged Plaintiffs' and the Nationwide Class Members' PCs by interfering with their operation, including when playing video, playing audio, running videoconferencing software, and/or running games. The Affected CPUs also made Plaintiffs' and the Nationwide Class Members' PCs less secure. AMD was enriched, while at the same time, Plaintiffs and the Nationwide Class Members experienced a diminution of value to their PCs.

469.    Therefore, because AMD will be unjustly enriched if it is allowed to retain the revenues obtained through its negligence and unlawful conduct, Plaintiffs and the Nationwide Class Members are entitled to recover the amount by which AMD was unjustly enriched at their expense.

470.    Accordingly, Plaintiffs, on behalf of themselves and each Nationwide Class Member, seek damages against AMD in the amounts by which AMD has been unjustly enriched at Plaintiffs' and the Nationwide Class Members' expense, and such other relief as this Court deems just and proper.

**B.** **Claims Brought in the Alternative on Behalf of the Illinois Subclass**

**COUNT EIGHT**
**Breach of Implied Warranty under Illinois Law**
**(On behalf of the Illinois Class)**

471. Plaintiffs incorporate by reference all preceding and succeeding allegations as though fully set forth in this Count.

472. Plaintiff Dobek brings this cause of action on her own behalf and on behalf of the Illinois Class.

473. AMD is and was at all relevant times a merchant with respect to its PCs, including the Affected CPUs.

474. A warranty that the Affected CPUs were in merchantable condition was implied by law for the subject transactions.

475. AMD marketed the Affected CPUs as having high quality, speed, performance, and security, that would function, at least, as reasonably expected by consumers and in accordance with industry standards. AMD's representations formed the basis of the bargain in Plaintiff Dobek and the Illinois Class Members' decisions to purchase the Affected CPUs.

476. Plaintiff Dobek and the other Illinois Class Members purchased the Affected CPUs from AMD, or through retailers or resellers. At all relevant times, AMD was the manufacturer, distributor, warrantor, and/or seller of the Affected PCs.

477. AMD knew or had reason to know of the specific use for which the Affected CPUs were purchased.

478. Because of the defective AMD-based CPUs and integrated fTPM subsystems in the Affected CPUs, the Affected CPUs were not in merchantable condition when sold and are not fit for the ordinary purpose of such CPUs.

479. AMD knew about the defect in the Affected CPUs, allowing AMD to cure its breach of warranty if it chose.

480. In its capacity as warrantor, AMD had knowledge of the inherently defective nature of the defectively designed fTPM system. Any effort by AMD to limit the implied warranties in a manner that

would exclude coverage of the Affected CPUs is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

481.    Any limitations AMD might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between AMD on the one hand and Plaintiff Dobek and the Illinois Class Members on the other as, at the time of purchase, Plaintiff Dobek and the Illinois Class Members had no other viable options for purchasing warranty coverage other than from AMD, nor were there alternative sources of comparable CPUs that Plaintiff Dobek or the Illinois Class Members could have purchased free of the unconscionable terms contained in AMD's warranties. In addition, the terms of any applicable AMD express warranties were not displayed or conspicuous to Ms. Dobek during the process of purchasing her AMD CPU on the Micro Center website, and she did not review those terms prior to purchase. The time limits contained in AMD's warranty periods were also unconscionable and inadequate to protect Plaintiff Dobek and the Illinois Class Members. Among other things, Plaintiff Dobek and the Illinois Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored AMD.

