<u>**FILED UNDER SEAL**</u>

**BATHAEE DUNNE LLP**
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (CA 345965)
awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com
Allison Watson (CA 328596)
awatson@bathaeedunne.com
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel.: (213) 462-2772

*Attorneys for Plaintiffs and the Proposed
Classes*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Christopher R. Pitoun (SBN 290235)
christopherp@hbsslaw.com
Abigail D. Pershing (SBN 346467)
abigailp@hbsslaw.com
Emilee N. Sisco (*pro hac vice*)
emilees@hbsslaw.com
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Tel.: (213) 330-7150

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JONATHAN DAY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ADVANCED MICRO DEVICES, INC., <br><br> Defendant. | Case No. 3:22-cv-04305-VC <br><br> **PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESPONSE TO COURT ORDER AT *DAY* DKT. NO. 370** <br><br> Hon. Vince Chhabria |

<u>**FILED UNDER SEAL**</u>

## TABLE OF CONTENTS

I.      TOPIC 1: SCIENTER FOR A FRAUD CLAIM AND CHOICE OF LAW ......................1

II.     TOPIC 2: AMD'S AWARENESS ....................................................................................2

III.    TOPIC 3: DISCOVERY....................................................................................................15

IV.    TOPIC 4: CASES ON DOBEK INVESTIGATION...........................................................17

V.     TOPIC 5: DR. SORINI VIDEO (EX. 58 OF DUNNE DECL.).......................................18

Plaintiffs' Supplemental Brief Concerning Summary Judgment – No. 3:22-cv-04305-VC

**FILED UNDER SEAL**

# TABLE OF AUTHORITIES

## Cases

*Abazari v. Rosalind Franklin Univ. of Med. & Sci.*,
   40 N.E.3d 264 (Ill. App. 2015) ................................................................................1

*Arroyo v. TP-Link USA Corp.*,
   2015 WL 5698752 (N.D. Cal. Sept. 29, 2015) ..........................................................2

*Daniel v. Ford Motor Co.*,
   806 F.3d 1217 (9th Cir. 2015) ................................................................................18

*De Bouse v. Bayer*,
   922 N.E.2d 309 (Ill. 2009) ......................................................................................17

*Forcellati v. Hyland's, Inc.*,
   2014 WL 1410264 (C.D. Cal. Apr. 9, 2014) ............................................................2

*Hambrick v. Healthcare Partners Med. Grp., Inc.*,
   238 Cal. App. 4th 124 (2015) ..................................................................................1

*In re Bextra & Celebrex Mktg., Sales Pracs. & Prod. Liab. Litig.*,
   2007 WL 2028408 (N.D. Cal. Jul. 10, 2007) ..........................................................17

*In re POM Wonderful LLC Mktg. & Sales Pracs. Litig.*,
   2012 WL 4490860 (C.D. Cal. Sept. 28, 2012) ........................................................2

*Kahn v. Walmart Inc.*,
   107 F.4th 585 (7th Cir. 2024) ..................................................................................1

*Martinez v. Knight Transp., Inc.*,
   2018 WL 6308110 (E.D. Cal. Dec. 3, 2018) ............................................................2

*Paduano v. Am. Honda Mot. Co., Inc.*,
   169 Cal. App. 4th 1453 (2009) ................................................................................1

*Paulus v. Bob Lynch Ford, Inc.*,
   139 Cal. App. 4th 659 (2006) ..................................................................................1

*People v. Ashford Univ., LLC*,
   100 Cal. App. 5th 485 (2024) ..................................................................................1

*Shannon v. Boise Cascade Corp.*,
   805 N.E.2d 213 (Ill. 2004) ....................................................................................17

*Warren v. LeMay*,
   491 N.E.2d 464 (Ill. App. 1986) ..............................................................................1

<u>**FILED UNDER SEAL**</u>

*Wilson v. Norman*,
   2025 WL 947959 (N.D. Ill. Mar. 30, 2025) ............................................................................17

**FILED UNDER SEAL**

## I.    TOPIC 1: SCIENTER FOR A FRAUD CLAIM AND CHOICE OF LAW

There is no material difference in the scienter requirement for common law fraud between Illinois law and California law. Both Illinois and California require intent to defraud at common law. *See, e.g., Abazari v. Rosalind Franklin Univ. of Med. & Sci.*, 40 N.E.3d 264, 274 (Ill. App. 2015); *Hambrick v. Healthcare Partners Med. Grp., Inc.*, 238 Cal. App. 4th 124, 162 (2015).

As to the states' respective consumer protection statutes, there is no material difference in scienter with respect to this case. Under the UCL, a defendant's intent does not need to be shown— just an unlawful, unfair, or fraudulent business practice. *See, e.g., Paulus v. Bob Lynch Ford, Inc.*, 139 Cal. App. 4th 659, 678 (2006). The FAL and CLRA, like the UCL, simply prohibit certain proscribed acts, without a separate intent requirement. *See People v. Ashford Univ., LLC*, 100 Cal. App. 5th 485, 508 (2024) (FAL); *Paduano v. Am. Honda Mot. Co., Inc.*, 169 Cal. App. 4th 1453, 1468 (2009) (CLRA).

The Illinois standard under ICFA is facially more complex, but materially the same as the California standard with respect to this case. Under ICFA, a plaintiff must show defendant's intent to cause reliance, but this does not require a showing of intent to defraud. *See Kahn v. Walmart Inc.*, 107 F.4th 585, 598 (7th Cir. 2024) ("the ICFA eliminated the requirement of scienter, so that innocent misrepresentations are actionable as statutory fraud" (cleaned up)); *Warren v. LeMay*, 491 N.E.2d 464, 474 (Ill. App. 1986). As the Appellate Court of Illinois explained in *Warren*:

> Under the [ICFA], state of mind is immaterial and a defendant need not be motivated by an intent to deceive. . . . [A] violator's good or bad faith is not important. Even innocent misrepresentations may be actionable. By its own terms, the statute requires only that a violator intend for a purchaser to rely on his acts or omissions. A party is considered to intend the necessary consequences of his own acts or conduct.

*Id.* at 474 (citations omitted).