482.    Any limitations AMD might seek to impose on its warranties are also substantively unconscionable. AMD knew that the Affected CPUs would result in the Effects set forth above and that the fTPM module was defectively designed and faulty. Moreover, AMD knew that the Affected CPUs would result in the Effects after the warranty purportedly expired. AMD failed to disclose the fTPM defect, or the Effects stemming from it, to Plaintiff Dobek and the Illinois Class Members. Thus, AMD's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

483.    To the extent Plaintiff Dobek or an Illinois Class Member is not in privity with AMD, privity of contract is not required here because Plaintiff Dobek and the Illinois Class Members are intended third-party beneficiaries of contracts between AMD and retailers/resellers, including (1) the written distribution and supply agreements between AMD and its authorized resellers (*e.g.*, Amazon.com, Micro Center), and of the implied warranties that attach to those contracts; and (2) any express warranties provided by AMD. AMD's retailers and resellers have no rights under the warranty agreements provided with the Affected CPUs; the warranty agreements were designed for and intended to benefit consumers.

Plaintiff Dobek and the Illinois Class Members are also the intended beneficiaries of retailer and reseller warranties.

484.    Plaintiff Dobek and the Illinois Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of AMD's conduct described in this Complaint. Affording AMD a reasonable opportunity to cure the breach of written warranties would be unnecessary and futile.

485.    Accordingly, AMD is liable to Plaintiff Dobek and the Illinois Class Members for damages in an amount to be proven at trial.

## COUNT NINE
### Violation of the Illinois Consumer Fraud and Deceptive Business Practice Act
### 815 Ill. Comp. Stat. 505/1, *et seq.*
### (On behalf of the Illinois Class Or, In the Alternative, the Illinois Fraud Class)

486.    Plaintiffs incorporate by reference all preceding and succeeding allegations as though fully set forth in this Count.

487.    Plaintiff Dobek brings this cause of action individually and on behalf of the Illinois Class, or in the alternative, the Illinois Fraud Class, against AMD.

488.    AMD is a "person" as that term is defined in 815 Ill. Comp. Stat. 505/1(c).

489.    Plaintiff Dobek and the Illinois Class (and Illinois Fraud Class) Members are "consumers" as that term is defined in 815 Ill. Comp. Stat. 505/1(e).

490.    AMD's unlawful and unfair conduct described in this Complaint violates the Illinois Consumer Fraud and Deceptive Business Practice Act ("ICFA"). AMD knew or should have known that its conduct violated the ICFA.

491.    Plaintiff Dobek and the Illinois Class (and Illinois Fraud Class) Members suffered ascertainable loss caused by AMD's conduct, as alleged in this Complaint, including from the diminution of value to their PCs.

492.    AMD's conduct proximately caused injuries to Plaintiff Dobek and the Illinois Class (and Illinois Fraud Class) Members.

493.    Plaintiff Dobek and the Illinois Class (and Illinois Fraud Class) Members were injured and suffered ascertainable loss, injury in fact, and/or actual damages as a proximate result of AMD's conduct in that Plaintiff Dobek and the Illinois Class (and Illinois Fraud Class) Members (a) overpaid for the Affected CPUs, (b) did not receive the benefit of their bargain, and (c) experienced a diminution of value to their PCs. These injuries are the direct and natural consequence of AMD's conduct.

494.    AMDs' violations present a continuing risk to Plaintiff Dobek, to the Illinois Class (and Illinois Fraud Class) Members, and to the general public. AMD's unlawful acts and practices set forth in this Complaint affect the public interest.

495.    Pursuant to 815 Ill. Comp. Stat. 505/10a(a), Plaintiff Dobek and the Illinois Class (and Illinois Fraud Class) Members seek monetary relief against AMD in the amount of their actual damages, as well as punitive damages because AMD acted with malice and/or was grossly negligent.

496.    Plaintiff Dobek and the Illinois Class (and Illinois Fraud Class) Members also seek attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1 *et. seq.*

## COUNT TEN
### Unjust Enrichment under Illinois Law
### (On behalf of the Illinois Class)

497.    Plaintiffs incorporate by reference all preceding and succeeding allegations as though fully set forth in this Count.

498.    Plaintiff Dobek brings this cause of action on her own behalf and on behalf of the Illinois Class Members against AMD under Illinois law.