Here, there is no material dispute that AMD intended CPU-SOC purchasers to rely on its alleged omissions, as "intend" is used in cases interpreting the ICFA. As a result, there is no material difference between the scienter requirement for fraud under California and Illinois law, regardless of the specific fraud claim, in the context of this case. Moreover, under the *Mazza*

FILED UNDER SEAL

standard, it is the *defendant's* burden to affirmatively show a material difference between an alternate proposed law—Illinois—and that of California, the forum state for this dispute and one which AMD unquestionably has minimum contacts with. *See, e.g., Martinez v. Knight Transp., Inc.*, 2018 WL 6308110, at *9 (E.D. Cal. Dec. 3, 2018) (applying California law when defendant failed to perform proper choice-of-law analysis); *Arroyo v. TP-Link USA Corp.*, 2015 WL 5698752, at *3-4 (N.D. Cal. Sept. 29, 2015) (allowing extraterritorial application of California law specifically because defendant did not carry choice-of-law burden); *Forcellati v. Hyland's, Inc.*, 2014 WL 1410264 (C.D. Cal. Apr. 9, 2014) (same); *In re POM Wonderful LLC Mktg. & Sales Pracs. Litig.*, 2012 WL 4490860, at *4 (C.D. Cal. Sept. 28, 2012) (same).

There is no difference in scienter between the states' fraud and consumer protection laws that is material with respect to this case, and even if there were, the Court is not "required" to apply Illinois law given AMD's failure to offer an adequate choice-of-law analysis in the first instance.

## II.    TOPIC 2: AMD'S AWARENESS

A reasonable juror could fairly conclude that AMD was aware of an ongoing stutter issue, caused by a known design defect in its Ryzen and Athlon-branded CPU-SOCs, at the time Mr. Day (Nov. 17, 2020) and Ms. Dobek (Aug. 19, 2021) purchased their respective products.

The evidence before the jury would begin with what is not, at this point, in serious dispute. There is significant, direct evidence that in the second half of 2017, AMD learned of the following design flaw in its CPU-SOCs:

- The security processor (the PSP) in these SOCs accessed off-chip storage (SPI-ROM flash memory, sometimes referred to as NVRAM) in a way that halted processing systemwide for the duration of the access.

- AMD placed an fTPM—a processing module designed to be accessed by the operating system during runtime (*i.e.*, while the computer is running, when a user may be in the middle of everyday computing tasks)—inside the PSP, and the fTPM relied on the same off-chip storage and accessed it the same way, by halting the entire system for the duration of an access.

- When the fTPM wrote or erased this off-chip storage, this was a relatively time-consuming process, due to a combination of both the hardware (principally, the SPI-ROM chip and its interface) and fTPM requirements.

<u>FILED UNDER SEAL</u>

- An fTPM SPI-ROM write or erase lasting more than a few milliseconds would halt processing long enough that user-facing processes (audio, video, mouse control, gameplay, videoconferencing/VOIP) would "stutter"—they would stop, lag, hiccup, proceed in jerks, and similarly not work as expected.

- Writing or erasing an entire sector of the SPI-ROM—approximately 64kb—would take close to a full second (600-800 milliseconds or more). A write or erase of this magnitude would cause an extremely intrusive user-facing "stutter."

- An AMD customer, HP, discovered this stutter—manifested as a distortion in audio playback—during testing of one of its new laptops in late Summer 2017. HP internally designated this a "P1" – highest level, "stop-ship"—problem, and reported it to AMD by August 24, 2017, which correspondingly labeled the issue a "P1" priority.

- Both AMD and HP were able to reproduce the problem, and corresponded regarding its cause. At AMD, at least eighteen different firmware engineers were actively involved in analyzing, diagnosing, and developing mitigations for the problem between August 29 and November 9, 2017.

Evidence fairly showing that AMD learned all of the above by Autumn 2017 exists in AMD's own documents—for example, Exs. 21 (an Aug. 29-Nov. 9, 2017 email thread), 38 (a 2022 email thread attaching Ex. 21 and discussing its relation to a 2022 recurrence of fTPM stuttering), S-1 and S-2 (a source code change log and printed source code, respectively, which both directly evidence AMD's knowledge—frequently in human-understandable prose—and have also been explained by Plaintiffs' experts); HP documents reflecting communications with AMD and a third-party, Wistron, about the 2017 problem and investigation, *see* Exs. 99, 100; and expert testimony explaining the nature of the design defect and explaining AMD-produced technical evidence, *see* Exs. N-1 & N-2 (Novak expert reports), O-1 & O-2 (Oklobdzija expert reports).

So, there is substantial evidence that as of mid-September 2017, AMD—through at least eighteen different firmware engineers, plus some number of managers, executives, and other employees—knew of the very design defect that was in Plaintiffs' AMD CPU-SOCs when they were purchased in 2020 and 2021, and knew the defect could cause (and in fact, had caused) stuttering. The overall trial record continues, but does not alter AMD's knowledge of the defect.

First, in late September 2017, AMD—through one or more employees interfacing with HP and/or its BIOS vendor Wistron—recorded that HP was "happy with current implementation," and that "[i]n [a] review meeting it was agreed that [the fTPM audio distortion ticket] should be

**FILED UNDER SEAL**

closed." Ex. 20 at AMD01430144. John Abshier, the AMD employee who recorded the result of this "review meeting," was not a participant in Ex. 21, and there is no evidence that Abshier or anyone else at the "review meeting" were part of AMD's investigation, analysis, or attempted remediation of fTPM stuttering. Three different AMD engineers actually involved in the 2017 fTPM stutter investigation contemporaneously stated that what AMD now claims "fixed" fTPM stuttering in 2017—spreading out fTPM writes and erases—was flawed and incomplete. *See, e.g.,* Ex. 21 at AMD01047727 (Sergey Blotsky, Sept. 15, 2017: "Writing data in smaller chunks will not resolve the issue (or it will create huge latency on fTPM command which will break HLK tests). The write operation also must be asynchronous."); *id.* (Parth Joshi, Sept. 14, 2017: "Adding to Sergey comments, I have tested SPI erase(4k) with intermediate delay of 2, 5, and even 10 seconds but the results were no good, distortions spikes in audio is still audible. There is no point of introducing the extra delay when the culprit is single SPI (write or erase) operation which takes more than 20 ms."); *id.* at AMD01047737-38 (Po-chen Pan, Sept. 12, 2017: "From the log, PSP do change the 64K erase one time 4K*16 times. The audio distortion is still exist while PSP NV erase, but it sounds better, the continuous buzz change to a shorter buzz.").

*None* of the eighteen engineers in Ex. 21 stated at the time that spreading out writes and erases would actually fix the stutter problem. Further, despite learning by September 21 that HP had rejected a further mitigation called asynchronous erase (which meant the PSP/fTPM would start erasing SPI-ROM, but not wait for the erase to finish before allowing processing to restart), AMD engineers continued to work to implement asynchronous erase for almost *two additional months* just in case "async erase is ever required." Ex. 21 at AMD01047719 (Nov. 7, 2017 email).