499.    This cause of action is pleaded in the alternative to the legal claims asserted.

500.    Plaintiffs lack an adequate remedy at law for their claim, as specifically set forth later in this complaint.

501.    AMD received hundreds of millions—if not billions—of dollars in revenue from the sale of the Affected CPUs.

502.    This revenue was a benefit conferred upon AMD by Plaintiff Dobek and the Illinois Class Members.

503.    AMD was unjustly enriched through financial benefits conferred upon it by Plaintiff Dobek and the Illinois Class Members, in the form of the amounts paid to AMD for the Affected CPUs.

504.    AMD knew and understood that it would and did receive a financial benefit, and voluntarily accepted the same, from Plaintiff Dobek and the Illinois Class Members when they elected to purchase the Affected CPUs.

505.    By selecting the Affected CPUs and purchasing them at a premium price, Plaintiff Dobek and the Illinois Class Members reasonably expected that the affected AMD CPUs would have the performance, security, and quality promoted by AMD, and be designed and manufactured with reasonable care. Instead, not only did the Affected CPUs fall short of such expectations and performance/security standards, they injured and damaged Plaintiff Dobek and the Illinois Class Members' PCs by interfering with their operation, including when playing video, playing audio, running videoconferencing software, and/or running games. The Affected CPUs also made Plaintiff Dobek and the Illinois Class Members' PCs less secure. AMD was enriched, while at the same time, Plaintiff Dobek and the Illinois Class Members experienced a diminution of value to their PCs.

506.    Therefore, because AMD will be unjustly enriched if it is allowed to retain the revenues obtained through its negligence and unlawful conduct, Plaintiff Dobek and the Illinois Class Members are entitled to recover the amount by which AMD was unjustly enriched at their expense.

507.    Accordingly, Plaintiff Dobek, on behalf of herself and each Illinois Class Member, seeks damages against AMD in the amounts by which AMD has been unjustly enriched at Plaintiff Dobek's and the Illinois Class Members' expense, and such other relief as this Court deems just and proper.

**C.    Claims Brought in the Alternative on Behalf of the West Virginia Class**

<u>**COUNT ELEVEN**</u>
**Breach of Implied Warranty under West Virginia Law**
**(On behalf of the West Virginia Class)**

508.    Plaintiffs incorporate by reference all preceding and succeeding allegations as though fully set forth in this Count.

509.    Plaintiff Day brings this cause of action on his own behalf and on behalf of the West Virginia Class.

510.     AMD is and was at all relevant times a merchant with respect to its PCs, including the Affected CPUs.

511.     A warranty that the Affected CPUs were in merchantable condition was implied by law for the subject transactions.

512.     AMD marketed the Affected CPUs as having high quality, speed, performance, and security, that would function, at least, as reasonably expected by consumers and in accordance with industry standards. AMD's representations formed the basis of the bargain in Plaintiff Day and the West Virginia Class Members' decisions to purchase the Affected CPUs.

513.     Plaintiff Day and the other West Virginia Class Members purchased the Affected CPUs from AMD, or through retailers or resellers. At all relevant times, AMD was the manufacturer, distributor, warrantor, and/or seller of the Affected PCs.

514.     AMD knew or had reason to know of the specific use for which the Affected CPUs were purchased.

515.     Because of the defective AMD-based CPUs and integrated fTPM subsystems in the Affected CPUs, the Affected CPUs were not in merchantable condition when sold and are not fit for the ordinary purpose of such CPUs.