The above evidence would fairly permit a jury to find that as of November 9, 2017, AMD knew that its Ryzen and Athlon CPU-SOCs contained the design defect at issue in this case, and knew that the design defect could cause (and, for at least one important customer, had caused) stuttering. AMD, as a party with superior (indeed, exclusive knowledge) of this defect and its materiality on purchasers' decisions, had a duty to disclose it as of November 9, 2017.

The Court's current question concerns the next temporal step: the plaintiffs bought their defective AMD CPU-SOCs on November 17, 2020 (Day) and August 19, 2021 (Dobek),

respectively. Could a jury fairly find that AMD had the requisite knowledge, giving rise to a duty to disclose, in the time frame of Plaintiffs' purchases? The answer is yes, for a variety of reasons. AMD's pitched but largely conclusory assertions about what occurred between November 2017 and November 2020 are in fact inaccurate, and regardless the record does not compel the conclusion that what AMD knew to be a problem in November 2017, it knew was no longer problem in 2020. In fact, the evidence not only permits, but points to, the opposite conclusion.

As to the Court's question about "the absence of JIRA tickets raising this issue until 2022," that is simply an incorrect premise—albeit one repeatedly stated as truth by AMD, without citing to specific evidence. Spreadsheets produced by AMD list more than 10,000 JIRA tickets submitted between 2015 and 2021, including 7890 in a single spreadsheet denoting "Platform" tickets between 2015 and late 2019. *See* Ex. 104[1] (AMD01325153) at "All date 2" sheet. Although AMD produced only 95 distinct JIRA tickets in full (315 including duplicates or near-duplicates),[2] the company's spreadsheets illuminate the actual universe of issues reported to AMD between 2017 and 2020—and they include numerous complaints, flagged to AMD in JIRA, that materially resemble the 2017 fTPM stutter report, yet were simply never resolved by AMD.

For example, Ex. 104, a spreadsheet circulated in late September 2019, lists 7809 "Platform" tickets submitted to AMD between 2015 and Fall 2019. The spreadsheet includes, among other information, the JIRA ticket number (*e.g.*, PLAT-12345), a "Summary," several date fields, "Priority," and "Issue Resolution," "Resolution," and "Root Cause" for each recorded issue. *See id.* at "All date 2" sheet. Helpfully, the 2017 fTPM stutter issue (PLAT-24478) is recorded on this spreadsheet, at row 3730. That entry states, for "Summary," the following, ***in its entirety***: "Sounds will distort while playing video or music." *Id.* at row 3730, col. C. The entry identifies Parth Joshi and Lorien Liang, provides late-2017 dates, indicates a P1 (Gating) priority, and states "Fixed," noting an "AMD: Software Coding" issue. But what is most illustrative is what is missing

---

[1] All exhibits are to the Supplemental Dunne Declaration; for ease of reference and to ensure a joint summary judgment record with the *Pietosi* case, the exhibits submitted with this brief include those submitted with the *Pietosi* supplemental brief and maintain common numbering.

[2] These numbers are per Plaintiffs' calculations; a more detailed explanation of the methodology underlying this analysis is set forth in ¶ 27 of the Dunne Declaration in support of this brief.

<u>**FILED UNDER SEAL**</u>

from this entry: everything else. There is no mention of fTPM (the word does not appear). There is no mention of stuttering (again, the word is absent). There is, in fact, no discussion of the actual root cause, or the issue of SMIs, or the writing of SPI-ROM, or literally any other substantive fact about what occurred in late 2017. The only substance that appears is "Sounds will distort while playing video or music." *See id.* at row 3730.

Why is this important? Because this same spreadsheet includes numerous JIRA tickets, spread near-continuously between the late-2017 stutter inquiry and late 2019, that disclose materially similar symptoms, investigated by different engineers and teams from those that identified fTPM stuttering in 2017, that were ***never diagnosed or resolved***. For example, a January 2019 JIRA ticket complains of "[a]udio glitches (count) reached 90 with DP panel, it is far greater than standard 50." Ex. 104, "All date 2" sheet, row 2533 (PLAT-41458). This ticket, assigned to Jimmy Liu, an engineer who does not appear to have been involved in the 2017 fTPM stutter investigation, was closed without resolution with the explanation "Cannot Reproduce." *Id.* at cols. AF, AG. Two tickets in January 2018 were submitted claiming reduced performance, *see id.*, "All date 2" sheet, row 3072 (PLAT-28655: "Performance degradation with ECC enabled"); *id.* at row 3073 (PLAT-28654: "Diesel SP3 board's performance reduced with latest NDA BIOS"); both were closed without a root cause or resolution, *see id.* at row 3072, col. AG ("Unresolved"); *id.* at row 3073, col. AG ("Rejected – Unable to Reproduce"). An April 2019 ticket reported that an AMD board was "[f]reezing after certain time." *Id.* at row 738 (PLAT-45556). The issue, despite being reported with "P1 (Gating)" priority, was closed without resolution. *Id.* at cols. Z, AG. In February 2019, two separate tickets were created for "MP4 video playback stutters when playing in movies and TV," *id.* at row 89 (WSNPLAT-66), and "MOV video playback stutters when rewind/forward play," *id.* at row 90 (WSNPLAT-64); both were closed as "Rejected – Duplicate," without further explanation, *id.* at row 89, col. AG; row 90, col. AG. It's not clear if those video stutter tickets were rejected as duplicative of an "AVI video playback stutters" ticket submitted in January 2019, *id.* at row 114 (WSNPLAT-21), but that one was not resolved either—it was marked "Rejected," *id.* at col. F, then simultaneously labeled both "Fixed," *id.* at col. AF, and "Unresolved," *id.* at col. AG, with no root cause determined, *id.* at col. AH.

**FILED UNDER SEAL**

Other tickets from 2018 and 2019 describe system lag during video playback, Ex. 105 (AMD01320511), TICtoInternalTicket sheet, row 102 (TIC-38119, submitted Oct. 2018); mouse cursor stuttering, *id.* at row 1543 (TIC-53425, submitted Dec. 2019); "video playback still stuttering and tearing," *id.* at row 1684 (TIC-54363, submitted Dec. 2019); and "[v]ideo playback has lag and audio noise while drag Movies&TV playing windows," *id.* at row 59 (TIC-37684, submitted Oct. 2018). The first of these tickets was "Rejected—Will not fix," *id.* at row 102, col. "Issue_Resolution," the second closed through an unexplained "Workaround," *id.* at row 1543, col. "Issue_Resolution," the third "Rejected—Will not fix," *id.* at row 1684, col. "Issue_Resolution," and the fourth "Rejected—Duplicate, *id.* at row 59, col. "Issue_Resolution."