516.     AMD knew about the defect in the Affected CPUs, allowing AMD to cure its breach of warranty if it chose.

517.     In its capacity as warrantor, AMD had knowledge of the inherently defective nature of the defectively designed fTPM system. Any effort by AMD to limit the implied warranties in a manner that would exclude coverage of the Affected CPUs is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

518.     Any limitations AMD might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between AMD on the one hand and Plaintiff Day and the West Virginia Class Members on the other as, at the time of purchase, Plaintiff Day and the West Virginia Class Members had no other viable options for purchasing warranty coverage other than from AMD, and there were no alternative sources of comparable CPUs that Plaintiff Day or the West Virginia

Class Members could have purchased free of the unconscionable terms contained in AMD's warranties. In addition, the terms of any applicable AMD express warranties were not displayed or conspicuous to Mr. Day during the process of purchasing his AMD CPUs on the Amazon.com website, and he did not review those terms prior to purchase. The time limits contained in AMD's warranty periods were also unconscionable and inadequate to protect Plaintiff Day and the West Virginia Class Members. Among other things, Plaintiff Day and the West Virginia Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored AMD.

519.   Any limitations AMD might seek to impose on its warranties are also substantively unconscionable. AMD knew that the Affected CPUs would result in the Effects set forth above and that the fTPM module was defectively designed and faulty. Moreover, AMD knew that the Affected CPUs would result in the Effects after the warranty purportedly expired. AMD failed to disclose the fTPM defect, or the Effects stemming from it, to Plaintiff Day and the West Virginia Class Members. Thus, AMD's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

520.   A claim for breach of implied warranty under West Virginia law does not require contractual privity between the plaintiff and the defendant. In the alternative, to the extent Plaintiff Day or an West Virginia Class Member is not in privity with AMD, privity of contract is not required here because Plaintiff Day and the West Virginia Class Members are intended third-party beneficiaries of contracts between AMD and retailers/resellers, including (1) the written distribution and supply agreements between AMD and its authorized resellers (*e.g.*, Amazon.com, Micro Center), and of the implied warranties that attach to those contracts; and (2) any express warranties provided by AMD. AMD's retailers and resellers have no rights under the warranty agreements provided with the Affected CPUs; the warranty agreements were designed for and intended to benefit consumers. Plaintiff Day and the West Virginia Class Members are also the intended beneficiaries of retailer and reseller warranties.

521.   Plaintiff Day and the West Virginia Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of AMD's conduct described in this Complaint. Affording AMD a reasonable opportunity to cure the breach of written warranties would be unnecessary and futile.

522.     Accordingly, AMD is liable to Plaintiff Day and the West Virginia Class Members for damages in an amount to be proven at trial.

<u>COUNT TWELVE</u>
**Violation of West Virginia Consumer Credit and Protection Act**
**W. Va. Code § 46A-6-106**
**(On behalf of the West Virginia Class)**

523.     Plaintiffs incorporate by reference all preceding and succeeding allegations as though fully set forth in this Count.

524.     Plaintiff Day brings this cause of action individually and on behalf of the West Virginia Class against AMD.

525.     AMD engaged in an unfair method of competition or practice within the meaning of W. Va. Code § 46-A-6-102.

526.     AMD represented the Affected CPUs to be of a particular standard, quality or grade, when they were not, including because the Affected CPUs were marketed as including hardware-based security against firmware attacks, when in fact they did not, and indeed were uniquely vulnerable to firmware attacks.

527.     AMD knew that the Affected CPUs were defective in connection with their security features and vulnerabilities, but knowingly omitted that fact and/or failed to disclose the defect before selling the CPUs to Plaintiffs and members of the Class.

528.     AMD's conduct proximately caused injuries to Plaintiff Day and the West Virginia Class Members, including because CPUs, and the PCs built around them, are worth less than they would have been but for the fTPM defect.

529.     Plaintiff Day and the West Virginia Class Members were injured and suffered ascertainable loss, injury in fact, and/or actual damages as a proximate result of AMD's conduct in that Plaintiff Day and the West Virginia Class Members (a) overpaid for the Affected CPUs, (b) did not receive the benefit of their bargain, and (c) experienced a diminution of value to their PCs. These injuries are the direct and natural consequence of AMD's conduct.