The point of the above is not that any one of these unresolved issues was definitely fTPM stuttering, but rather that they, and dozens of other tickets submitted to AMD from 2018-2020, ***resembled*** fTPM stuttering, were sent to AMD, and were simply not resolved. To reiterate, in AMD's JIRA spreadsheets, the entry for the 2017 fTPM stuttering issue ***itself*** (PLAT-24478) does not reference fTPM, stuttering, or the actual diagnosed defect. *See* Ex. 104 at "All date 2" sheet, row 3730. The complete JIRA ticket for that issue does discuss the fTPM, stuttering, and SMIs, but AMD never produced the full JIRA tickets for the thousands of JIRA issues submitted during the 2018-2021 period, including the fTPM stutter-like issues discussed above.[3] Despite AMD's contrary representations, the evidentiary record does ***not*** show an absence of JIRA tickets flagging fTPM-caused stuttering between late 2017 and Mr. Day's purchase in 2020. Rather, the record shows that dozens if not hundreds of JIRA tickets from 2018-2020 flagged fTPM stutter-like symptoms, and a large proportion of these issues were simply rejected or left unresolved by AMD.

To be clear, Plaintiffs do not rely on the above analysis to show AMD's knowledge of the defect—there is already substantial, direct evidence from 2017 on that score. Rather, ***AMD*** has affirmatively argued that its JIRA production conclusively establishes an ***absence*** of fTPM stuttering reports—and indeed, actual incidents—from 2018-2021. But the true evidentiary record

---

[3] As noted earlier and discussed in more detail in connection with discovery, AMD in fact produced just 95 distinct JIRA tickets in this case—315, counting duplicates and near-duplicates.

**FILED UNDER SEAL**

simply does not show this. On this record, a jury could reasonably reject AMD's claim that it received no reports of stuttering arising from the design defect between 2018 and 2021.

One question that might be raised at this point is, "why didn't the engineers who worked on 2017 fTPM stuttering recognize or investigate these similar reports or stuttering and distortion in 2018, 2019, and 2020?" The answer is simple: AMD is a huge company, its engineering components were disorganized (and in late 2018, reorganized), and the number of JIRA reports in this time frame was in the tens of thousands, many opaquely written and directed to various technology subgroups for unexplained reasons. *See generally* Exs 104 & 105.

As to personnel, shortly after 2017 fTPM stutter investigation, the principal business units involved—in particular, the PSP firmware engineers in Ex. 21—were overhauled and reorganized by AMD. As explained by AMD executive Ed Benyukhis, in 2018 the "PSP organization needed some organizational changes, we believed," leading to "what [AMD] referred to as a get-well plan." Ex. 106 (Benyukhis Dep.) 64:8-13. There were "problems . . . in PSP engineering at the time," including that "the organization was underpowered, undermanned and overused." *Id.* at 64:25-65:7. Moreover, firmware engineering at AMD had been not just under-resourced, but balkanized, with disparate groups of firmware engineers assigned to various business units rather than working together in a centralized organization. *Id.* at 66:11-67:1. Benyukhis was hired to correct this problem, and in late 2018 he led a company reorganization to do so. *Id.* at 15:21-18:22.

As to the JIRA reporting system itself, as described above, tens of thousands of issues were reported to AMD from customers and its own employees between 2018 and 2021, and these issues were directed to disparate groups of AMD's thousands of employees. As discussed above, at least dozens of these issues facially resembled fTPM stutter, and many were ultimately closed as "rejected" or "unresolved."  None of the tickets specifically referenced above—or many others that list symptoms materially similar to fTPM "stutter," yet were never resolved by AMD between 2018 and 2020—appear to have been sent to the PSP firmware team, or to the engineers familiar with the PSP/fTPM design defect that was known to have caused stuttering.

So it would, in fact, be unremarkable if the AMD employees—Parth Joshi, for example— who knew of the PSP design defect, knew it caused fTPM stuttering, and knew that the problem

**FILED UNDER SEAL**

had not been fixed, did not again encounter stuttering caused by the defect for a period of years. These engineers were, according to AMD's own executives, "undermanned and overused," Ex. 106 (Benyukhis Dep.) 64:25-65:7, and were deployed between 2018 and 2021 on concrete problems identified to them by leadership and management at one of the world's largest microprocessor companies. This is not to say that any of those employees did not, in *fact*, continue to discuss, monitor, or even continue to work on the PSP design defect or its fTPM stutter manifestation—AMD produced *zero* custodial documents from *any* engineer (or other employee) who was involved in the 2017 fTPM stutter investigation, so we don't actually know from the record what *any* of these employees did and said between 2018 and 2022. But even taking the absence of evidence as evidence of absence—*i.e.*, assuming for the purposes of this motion that the engineers who knew of and investigated the defect in 2017 truly never re-encountered fTPM stuttering before 2022—this would not be at all inconsistent with Plaintiffs' affirmative case.

And, in fact, given the background evidence about AMD as a company, the number of issues flagged to it on a continuous basis, and the number of such issues the company simply gave up on, rejected, or closed as unresolved between 2018-2021, a reasonable juror could conclude that an absence of reports expressly diagnosing fTPM stutter over this period would not compel— or even justify—the company to conclude that a defect it had identified, and declined to fix, in 2017 had in fact been resolved. Notably, this would be the case were the record to *actually* show that the design defect AMD identified in 2017 never really came to the company's attention again until early 2022—but in fact, that is very much *not* the case. Rather, the years 2019, 2020, and 2021 reflect substantial, companywide efforts focusing on this very same design defect—the company's indefensible choice to rely on SMI, invoked by the x86, for the PSP to access its non-volatile storage. *See* Ex. 25 at AMD00056368 (ROM Armor introduced by Feb. 2020); Ex. 30 at 5-6 (Aug. 2021 presentation describing PSP storage access defect, discussing real-world problems it caused in AMD-based computers, and concluding "ROMArmor by design completely avoids usage of fake SMIs which is deemd to be the root cause of the problem described"); Ex. 26 (Sept. 2021 publication for OEMs stating that "[t]riggering interrupt to x86 through SMI interface is not stable and causes intermittent issues").

**FILED UNDER SEAL**

Jurors are uniquely well suited to aggregate and weigh the meaning of a body of evidence like the above, and to evaluate the credibility of a position like AMD's vis-à-vis its knowledge in 2020 and 2021. And in this case, they will be weighing *actual* evidence, from 2017, from 2018, from 2019, from 2020, from 2021, and from 2022, that fairly permits the conclusion that AMD knew of an ongoing design defect that could cause—and had caused—stuttering in its CPU-SOCs at the time Mr. Day and Ms. Dobek bought their defective AMD products.