**COUNT THIRTEEN**
**Unjust Enrichment under West Virginia Law**
**(On behalf of the West Virginia Class)**

530.     Plaintiffs incorporate by reference all preceding and succeeding allegations as though fully set forth in this Count.

531.     Plaintiff Day brings this cause of action on his own behalf and on behalf of the West Virginia Class Members against AMD under West Virginia law.

532.     This cause of action is pleaded in the alternative to the legal claims asserted.

533.     Plaintiffs lack an adequate remedy at law for their claim, as specifically set forth later in this complaint.

534.     AMD received hundreds of millions—if not billions—of dollars in revenue from the sale of the Affected CPUs.

535.     This revenue was a benefit conferred upon AMD by Plaintiff Day and the West Virginia Class Members.

536.     AMD was unjustly enriched through financial benefits conferred upon it by Plaintiff Day and the West Virginia Class Members, in the form of the amounts paid to AMD for the Affected CPUs.

537.     AMD knew and understood that it would and did receive a financial benefit, and voluntarily accepted the same, from Plaintiff Day and the West Virginia Class Members when they elected to purchase the Affected CPUs.

538.     By selecting the Affected CPUs and purchasing them at a premium price, Plaintiff Day and the West Virginia Class Members reasonably expected that the affected AMD CPUs would have the performance, security, and quality promoted by AMD, and be designed and manufactured with reasonable care. Instead, not only did the Affected CPUs fall short of such expectations and performance/security standards, they injured and damaged Plaintiff Day and the West Virginia Class Members' PCs by interfering with their operation, including when playing video, playing audio, running videoconferencing software, and/or running games. The Affected CPUs also made Plaintiff Day and the West Virginia Class Members' PCs less secure. AMD was enriched, while at the same time, Plaintiff Day and the West Virginia Class Members experienced a diminution of value to their PCs.

539.    Therefore, because AMD will be unjustly enriched if it is allowed to retain the revenues obtained through its negligence and unlawful conduct, Plaintiff Day and the West Virginia Class Members are entitled to recover the amount by which AMD was unjustly enriched at their expense.

540.    Accordingly, Plaintiff Day, on behalf of himself and each West Virginia Class Member, seeks damages against AMD in the amounts by which AMD has been unjustly enriched at Plaintiff Day and the West Virginia Class Members' expense, and such other relief as this Court deems just and proper.

## LACK OF ADEQUATE REMEDIES AT LAW

541.    Plaintiffs lack an adequate remedy at law for their claims to the extent they seek relief that is equitable in nature.

542.    ***Injunctive relief.*** Plaintiffs seek injunctive relief to enjoin AMD from continuing its campaign of false and misleading statements concerning its defective CPUs.

543.    AMD continues to make false statements about its CPUs, including express statements—currently on its website—that AMD's CPUs "stream with less stutter." AMD also falsely states, on its website and elsewhere, that it has provided a microcode update to motherboard manufacturers that "fixes" the stuttering experienced by Plaintiffs and Class Members.

544.    Moreover, AMD has sold, and continues to sell, its Ryzen and Athlon CPUs while omitting that these CPUs are defectively designed and suffer from the crippling effects of that defective design, including intrusive stuttering during media playback, gameplay, and videoconferencing.

545.    An injunction is required to prevent the continued false and misleading marketing of AMD's CPUs. Legal remedies, such as damages, cannot prevent such continued harm.

546.    In addition, absent an injunction, Plaintiffs, who build their own computers and would like to buy AMD CPUs in the future, can no longer rely on AMD's statements about its Ryzen and Athlon products, including on AMD's website and in AMD marketing materials distributed to third-party sellers like Amazon.com and Micro Center. Thus, absent an injunction, Plaintiffs will abstain from buying AMD CPUs.

547.    Plaintiffs also seek an injunction requiring AMD to implement a repair program. At present, AMD will only provide firmware updates to motherboard manufacturers, who may or may not

deploy any such update to end users (or may provide unstable versions of AMD's firmware, such as a beta version). Firmware updates are risky and complicated. If a firmware update fails, it may result in damage to hardware or loss of data.