To hold otherwise—that is, to hold that a reasonable juror could *not* conclude that AMD was aware of an ongoing stutter issue in 2020 and 2021, despite written documentation from late 2017 showing that AMD engineers actually discovered this issue; memorialized its technical cause and user-facing impacts; and wrote that it had not been fixed—would seriously intrude upon the province of the jury to evaluate commonsense evidence and arguments where the credibility of competing narratives is at issue. According to Plaintiffs, when AMD engineers wrote in emails that there was a design flaw in AMD's CPU-SOCs, wrote in emails that this design flaw had caused stuttering in their own tests and explained the technical details of why such stuttering was endemic to the design, and wrote in emails that the stuttering would not be (and had not been) fixed by spreading out writes, they were speaking the truth. There was a design flaw in AMD's CPU-SOCs, which would cause—and had caused—stuttering in end-user products, and that flaw had not been fixed. It was certain to recur—and manifest as stuttering—in in-the-wild computers that used the fTPM at runtime. Plaintiffs' experts, a microprocessor designer and a computer architecture professor, have explained why from a technical perspective this was necessarily the case.

According to AMD, a self-selected record between 2018 and 2020 can somehow *defeat* direct evidence of the company's knowledge because of what the evidence is said to lack—the "smoking gun" of the company actually receiving reports of stuttering, investigating them, and determining they were the result of the fTPM defect. But AMD already *had* this evidence—the company received just such a report, conducted just such an investigation, and came to just such a conclusion in late 2017. Yet instead of disclosing the defect and its manifestation to users, AMD continued selling defective CPU-SOCs for four more years, until the defect was so widespread that public hobbyists traced it to the fTPM and the company's executives were compelled to act.

<u>**FILED UNDER SEAL**</u>

Both Mr. Day and Ms. Dobek bought defective CPU-SOCs that were defective in ***exactly*** the way AMD learned about in late 2017, and that AMD ***decided*** to neither fix nor disclose.

A similar analysis to that of the JIRA tickets holds for the "apparent absence of complaints by any users until July 2021," as described by in the Court's Order. First, here too, the record simply does not establish an absence of such complaints. Setting aside that the 2017 stutter investigation actually stemmed from a customer complaint, and further setting aside that nearly all of the undiagnosed JIRA tickets reporting fTPM stutter-like symptoms discussed earlier in this brief came from AMD customers,[4] it is just not the factual case that users of AMD-based computers were not complaining about stuttering before July 2021. In fact, Internet forums and AMD's own website and subreddit are full of stuttering complaints dated between 2017 and 2021. For example, an August 24, 2019 post on Overclock.net states, about a Ryzen 5 2600 CPU-SOC:

> I get around 120 fps on games like siege,csgo, payday 2 and gmod but more often then not the game stutters, oddly enough it doesn't happen all the time, i was wondering if it could be (now dont laugh at this peasantry) my hard drive which i plucked from my PS4 its a seagate backup plus 5tb, i would instantly believe that's the problem, BUT i have csgo on my 250GB SSD (boot drive) and that has stuttering issues, my components are not overheating, i have not downloaded anything suspicious so there's no malware running in the background or anything like that, my cpu and ram are running at around 50% and my GPU runs around 100% but the extended hard drive runs at 100% even when playing games from my SSD so idk whats going on there, vsync is always turned off and i rarely have any apps running in the background.

Ex. 107 at 1-2.

Another post from the same forum, this one dated October 8, 2020, includes a comparable lament, this one from a user with a Ryzen 3200g CPU-SOC:

> i have these problems with my ryzen 3200g system... whenever i resume the computer from a longer period of sleep i get massive stutter in games like cs go at high fps, even 150-200, there is also a 10-15% fps reduction when stuttering scenario occurs but

---

[4] *See, e.g.,* Ex. 105 (AMD01320511) at row 59, col. "External_Reporter" (reported by Compal); *id.* at row 102, col. "External_Reporter" (reported by LC Future Center); *id.* at row 1543, col. "External_Reporter" (reported by Asus); *id.* at row 1684, col. "External_Reporter" (reported by LC Future Center).

FILED UNDER SEAL

> nevertheless the stutter should not appear at these high fps (i get 235fps in dust2 pit, when the stutter occurs i get 200fps there,so there is deffenetely a 10-15 fps drop). if i restart the pc it works fine and smooth even with 2 live video streaming platforms tabs. stutters also occurs when pc left on idle for a longer time then gaming.

Ex. 108 at 1.

An August 11, 2020 Reddit post—similarly detailed and technically sophisticated like the ones quoted above—states that the poster bought a Ryzen 5 3600 CPU "brand spanking new from Walmart," built it into a gaming computer, and suffered stuttering despite going through a 24-point troubleshooting list of alternate sources beside "my CPU." Ex. 109 at 1. A May 7, 2020 post on AMD's own website—recently wiped from the Internet by AMD, but thankfully preserved in the Internet Archive—describes Ryzen 3 3200g stuttering "[w]hen I play games or stream video on any browser, I get a 1 sec freeze or lock up, and a very loud audio glitch . . . the glitch is very random, I have gone now a full day with out it happening, too now today its happening 1-2 times per hour." Ex. 110 at 1-2. There are other posts across the Internet dated between 2018 and 2021. *See, e.g.*, Ex. 111 (Nov. 25, 2018 post on r/ryzen); Ex. 112 (Jul. 24, 2018 Linus Tech Tips post).

All of the above posts are from sophisticated-sounding AMD CPU-SOC purchasers who, in addition to the statements quoted above, lengthily and carefully troubleshoot the intermittent system stuttering they are experiencing and can find no alternate explanation in peripherals, in firmware, in software, or in drivers. *See* Exs. 107-12. The stuttering they describe is fully consistent with—arguably, has no other explanation than—the design defect in AMD's PSP and fTPM. To be clear, none of these users explicitly blame the AMD fTPM for their stuttering, but that is fully consistent with the overarching point: AMD is in such a superior information position with respect to its products that it has a duty to inform consumers about known design flaws connected with stuttering in AMD-based PCs. It is not a consumer's duty to connect known stuttering to a microprocessor design defect.[5]

---

[5] Indeed, the record is replete with AMD users who, upon learning that the fTPM was connected to stuttering, took to the Internet to proclaim they had finally, at long last, figured out what had been plaguing their AMD-based computers. *See, e.g.,* Ex. 35 at 1 (comment on Jan. 2022 YouTube video: "Just wanted to say I've been seeing this for like two years, always thought I was crazy! . .