548.    Any remediation by AMD of its design defect will therefore require a program to send Affected CPUs to AMD for direct repair or replacement.

549.    Absent such an option, Plaintiffs and the Class Members cannot obtain complete relief. Such relief is purely equitable in nature and unavailable at law.

550.    Indeed, damages available at law would still leave members of the class with defective CPUs.

551.    ***Alternative Pleading.*** Plaintiffs also plead their equitable claims in the alternative to their legal claims. Thus, for example, any equitable restitution available under the unjust enrichment and quasi-contract claims asserted cannot possibly be asserted alongside legal claims, as Plaintiffs seek to press those equitable claims *only* if they do not prevail on claims providing legal remedies.

552.    This alternative pleading is necessary to ensure that Plaintiffs retain equitable remedies if, for example, claims providing legal remedies are dismissed or judgment is rendered upon them prior to trial.

553.    Moreover, if Plaintiffs prevail at trial on claims providing legal remedies, Plaintiffs' claims for equitable restitution will necessarily fail (and would not be asserted) to the extent co-extensive with monetary damages obtained at law.

554.    ***Damages to Plaintiffs' PCs/Computers.*** Plaintiffs also plead equitable claims, including unjust enrichment and quasi-contract claims, because they seek redress for harm to their ***computers***, not merely their CPUs.

555.    As explained above, AMD's conduct has resulted in (a) the direct diminution in value to Plaintiffs' and Class Members computers; and (b) AMD's capture of market share (and revenue) from Intel in excess of what it would have had absent its inequitable and/or wrongful conduct.

556.    Damage to Plaintiffs' computers will require a measure of monetary compensation beyond what is available at law for injuries relating directly to the purchase of AMD's CPUs. Indeed, to

adequately compensate Plaintiffs, some non-restitutionary disgorgement of profits is necessary, as compensation for the overpayment for, or diminution of value of, AMD's CPUs will not compensate Plaintiffs for harm to their PCs, including the loss of the full use and benefit of their PCs as a result of AMD's conduct.

557.    Plaintiffs thus require equitable relief to obtain disgorgement of AMD's ill-gotten profits to provide an adequate remedy for harm to their PCs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of members of the Proposed Classes, respectfully request that the Court enter judgment in their favor and against AMD, as follows:

A.    Certification of the proposed Nationwide Class and Nationwide Fraud Class or, alternatively, certification of the proposed State Classes, including appointment of Plaintiffs' counsel as Class Counsel;

B.    Injunctive relief in the form of a recall or free replacement program;

C.    Injunctive relief in the form of a buyback;

D.    Injunctive relief in the form of a prohibition on falsely advertising the Affected CPUs or AMD CPUs of similar design until the design defect is corrected;

E.    An order temporarily and permanently enjoining AMD from continuing the unlawful, deceptive and unfair business practices alleged in this Complaint;

F.    Restitution, including at the election of the Class and Subclass Members, recovery of the purchase price of their Affected CPUs, or the overpayment for their Affected CPUs;

G.    Damages for injury to Plaintiffs' and Class Members' PCs;

H.    Damages (including punitive damages), costs, and disgorgement in an amount to be determined at trial;

I.    An order requiring AMD to pay both pre- and post-judgment interest on any amounts awarded;

J.    An award of costs and attorneys' fees; and

K.    Such other or further relief as may be appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable as a matter of right.

Dated: June 27, 2023

Respectfully submitted,

**Brian J. Dunne** (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com
**BATHAEE DUNNE LLP**
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel.: (213) 462-2772

**Yavar Bathaee** (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (CA 345965)
awolinsky@bathaeedunne.com
**BATHAEE DUNNE LLP**
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

*Attorneys for Plaintiffs and
the Proposed Classes*