**FILED UNDER SEAL**

None of the above stuttering complaints would necessarily put AMD on notice that its CPU-SOCs had a design defect in the PSP/fTPM that caused (among other problems) stuttering—although AMD personnel did proactively monitor Internet forums, including the AMD website forums and the AMD subreddit, for discussions about AMD products. Ex. 113 (Prairie Dep. Tr. 63:4-74:23). But this is, again, beside the point; Plaintiffs already offered unambiguous, substantial evidence that AMD ***was on notice*** of the design defect and its manifestation as of November 9, 2017, and ***knew it was not fixed***. Nothing in the record about user-specific stuttering complaints defeats the overall evidentiary landscape, described above in this brief, that would permit a reasonable juror to rule for the plaintiffs on the presale knowledge issue.

Finally, the Court inquires as to the impact, if any, of "the fact that extensive searches Day and Dobek claim to have conducted prior to their respective purchases did not uncover any complaints about stuttering." The short answer is that it is entirely consistent to conclude (i) that AMD knew that its CPU-SOCs had design defect that caused fTPM stuttering, and failed to disclose it for four years, (ii) that AMD CPU-SOCs sold during this period in fact had this design defect, which would cause stuttering when the fTPM was used substantially at runtime, and (iii) that Mr. Day and Ms. Dobek conducted a substantial pre-purchase investigation, and never learned that AMD's CPU-SOCs were defective in a way that caused stuttering. In fact, the logical throughline that makes these three statements consistent is the very heart of omissions liability and the duty to speak: the maker of a product has a special, unparalleled role in the consumer information ecosystem.

One thing that can be fairly gleaned from the record—whether from AMD's voluminous JIRA spreadsheets; from user complaints on AMD's website, on hardware forums, or on Reddit; or even from HP's expert, who spent 100 pages writing about all the ways frayed cables and ill-fitting RAM can cause problems, even stuttering—is that computers can and do suffer many sorts of issues. As a result, it would be entirely unexceptional for a user researching a CPU-SOC purchase to see user complaints of stuttering on an AMD-based computer, perhaps even in a subset

---

. [I] disabled the bios switch for it and now I'm stutter free. Thank you!"); *id.* at 4 ("Holy shit, I have been having this issue for months and months after switching my X370 to X570.").

**FILED UNDER SEAL**

of reviews, and not immediately conclude that the CPU-SOC in that computer was itself defective and worth less than the current market price. But if the CPU-SOC maker itself were to disclose—truthfully, in this case—that its chips had a design defect that, among other things, caused stuttering when the fTPM was used, it is perfectly plausible that the reader of this information (whether learned directly, or through secondary sources recounting **what AMD disclosed about its products**) would find the disclosure very impactful. There is no dispute that AMD did not disclose the design defect in its CPU-SOCs, or the fact it causes stuttering, prior to either plaintiff's CPU-SOC purchase, so the plaintiffs' pre-purchase investigation is not in tension at all with their claims.

To the extent the question is meant to imply that if fTPM stuttering were actually happening in the 2020 and 2021 time frame—but AMD had not disclosed it—it would be described as such in product discussions and reviews, a reasonable juror could readily conclude that this would not be the case. In fact, the real-world evidence suggests that people *were* experiencing fTPM stuttering by 2020 and 2021, in the wild, and yet were just not documenting it as such. The user complaints from 2018-2020 documented earlier in this brief can fairly be interpreted in this manner, as can user comments after the fTPM was outed as the culprit that state the new information explains **preexisting** (in some cases, longstanding) stuttering problems they had experienced. *See, e.g.,* Ex. 35 at 1 ("Just wanted to say I've been seeing this for two years, always thought I was crazy! I tried reformatting multiple times.").

Notably, **a design defect in one's CPU** is a particularly pernicious problem, and one that no amount of YouTube troubleshooting is likely to diagnose (let alone fix). Many of the user complaints about fTPM stutter in AMD CPU-SOCs reflect this exact point. *See, e.g.,* Ex. 35 at 4 ("Been looking for this for almost a year to the point where I thought I'm just gonna live with it!"); ("Omg thank you, I got a new amd system and was banging my head against the wall as to what the issue was."). It would be unsurprising—and is certainly within the realm of permissible inference by a reasonable juror—that fTPM stuttering was occurring in the wild between 2018 and 2021 and was simply not diagnosed as such by any layperson until it was particularly widespread and pervasive. Had **AMD** spoken on the issue at any point, however, the situation would

**FILED UNDER SEAL**

unquestionably have been quite different—as the near-immediate "me too"-ing on posts and videos about fTPM stutter after AMD acknowledged the problem fairly indicates.[6]

## III.    TOPIC 3: DISCOVERY

Plaintiffs have explained at length, in briefing to the Court, the serious deficiencies in the factual record specifically engineered by AMD in this case. In particular, Dkt. 211, a motion filed by Plaintiffs August 20, 2024, describes in exacting detail, with voluminous evidence, AMD's indefensible decision to produce documents from just four custodians, only one of whom—Saurabh Gupta—was a technical employee. Worse still, Mr. Gupta—AMD's *sole* custodian who was actually involved in any investigation of stutter issues—*did not join AMD until mid-2021*. As a result, AMD offered *no custodial documents* from any technical employee involved not only in the 2017 fTPM stutter investigation, but *in any investigation or engineering activity between late 2017 and July 2021*. Plaintiffs sent months of letters asking for a reasonable—even bare-minimum acceptable—custodial collection. Dkt. 211-1, -2, -6, -12, -16. AMD refused. Dkt. 211-3, -5, -7, -14. Plaintiffs moved to compel additional custodians. Dkt. 139. Judge Kim denied the motion. Dkt. 157. Plaintiffs moved for relief. Dkt. 211. The Court denied the motion. Dkt. 263.

As a result, there are, in the record, no custodial documents from the 2017 fTPM stutter investigation—and no communications whatsoever about it, except an attachment to a 2022 email, are in the evidentiary record. Similarly, no documents from *any* of the engineers or other employees involved in the 2017 fTPM stutter investigation from prior to July 2021 were produced, and *no* custodial documents from *any* of them, from *any* time period, were produced either.

AMD has repeatedly claimed—most recently at the hearing—that it has produced all relevant JIRA tickets as a substitute for a meaningful custodial collection. Hr'g Tr. 76:6-15, July

---

[6] There is no tension between fTPM being enabled by default on some computers (including HP's) prior to Windows 11 and the major uptick in stuttering reports in 2021. This is in fact consistent with the technical evidence, which shows that the more the fTPM is *used*, the more often and intrusively stuttering will occur. *See* Ex. N-1 (Novak Rpt.) ¶ 50 (fTPM "is called during runtime by the operating system to . . . perform encryption/decryption for videoconferencing, secure networking, media playback, DRM, gaming, and anti-cheat functionality. The PSP must access its non-volatile storage . . . to perform these runtime functions."). Between late 2017 and late 2021, runtime processes used by the fTPM increased in widespread usage—with a massive and sudden increase in videoconferencing in 2021 due to the COVID pandemic.

FILED UNDER SEAL

30, 2025. This is false. Based on a recent analysis by Plaintiffs, AMD produced only ***315 JIRA tickets in this case***, all but ***95*** of which are duplicates or near-duplicates. *See* Ex. 114 (Plaintiffs' analysis of AMD JIRA production). Not produced by AMD are nearly all of the thousands of JIRA tickets listed on its own spreadsheets, including hundreds of tickets underlying video or audio stutter issues reported from late 2017 to late 2021. *Compare* Exs. 104 & 105 *with* Ex. 114. Not produced by AMD are the JIRA tickets referenced throughout its relevant source code, including the JIRA tickets discussed in Ex. S-1, which motivate or describe source code changes to smi_interface.c facially related to the very defect in this case. *See, e.g.,* Ex. S-1 at AMD01430224 (pages of JIRA tickets specifically drawn to source code changes in the PSP's SMI interface, ***none produced by AMD***). Indeed, never produced by AMD until Plaintiffs specifically demanded it was the 2017 fTPM stuttering JIRA ticket itself—and other JIRA tickets specifically relating to that 2017 investigation that are identified in HP documents and yet have never been produced. *See, e.g.,* Ex. 102 at HP_PIETOSI_01253896 (referencing EXT-17204 for 2017 HP/Wistron Rockets fTPM issue, never produced by AMD); Ex. 101 at HP_PIETOSI_01253909 (referencing TIC-24412, TIC-25183, never produced by AMD). Not produced either was PLAT-54423: "ROM-Armor feature," *see* Ex. 25 at AMD000056368—or any custodial documents relating to ROM Armor's development—despite AMD now affirmatively arguing about ROM Armor's origins.

The JIRA tickets that AMD has, in reality, never produced include tickets whose contents AMD has, in its own summary judgment papers, made factual arguments about—through a declaration by Parth Joshi, whose documents have never been collected. *See* Dkt. 344-4. That's right: pages of substantive argument by AMD are based on "evidence" offered for the first time in a summary judgment brief, ***on issues that AMD expressly refused to produce documents about.***

The deficiencies do not end there, but the bottom line is this: as described earlier in this brief, the record already contains sufficient evidence to go to a jury on the claims in this case. This does ***not***, however, solve the evidentiary deficiencies created by AMD's refusal to provide a real custodial production or a complete set of JIRA documents. Discrete additional discovery—most notably, a real custodial collection from a handful of new custodians identified by Plaintiffs, plus financial discovery that AMD previously stated it would provide at the class certification stage,

**FILED UNDER SEAL**

yet recently has taken the position it will never provide at all—is warranted to permit Plaintiffs to fairly move for class certification and then try this case.[7]

## IV.    TOPIC 4: CASES ON DOBEK INVESTIGATION

By way of brief refresher, Ms. Dobek testified that she reviewed and relied on marketing materials and online reviews concerning the AMD Ryzen CPU before purchasing it, as well as speaking to a sales associate at Micro Center (a computer retailer). Ex. 53 (Dobek Dep.) 20:25-9. Ms. Dobek looked at YouTube reviews of the AMD Ryzen chip, including comparisons between it and Intel CPUs. *Id.* at 48:4-51:25. She looked at "five to ten" different YouTube reviews of the Ryzen, and also spoke to a Micro Center employee who told her that similar-specification AMD and Intel CPUs were comparable, but AMD was cheaper. *Id.* at 56:2-57:14. Had Ms. Dobek seen information prior to or at the time of her purchase revealing that her AMD CPU included a design defect that rendered it subject to stuttering in performance of everyday computing tasks and made the system built around it particularly vulnerable to firmware attacks, she would not have purchased her AMD CPU at the price she paid. Ex. 55 at 9; Dobek Dec. ¶¶ 7-9.

Illinois law recognizes an "indirect deception" theory for proving reliance or proximate cause in fraud-based claims under the ICFA. Two key cases setting forth this theory are *De Bouse v. Bayer*, 922 N.E.2d 309, 314 (Ill. 2009), and *Shannon v. Boise Cascade Corp.*, 805 N.E.2d 213, 215 (Ill. 2004). Under this theory, "reliance can be established where a defendant deceives a third party and that deception is passed along to the plaintiff." *Wilson v. Norman*, 2025 WL 947959, at *6 (N.D. Ill. Mar. 30, 2025). Applying this standard, Judge Breyer in *In re Bextra & Celebrex Mktg., Sales Pracs. & Prod. Liab. Litig.*, 2007 WL 2028408, at *3 (N.D. Cal. Jul. 10, 2007), held that where physicians were misled by deceptive marketing of a drug, and consumers bought that drug based on their interactions with physicians, the consumers could state an ICFA claim against the pharmaceutical manufacturer despite never seeing its deceptive marketing. This fact pattern is quite comparable to Ms. Dobek's reliance on the urging of a Micro Center employee, who directly told her at the point of purchase that an AMD Ryzen CPU was materially like a similarly-specified

---

[7] To be clear, discovery would need to be reopened prior to ***granting*** AMD summary judgment on any issue, given the procedural facts.

FILED UNDER SEAL

Intel CPU, and "you will get your bang for the buck by going with AMD." Ex. 53 (Dobek Dep.) at 51:13-15. Had AMD truthfully disclosed through its ordinary marketing channels that its Ryzen CPU-SOCs included a design defect that caused stuttering during everyday tasks, this is precisely the sort of information that would have filtered through to the Micro Center employee and impacted his statement and recommendation to Ms. Dobek—a recommendation that, per her testimony, directly impacted her purchase decision. Similarly, had AMD made such a truthful disclosure prior to Ms. Dobek's pre-purchase product research on YouTube, this information would have been reasonably likely to have been relayed to her by at least one of the "5 to 10" product reviewers Ms. Dobek consulted prior to leaving for Micro Center.

An analogous concept appears in cases applying California state law, including *Daniel v. Ford Motor Co.*, 806 F.3d 1217 (9th Cir. 2015). In *Daniel*, the Ninth Circuit reversed a district court's grant of summary judgment in connection with the alleged omission by Ford of material information about a defect. There, the proffered chain of reliance/causation ran through sales representatives at authorized Ford dealerships. The car-buyer plaintiffs argued that, had Ford truthfully disclosed information about the defect in its vehicles, the plaintiffs would have learned that information from their interactions with sales representatives at the dealership, and been impacted in their purchase decisions from doing so. *Id.* at 1225-27. So too here—for Ms. Dobek, the Micro Center employee was a near-identical stand-in to a salesperson at a dealer; and the product reviewers stand in similar shoes with respect to providing Ms. Dobek with material information about AMD's defective CPU-SOCs, had the company deigned to disclose it.

## V. TOPIC 5: DR. SORINI VIDEO (EX. 58 OF DUNNE DECL.)

Plaintiffs directed the Court to Ex. 58 for two distinct, but related reasons. <u>First</u>, the video—taken by AMD's own expert—shows the real-world impact of the design defect at issue in this case (the halting of systemwide processing for an fTPM storage write or erase) on a common, expected PC usage scenario. In Ex. 58, a computer user is listening to audio, watching a video, and using a paint program while a real-time clock runs on the screen. This is, in important ways, close to the real-world usage scenarios described by the plaintiffs in both cases (this and

**FILED UNDER SEAL**

*Pietosi*), and in particular to the real-world usage described by Mr. Day, who in his deposition in June 2024—months prior to AMD's production to Plaintiffs of Ex. 58—explained that the frustrating "stuttering" he consistently experienced impacted him in photo editing, Ex. 51 (Day Dep.) at 144:4-49:14, using Excel, *id.* at 155:14-56:21, gaming, *id.* at 161:19-63:9, and in audio playback, whether streaming a video or just playing music in general, *id.* at 156:22-57:10.

A principal problem that transformed the fTPM stuttering Mr. Day and others experienced from intrusive, unwanted annoyance to serious interference with everyday, expected computing tasks was the fact that all system interactivity—cursor (mouse), keyboard, and other inputs—would be disrupted, causing detail-oriented, time-consuming computer tasks to actually fail due to what AMD blithely labels "momentary" or "insignificant" disruption of computing. As Mr. Day explained at deposition, "one of the most difficult parts with the stuttering, is that it impedes your ability to do smooth, consistently predictable actions," Ex. 51 (Day Dep.) at 149:11-14, causing him to have to completely redo significant photo editing work, *id.* at 146:20-147:8, interfering with complicated Excel spreadsheet manipulations, *id.* at 156:7-13, and preventing Day from carrying out assigned tasks in multiplayer games where as a result, "everybody dies," *id.* at 161:19-63:9.

Ex. 58—for which AMD's expert built an exact clone of Mr. Day's computer, then ran a program that caused the fTPM to write to SPI-ROM, triggering a stutter—shows exactly the problem complained of by Day and others, because it actually shows AMD's expert attempting to use a cursor to draw during the stuttering, with unusably wild results. Notably, it is the ***only*** video—or, according to AMD's expert, experiment—in which the expert actually attempted to use the cursor for an onscreen task while triggering the stutter.

The above sentence leads to the <u>second</u> reason Ex. 58 is notable—it shows the immateriality of AMD's expert's purported experiments with patched firmwares, including with the Async SMI mitigation, where he does ***not*** perform any cursor-dependent tasks when he triggers an fTPM write (in fact, all he does is watch a basic YouTube video). Specifically, AMD's expert claims to have tested several "patched" firmwares, including ones with the Async SMI mitigation (rather than ROM Armor), and not observed material stuttering with these "patched" firmwares, Ex. 6 at 94-95. But AMD's expert ***never conducted any experiment*** with newer firmwares in

**FILED UNDER SEAL**

which he attempted to actually draw something, play a game, or otherwise use the cursor when he triggered an fTPM write—the very activities that Mr. Day and others placed at the center of their usage complaints. *See* Ex. 51 (Day Dep.) at 144:4-49:14, 155:14-57:10, 161:19-63:9. The reason AMD's expert never attempted such a task—or at least, never disclosed such an attempt—with allegedly "patched" firmware should be clear from Ex. 58, from AMD's own documents discussing Async SMI, *see, e.g.,* Ex. 28 at AMD00017333-34; Ex. 115 at AMD01430026 (AMD employee testing Async patch for gaming in 2022 "nearly vomited" collecting performance data), and from the technical nature of the SPI/fTPM write defect. To wit, an fTPM stutter would unquestionably have been detected and significant from Async SMI-patched firmware for a real-time interactive task such as drawing or playing a game. *See* Ex. 115 at AMD01430025 ("so Async change we are doing does not cover gaming"); *id.* at AMD01430028 ("we need [AMD PR employees] to understand the limitations of our proposed solution and not overstate it to customers and the general public"). Ex. 58 shows that AMD's expert could have tested—and in fact, at one point did test—AMD's firmware with respect to real-time interactive tasks like drawing, photo editing, and gaming, but the expert (according to his testimony) ran that experiment once, saw how terrible the results were, and never did it again with any other firmware. Notably, this same expert is the entire basis for AMD's argument—including at the recent hearing—that Mr. Day has a "fixed" computer as a matter of law because he downloaded the Async SMI mitigation. AMD's own documents state the contrary, *see* Exs. 28, 115, as do Plaintiffs' experts, *see, e.g.,* Ex. N-2 ¶¶ 46-52. But Ex. 58 shows that AMD's own expert didn't run a real experiment—one he actually knew how to conduct, and at one point did—to arrive at his conclusion that Async SMI "fixes" the complained-of problems on Mr. Day's computer. And this fully deflates AMD's attempt to argue that Mr. Day could not be suffering fTPM stuttering as a matter of law.

**FILED UNDER SEAL**

Dated: August 8, 2025

Respectfully submitted,

By: */s/ Brian J. Dunne*
    Brian J. Dunne

**BATHAEE DUNNE LLP**
Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com
Allison Watson (CA 328596)
awatson@bathaeedunne.com
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel.: (213) 462-2772

Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (CA 345965)
awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Christopher R. Pitoun (SBN 290235)
christopherp@hbsslaw.com
Abigail D. Pershing (SBN 346467)
abigailp@hbsslaw.com
Emilee N. Sisco (*pro hac vice*)
emilees@hbsslaw.com
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Tel.: (213) 330-7150

*Attorneys for Plaintiffs and the
Proposed Classes*

Plaintiffs' Supplemental Brief Concerning Summary Judgment – No. 3:22-cv-04305-VC